# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

CORNERSTONE CREDIT UNION
LEAGUE,

CONSUMER DATA INDUSTRY
ASSOCIATION,

     *Plaintiffs*,

       v.

CONSUMER FINANCIAL PROTECTION
BUREAU and ROHIT CHOPRA in his
official capacity as Director of the CFPB,

     *Defendants.*

Civil Action No.: _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Cornerstone Credit Union League and Consumer Data Industry Association, on

behalf of their members, by and through their undersigned counsel, allege as follows:

## INTRODUCTION

1.     The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*., expressly

permits consumer reporting agencies ("CRAs") to report information about medical debt that has

been coded to protect the medical privacy of consumers, and expressly authorizes creditors to

consider the coded medical debt information in making credit decisions.  On January 7, 2025, the

Consumer Financial Protection Bureau ("CFPB" or "Bureau") issued a Final Rule rejecting this

framework.[1]  The Final Rule categorically precludes the inclusion of medical debt—coded or

---

[1] Consumer Financial Protection Bureau, Prohibition on Creditors and Consumer Reporting
Agencies Concerning Medical Information (Regulation V) (Jan. 7, 2025),

otherwise—on consumer reports (also known as credit reports) if they are provided to creditors for the purpose of a credit determination; and it forbids creditors from considering solicited medical debt information—coded or otherwise—when making credit decisions.  It is black letter law that an agency cannot prohibit through regulations what Congress has expressly permitted by statute.  *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 182 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016).  Because the Final Rule contravenes the statute, it should be vacated.

2.     In 2003, Congress amended FCRA through the Fair and Accurate Credit Transactions Act ("FACT Act") to, among other things, permit CRAs to include certain medical debt information on consumer reports and permit creditors to use that information in making credit determinations.  More specifically, the FACT Act permitted CRAs to report medical debt that has been coded to protect the medical privacy of consumers (by concealing the name of the provider and the nature of the services provided), and it authorized creditors to consider the coded medical debt information in making credit decisions.  Congress determined that these provisions struck the appropriate balance between protecting a consumer's private medical information and ensuring creditors have access to information relevant to the assessment of a consumer's creditworthiness when determining whether to extend credit to the consumer.

3.     The FACT Act also authorized financial regulatory agencies to make exceptions that would permit creditors to obtain and use *non-coded* medical debt information in certain circumstances when it would be "necessary and appropriate to protect legitimate operational, transactional, risk, consumer, and other needs."  Pub. L. No. 108-159, 117 Stat. 1952, 2001

---

https://www.consumerfinance.gov/rules-policy/final-rules/prohibition-on-creditors-and-consumer-reporting-agencies-concerning-medical-information-regulation-v/ ("Final Rule").

(codified at 15 U.S.C. § 1681b(g)(5)(A)).  In 2005, the agencies then charged with making

exceptions under this provision exercised their authority and promulgated a rule permitting

creditors to solicit and use non-coded medical debt information if (1) it is "the type of

information routinely used in making credit eligibility determinations," (2) it is used "in a

manner and to an extent no less favorable than [the creditor] would use comparable

information," and (3) the creditor does "not take the consumer's physical, mental, or behavioral

health, condition or history, type of treatment, or prognosis into account."  Fair Credit Reporting

Medical Information Regulations, 70 Fed. Reg. 70,664, 70,667–68 (Nov. 22, 2005) (now

codified at 12 C.F.R. § 1022.30(d)(1)).  The agencies explained the exception struck a balance

between permitting creditors to access information when "necessary and appropriate to satisfy

prudent underwriting criteria," and to "ensure that credit is extended in a safe and sound

manner."  Fair Credit Reporting Medical Information Regulations, 69 Fed. Reg. 23,380, 23,384

(Apr. 28, 2004).  After the CFPB was given this rulemaking authority in 2011, it reissued the

same rule in the same form, and it did not change the provisions until it issued the Final Rule.

4.    Over the past 20 years, CRAs and creditors have been operating in good faith

within this statutory and regulatory framework.  CRAs include certain medical debt information

on consumer reports using codes to conceal the nature of the medical services, consistent with

Congress's mandate, so as to protect the privacy interests of consumers.  And creditors use this

coded medical debt information to make lending decisions based on an informed assessment of

the potential borrower's creditworthiness.

5.    In recent years, CRAs have made voluntary changes to how they include medical

debt information on consumer reports.  These changes help to better ensure the quality and utility

of the consumer reports.  To promote even greater accuracy in consumer reporting, many CRAs,

including the nationwide CRAs (Experian, TransUnion, and Equifax), now delay reporting of medical debt collections for one year to account for slower insurance repayment practices.  And these CRAs no longer report paid medical debt collections or medical debt collections less than $500 to enable a greater focus on material unpaid medical debts in consumer reports.

6.      Now, in the waning days of the Biden Administration, the CFPB upends the carefully balanced framework established by Congress with a Final Rule that plainly exceeds its statutory authority.  The Final Rule purports simply to roll back the 2005 regulatory exception permitting the use of non-coded medical information by creditors, but in reality, it goes much further.  It bans creditors from seeking to obtain or to use *any* medical information in making credit determinations—including the coded medical debt information that Congress expressly permitted creditors to use in gauging creditworthiness—subject to a few limited exceptions.[2] Not stopping there, the CFPB also prohibits CRAs from reporting *any* medical debt information on a consumer report that creditors under this Final Rule or under any (unidentified) state laws would not be able to use in making credit determinations—including, once again, the coded medical debt information Congress permitted CRAs to report.  Not only does this provision negate the express statutory provisions in FCRA, but by incorporating various state law prohibitions on the information creditors may consider when making credit decisions, the Final Rule also violates FCRA's preemption provisions.

7.      The CFPB has the authority under the statute to revoke the exception for considering *non-coded* medical debt; it has no authority, however, to contravene the framework

---

[2] As noted below, ¶¶ 57–59, the Final Rule contains an exception that allows a creditor to consider unsolicited medical information voluntarily provided by a consumer; in fact, the creditor *must* consider that unsolicited information in certain circumstances pursuant to other regulations issued by the CFPB.

Congress established that expressly permits consideration of *coded* medical debt. "The Executive Branch is not permitted to administer [an] Act in a manner that is inconsistent with the administrative structure that Congress enacted into law." *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988). While the Bureau asserts authority to make "exceptions," that authority extends only to *non-coded* medical debt. Indeed, the 2005 exception that the CFPB now claims it is merely rolling back was only relevant for non-coded medical debt information, since the statute established that creditors could use coded medical debt.

8.    Not only does the Final Rule exceed the Bureau's statutory authority and FCRA's express preemption provisions, it is also arbitrary and capricious on multiple levels. *First*, in attempting to rationalize the Final Rule, the CFPB relies heavily on a Bureau-conducted 2014 study allegedly showing that "medical debt information has relatively limited predictive value." But the 2014 study is too old to justify the Final Rule, and in any event reached conclusions much more modest than the scope of the Final Rule. By relying on this study, the Bureau failed to account for both the reporting changes implemented by the CRAs in the years since and the numerous more recent studies showing that unpaid medical debt *does* have important predictive value. The findings of these more recent studies align with common sense:  knowing whether a consumer has a significant unpaid debt (medical or otherwise) is an important element of underwriting, and unilaterally eliminating the consideration of coded medical debt will naturally be expected to adversely affect a creditor's assessment of the creditworthiness of a borrower.

9.    *Second*, the CFPB's failure to rely on the best available data also undermines its cost-benefit analysis. The Bureau claims that the Final Rule will not increase the cost of credit, as medical debt is not predictive of delinquency. But that conclusion relies on the same outdated data. Because medical debt is in fact predictive, removing that information from the credit

underwriting process will lead to higher consumer delinquency and default rates, which in turn will increase the cost of credit and make credit less accessible to consumers.

10.     *Third,* the CFPB does not even try to reconcile the new *prohibition* on a creditor considering medical debt obtained from a consumer report with the *requirement* that it consider that same medical debt if it is self-disclosed by a borrower.  A number of regulations promulgated *by the CFPB* contain "ability-to-repay" requirements that *require* creditors to consider all of the applicant's debts (including medical debt).  *See*, *e.g.*, 12 C.F.R. § 1026.43(c)(2)(vi) ("[I]n making the repayment ability determination required under paragraph (c)(1) of this section, a creditor *must consider* . . . [t]he consumer's current debt obligations . . . ." (emphasis added)).  By the plain terms of these regulations, if an applicant self-discloses a medical debt, the creditor *must* consider it as part of the ability-to-repay determination.  The Final Rule does not amend these requirements to exclude medical debt.  Under the Final Rule, therefore, whether medical debt information is "necessary and appropriate" for a creditor to consider depends only on the source of the information.  If it is provided by a CRA, it is not necessary and appropriate to protect any legitimate interest.  But if it is provided by the applicant, it is so necessary and appropriate that the law mandates its consideration.  This makes no sense, and the CFPB makes no effort to reconcile these dueling mandates.

11.     If not overturned, the Final Rule's impact will be significant and immediate. Knowing whether a consumer has debt is an important element of underwriting, and unilaterally eliminating consideration of coded medical debt information erodes the predictive nature, and therefore the value, of consumer reports.  This leads to worse credit decisions, which in turn will harm consumers in the form of higher delinquency and default rates and increased costs of credit.

## PARTIES

12.    Plaintiff Consumer Data Industry Association ("CDIA") is a trade association that serves as the voice of the consumer reporting industry.  It is headquartered at 1156 15th St. NW, Suite 1250, Washington, DC 20005.  Founded in 1906, its members include CRAs—including national and regional credit bureaus—and background check companies.  CDIA counts among its members the three nationwide CRAs: Experian, Equifax, and TransUnion.

13.    CDIA's member CRAs assemble and furnish consumer reports that detail a consumer's credit history.  A consumer report usually contains identifying information about an individual along with "tradelines" (or accounts) listing the creditor, type of account, the date opened, the amount of credit, payment history, and any remaining balance.  These reports are provided to creditors, employers, insurers, and other organizations to use for statutorily defined "permissible purposes," including making informed decisions about a potential borrower's creditworthiness or qualifications.  Consumer reports also benefit consumers by helping them secure access to credit and other financial products, and preventing them from over-leveraging themselves and taking on more debt than they could reasonably handle.  Because the existence of any unpaid medical debt on a consumer report is important to many consumer report users, CRAs will be adversely affected by the Final Rule because the quality of their product will be diminished.  Indeed, it has been CRAs' settled practice to report coded medical information for almost two decades.  The Final Rule thus disrupts established industry practice and hamstrings CRAs' ability to provide the data that many creditors use to make an informed decision about a consumer's creditworthiness.  The Final Rule also imposes substantial compliance costs, as CRAs are required to change their technology, policies, and procedures for generating consumer reports.

14.     Cornerstone Credit Union League ("Cornerstone") is a regional trade association whose mission is to advance the success of credit unions.  It is headquartered at 6801 Parkwood Blvd., Suite 300, Plano, TX 75024.  It represents nearly 600 credit unions in Arkansas, Kansas, Missouri, Oklahoma, and Texas, providing legislative advocacy, regulatory and compliance support, and trainings, among other products and services.  Cornerstone's member credit unions are not-for-profit financial cooperatives that are owned by the credit unions' members; the credit unions reinvest any earnings to the benefit of the membership, such as by offering lower fees, more affordable loans, and better rates on savings accounts.  Cornerstone's member credit unions will be harmed be the Final Rule, as they will no longer be permitted to consider solicited medical debt information in lending decisions, even when this information is important to assessing the creditworthiness of a borrower.  If more loans are given to unqualified borrowers, the costs of more frequent delinquencies and defaults will be passed on to credit unions' members in the form of more expensive credit and higher fees.  Credit unions will also incur substantial compliance costs as they change their underwriting policies, procedures, and technology to exclude the consideration of and account for the absence of solicited medical debt information.

15.     The CFPB is an independent bureau of the Federal Reserve that administers and enforces federal consumer protection laws.  Its address is 1700 G St. NW, Washington, DC 20552.  Rohit Chopra serves as Director of the CFPB, and he is sued exclusively in his official capacity.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331(a), which gives district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or

treaties of the United States." This case presents federal questions and arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*.

17.    CDIA has Article III standing to challenge the Final Rule on behalf of its members. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

18.    CDIA's members have standing because they are financially injured by both sections of the Final Rule. The section barring CRAs from reporting medical debt information will force them to change their reporting methodologies and algorithms, saddling them with substantial one-time and ongoing compliance costs. *See* Final Rule at 345 (to be codified at 12 C.F.R. § 1022.38); *see also* Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V) ("Proposed Rule"), 89 Fed. Reg. 51,682, 51,699 (June 18, 2024) (acknowledging CRAs may incur "fixed operational and compliance costs to conform to the proposed rule"). It also makes their consumer reports less valuable to creditors, who are less likely to buy or pay current rates for CRAs' reports to gauge a consumer's creditworthiness if those reports exclude a major category of financial obligations. Proposed Rule, 89 Fed. Reg. at 51,700 ("Creditors May Be Less Willing to Pay for Consumer Reports."). Likewise, the Final Rule's limits on creditors' obtaining or using solicited medical debt information make it less likely that creditors will purchase or utilize CRAs' consumer reports. *See* Final Rule at 341 (to be codified at 12 C.F.R. § 1022.30). This will also require CRAs to bear compliance costs as they revamp their databases and products to comply with the Final

Rule. Each of these harms is fairly traceable to the Final Rule and would be remedied by setting aside the agency action. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

19.    CRAs' interest in reporting accurate information about consumers' medical debt is germane to CDIA's purpose, which is to "promote[] the responsible use of consumer data . . . and to help businesses, governments and volunteer organizations avoid fraud and manage risk."[3]

20.    Finally, both the claims and requested relief can be proven with evidence from representative members and do not require the participation of individual members. Thus, CDIA has standing to challenge the Final Rule on behalf of its member CRAs.

21.    Independent of the rights of its members, CDIA is financially injured by the Final Rule and has Article III standing to bring this action. CDIA earns considerable revenue from training health care providers and other furnishers of medical debt how to use "Metro 2," a standardized electronic format used by companies that furnish data to CRAs. By limiting the use of medical debt information in consumer reports, fewer providers and medical debt furnishers will report information to CRAs and thus demand for CDIA's training services will decrease. The CFPB also acknowledges that prohibiting creditors from considering medical debt for use in credit determinations would "decrease" the "incentive for medical debt holders and collectors to furnish to consumer reporting agencies." Final Rule at 157. CDIA's financial injury from decreased reliance on Metro 2 is directly traceable to the Final Rule and would be remedied by a judgment vacating the rule.

22.    Cornerstone also has standing to challenge the Final Rule on behalf of its members. Cornerstone's members will be financially harmed by the Final Rule because they

---

[3] Consumer Data Industry Association, *About CDIA*, https://www.cdiaonline.org/about/about-cdia/ (last visited Jan. 6, 2025).

will have to change their underwriting procedures and policies to eliminate consideration of medical debt information and account for the loss of information elsewhere.  The Final Rule will also increase the cost of providing credit—by prohibiting credit unions from considering medical debt in lending decisions, credit underwriting models will be less predictive, credit will be extended to consumers who cannot reasonably afford it, and delinquencies and defaults will increase.  This will hamper credit union's ability to provide lending services, and the members of the credit unions will shoulder the cost of increased rates and more difficult access to credit.  The interest of credit unions in making informed and financially sustainable lending decisions is germane to Cornerstone's purpose, which is to "[a]dvance the success of credit unions."[4]  And as with CDIA, the claims and requested relief can be proven with representative members and do not require the participation of individual members.

23.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff Cornerstone is headquartered in Plano, Texas, and therefore resides in this district, and no real property is involved in the action.

## BACKGROUND

### A.     The Fair Credit Reporting Act

24.     FCRA, as amended, authorizes CRAs to include information about a consumer's medical debts in consumer reports as long as those debts are properly coded to hide the name of the provider and the nature of the services provided.  It also permits creditors to use that information to determine a consumer's eligibility (or continued eligibility) for credit.  15 U.S.C. § 1681b(g)(1)–(2).

---

[4] Cornerstone Credit Union League, *About Cornerstone*, https://www.cornerstoneleague.coop/about-us (last accessed Jan. 6, 2025).

25.    Congress passed FCRA in 1970 to protect the privacy of individuals whose information was furnished by CRAs and to ensure that consumer reports contained accurate information.  *See* Fair Credit Reporting Act, Pub. L. No. 91-508, 84 Stat. 1127 (1970).  Among other things, the original FCRA included rules about the kind of information that CRAs could include in consumer reports, as well as the use and disclosure of the reported information.  *See, e.g.*, *id.* §§ 604–10, 84 Stat. at 1129–32.  By increasing the accuracy of consumer reports, Congress aimed to make credit cheaper and more accessible for consumers while protecting the integrity of their personal information.

26.    For many years, FCRA did not address the topic of medical debt information.  But beginning in 1996, Congress flatly prohibited CRAs from reporting a consumer's medical information without their consent.  Economic Growth and Regulatory Paperwork Reduction Act of 1996 (Title II of Omnibus Consolidated Appropriations Act, 1997), Pub. L. No. 104-208, subtit. D, ch. 1, § 2405, 110 Stat. 3009-394 (codified at 15 U.S.C. § 1681b(g) (2000)).

27.    Seven years later, Congress adopted a more nuanced approach to medical information in the FACT Act.  *See* 117 Stat. at 1999–2003.  The FACT Act sought to balance the privacy of consumers against the need for accurate data about consumers' financial obligations. Accordingly, while the FACT Act still generally barred the dissemination and use of consumers' personal medical information, Congress allowed CRAs and creditors to make use of coded financial information related to medical debts.

28.    The FACT Act's medical debt provisions were developed across two sections, one regulating CRAs, and one regulating creditors.  *First*, the Act affirmatively permitted CRAs to furnish information about medical debt if that information was reported in a way that did not identify the provider of the services or expose the underlying medical condition:

A consumer reporting agency shall not furnish for employment purposes, or in connection with a credit or insurance transaction, a consumer report that contains medical information (other than medical contact information treated in the manner required under section 1681c(a)(6) of this title) about a consumer, unless . . . the information to be furnished pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services, products, or devises, *where such information, other than account status or amounts, is restricted or reported using codes that do not identify, or do not provide information sufficient to infer, the specific provider or the nature of such services, products, or devices, as provided in section 1681c(a)(6) of this title.*

15 U.S.C. § 1681b(g)(1) (emphasis added).  Section 1681c(a)(6) describes coding the name, address, and telephone number of a medical information furnisher such that the codes "do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer."

29.     *Second*, the Act included a parallel provision for creditors that permitted them to use medical debt information in making credit decisions so long as the information was coded:

Except as permitted pursuant to paragraph (3)(C) or regulations prescribed under paragraph (5)(A), a creditor shall not obtain or use medical information (*other than medical information treated in the manner required under section 1681c(a)(6) of this title*) pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit.

15 U.S.C. § 1681b(g)(2) (emphasis added).

30.     Paragraph (g)(5) gave the CFPB authority[5] to create additional exceptions to paragraph (g)(2), allowing creditors to make more uses of medical information than the statute would allow on its own.  The Bureau may "*permit transactions* under paragraph (2) that are determined to be necessary and appropriate to protect legitimate operational, transactional, risk, consumer, and other needs . . . consistent with the intent of paragraph (2) to restrict the use of medical information for inappropriate purposes."  15 U.S.C. § 1681b(g)(5)(A) (emphasis added).

---

[5] This authority was originally given to the federal financial regulators, but was transferred to the CFPB as part of the Dodd-Frank Act.  *See* ¶ 37, *infra*.

In other words, the CFPB may *allow* a creditor to obtain or use medical information to determine creditworthiness in more circumstances than the statute otherwise would, but it may not *prohibit* uses of coded medical information that the statute allows.

31.    These statutory provisions are consistent with the purposes of FCRA, which balanced the goal of accurate consumer reports against the need for consumer privacy.  In FCRA's statement of findings and purpose, Congress recognized both that our "banking system is dependent upon fair and accurate credit reporting" and that "consumer reporting agencies" must "respect . . . the consumer's right to privacy."  84 Stat. at 1128 (codified at 15 U.S.C. § 1681(a)(1), (4)).  The FACT Act was similarly passed with the general purpose of "improv[ing] the accuracy of consumer records," 117 Stat. at 1952, while also providing "significant new protections of consumers' medical information by limiting the disclosure of certain medical information … and requiring credit reporting agencies to code certain sensitive medical information to avoid unwanted disclosure."  H.R. Rep. No. 108-263, at 22.  Congress's careful treatment of medical debt aligns with these policy goals.  Congress allowed creditors to make decisions about creditworthiness based on an accurate assessment of a consumer's financial obligations, while protecting identifying information about a consumer's health and medical history.

32.    The legislative history of § 1681b(g) confirms that Congress intended to permit CRAs to report coded information about medical debt.  As mentioned, § 1681b(g) was first added to FCRA in 1996, and it categorically prohibited CRAs from furnishing medical information in many circumstances "unless the consumer consents to the furnishing of the report."  15 U.S.C. § 1681b(g) (2000).  That changed with the passage of the FACT Act, which expanded paragraph (g) to, among other things, both allow CRAs to report coded information about medical debts and

permit creditors to use that coded information in credit decisions.  The House Committee Report on the FACT Act explained that, upon the passage of the bill, "[m]edical information *may be included in a report* for employment or credit purposes . . . if the information . . . is restricted or reported using codes that do not identify or infer the specific provider or nature of the services, products, or devices to anyone other than the consumer (except for certain insurance purposes)." H.R. Rep. No. 108-263, at 52 (emphasis added).  The Senate Report on the companion version of the bill says almost the exact same thing.  *See* S. Rep. No. 108-166, at 23.

33.    Additionally, in committee hearings leading up to the passage of the FACT Act, the bill's sponsors in the House plainly anticipated that CRAs could report medical debt information—and creditors could use it in credit decisions—as long as the underlying health information was coded.  Representative Sue Kelly noted at a hearing of the House Committee on Financial Services that she planned to propose statutory language "that will protect medical information of individuals without disrupting the access to low cost credit and the security of information."  Fair and Accurate Credit Transactions Act of 2003: Hearings on H.R. 2622 Before the Comm. on Fin. Servs. 15 (2003).  She went on to give a more concrete example:

> In New York City we have a wonderful cancer-treating institution called Memorial Sloan-Kettering.  If I am being treated and I have a bill dispute with Memorial Sloan-Kettering, the assumption would be that I am being treated for cancer and the assumption is in many people's mind still that cancer is almost inevitably problematic to the extent that it deeply affects your ability to work or can result and does result in death.  My concern is if that name, like Memorial Sloan-Kettering, appears on a credit report, there may be an assumption made by someone who is looking at that credit report that I have a difficulty without understanding that I am there because I am actually going back in for a checkup and there was a discussion about that bill.  *I want to make sure that we work out a method so that the financial end of that could be presented, but the entity providing that service is not listed.* That is my intent, that is the legislation that I am working on, and I am glad to think that you would be working with me on that.

*Id.* at 15–16 (emphasis added).  Representative Kelly did just that, proposing an amendment in committee that would ultimately become 15 U.S.C. § 1681b(g)(1).  *See* H.R. Rep. No. 108-263, at 32.

34.     The legislative history also confirms that paragraph (g)(5) gave regulators the power to make exceptions to the general prohibition on using medical information, not the power to create additional limits.  According to the House Committee Report, 15 U.S.C. § 1681b(g) "establishes that creditors are not allowed to obtain or use medical information for credit granting purposes," but "[c]ertain *exceptions* are provided where authorized by Federal law . . . and where determined to be necessary and appropriate by the financial regulators."  *Id.* at 53 (emphasis added).  Nowhere, however, is there evidence in the legislative history that the power to authorize additional uses of medical information included the power to restrict or eliminate the uses of medical debt information that the statute allows.

### B.     Applicable Regulations

35.     Originally, the power under paragraph (g)(5) to recognize additional permissible uses of medical information was given to the National Credit Union Administration ("NCUA") and the federal banking agencies: the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Treasury's Office of Thrift Supervision.  FACT Act, 117 Stat. at 2001 (codified at 15 U.S.C. § 1681b(g)(5)(A)); *see also* 70 Fed. Reg. at 70,664.  In 2005, those agencies exercised their statutory authority to create the "financial information exception," which permitted creditors to use financial information associated with medical debt when determining a borrower's creditworthiness.  70 Fed. Reg. at 70,667.

36.     Although the FACT Act permitted use of coded medical debt information, the financial information exception swept more broadly—it allowed creditors to obtain and use medical information if (1) it was "the type of information routinely used in making credit eligibility determinations," (2) it was used "in a manner and to an extent no less favorable than [the creditor] would use comparable information," and (3) the creditor did "not take the consumer's physical, mental, or behavioral health, condition or history, type of treatment, or prognosis into account." *Id.* at 70,667–68.  Even *non-coded* medical information could meet those criteria.  For instance, as an "[e]xample[]" of a "use[] of medical information consistent with the exception," the 2005 rule describes a creditor that contacts a medical facility specializing in terminal diseases to inquire about the status and repayment history of a medical debt.  70 Fed. Reg. at 70,676 (now codified at 12 C.F.R. § 1022.30(d)(2)(ii)(C)).  Notably, however, the financial information exemption applied only to creditors; it did not alter what medical debt information CRAs could report on consumer reports, and thus CRAs were still limited to reporting only coded medical debt information.

37.     In 2011, Congress transferred rulemaking authority under paragraph (g)(5) from NCUA and the federal banking agencies to the CFPB, and the Bureau retained the financial information exception without amendment.  *See* Consumer Financial Protection Act of 2010 (Title X of Dodd-Frank Wall Street Reform and Consumer Protection Act), Pub. L. No. 111-203, subtit. F, § 1061, 124 Stat. 1955, 2035 (2010).  The Bureau reissued the 2005 financial information exception as an interim final rule and later finalized that rule without change in 2016. *See* Fair Credit Reporting (Regulation V), 76 Fed. Reg. 79,308, 79,322 (Dec. 21, 2011) (Interim Final Rule); Finalization of Interim Final Rules (Subject to Any Intervening Amendments) Under Consumer Financial Protection Laws, 81 Fed. Reg. 25,323, 25,324 (Apr. 28, 2016).

C.      **Consumer Reporting Agencies**

38.      CRAs assemble information on a consumer's credit history to give creditors and other businesses an accurate picture of the consumer's creditworthiness.  Credit scoring companies use the information in consumer reports to compile a consumer's "credit score," which quantifies for lenders how likely a particular individual is to repay a loan on time.  Both consumer reports and credit scores are vital in ensuring an efficient and well-functioning credit market. They help consumers easily and inexpensively prove their creditworthiness, giving them access to loans their credit record qualifies them for at affordable prices.  Consumer reporting also helps lenders make informed decisions and manage risk—"[d]ue to competition, firms cannot expect to sustain long-term profits by mispricing risk, nor can they remain solvent by extending credit to high-risk, unprofitable borrowers."[6]  Accurate consumer reporting therefore helps lenders make informed lending decisions and extend credit at lower rates, which in turn helps avoid consumer delinquencies and defaults and makes credit cheaper and more accessible for the general public.

39.      Consistent with those goals and the goals of FCRA, CRAs regularly include information about medical debt in consumer reports.  Indeed, medical debt is one of the most common types of debt for American consumers.  In 2022, 20% of households reported that they had medical debt, and medical tradelines appeared on 43 million consumer reports.[7]  In the second quarter of 2021, 58% of the recorded collections on consumer reports were for medical

---

[6] Andrew Rodrigo Nigrinis, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), at 11 (Aug. 13, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-1019.

[7] Consumer Financial Protection Bureau, *CFPB Estimates $88 Billion in Medical Bills on Credit Reports* (Mar. 1, 2022), https://www.consumerfinance.gov/about-us/newsroom/cfpb-estimates-88-billion-in-medical-bills-on-credit-reports/.

debts.[8]  Although the nationwide CRAs' voluntary changes have reduced the incidence of medical debt on consumer reports, "15 million Americans still have $49 billion in medical bills on their consumer reports."  Final Rule at 16.

40.     CRAs' standard practice is to code the medical debt information on consumer reports in accordance with FCRA and applicable regulations.  For example, a tradeline on a consumer report might show the amount and payment status of a medical debt collection along with a generic description of the original creditor (such as "medical payment").  In this way, creditors can obtain valuable information about a borrower's outstanding obligations without "identify[ing], or provid[ing] information sufficient to infer, the specific provider or the nature of [medical] services, products, or devices to a person other than the consumer."  15 U.S.C. § 1681c(a)(6)(A).

41.     The nationwide CRAs have also taken recent steps to improve their reporting of medical debt information.  For example, there was a prevailing concern in the industry that many medical debt tradelines were not due to delinquency by a borrower but delays in health insurance companies providing reimbursement.  These tradelines have less predictive value for a consumer's ability to repay other loans.  Accordingly, in 2022, the nationwide CRAs changed their standard practices and added a one-year delay period before unpaid medical collection debt is reported to account for delays in insurance reimbursement.[9]  Additionally, nationwide CRAs no

---

[8] *See id.*

[9] Ryan Sandler & Zachary Blizard, *Recent Changes in Medical Collections on Consumer Credit Records*, Consumer Financial Protection Bureau, at 2 (Mar. 2024), https://files.consumerfinance.gov/f/documents/cfpb_recent-changes-medical-collections-on-consumer-credit-reports_2024-03.pdf; TransUnion, *Equifax, Experian, and TransUnion Support U.S. Consumers With Changes to Medical Collection Debt Reporting* (Mar. 18, 2022), https://newsroom.transunion.com/equifax-experian-and-transunion-support-us-consumers-with-changes-to-medical-collection-debt-reporting/.

longer report paid medical collection debt or medical collection debts smaller than $500, focusing credit decisions on more material unpaid obligations.[10]  These changes have made consumer reports more accurate and predictive, benefitting both consumers and creditors.

42.    The medical debt on consumer reports is also factored into a consumer's credit score, as credit scores are based on tradelines that appear in a consumer report.[11]  Credit scores give lenders an easy-to-use and predictive indicator of a consumer's likelihood of timely repayment.  This makes it easier and quicker for qualified borrowers to get credit.  Additionally, both the coded medical debt tradelines on consumer reports and the medical debt information that is folded into credit scores increase the accuracy of credit assessments, decreasing the cost of credit for lenders, reducing consumer delinquencies and default rates, and making interest rates more affordable for consumers.

43.    In the past few years, credit scoring companies have taken different approaches to how they treat medical debt information in their score calculations.  VantageScore, for example, decided not to consider medical debt in the most recent version of its credit scoring model, citing, among other things, expected policy changes from the Biden Administration and "minimal" (though unquantified) "effects on predictive performance."[12]  FICO, by contrast, continues to

---

[10] *See sources cited id.*

[11] *See, e.g.*, FICO, *What's in my FICO Scores?*, https://www.myfico.com/credit-education/whats-in-your-credit-score (last accessed Jan. 6, 2025) ("Your FICO Score is calculated only from the information in your credit report."); VantageScore, *The Complete Guide to Your Vantage Score* (Oct. 11, 2019), https://www.vantagescore.com/the-complete-guide-to-your-vantagescore/ ("Your VantageScore is based on the data in your credit reports with each of the three credit bureaus.").

[12] VantageScore, *What was the rationale for removing Medical Debt from VantageScore* 4.0?, https://www.vantagescore.com/faq/what-was-the-rationale-for-removing-medical-debt-from-vantagescore-4-0/ (last accessed Jan. 6, 2025).

include unpaid medical debt in its model.  Although it decided to disregard paid medical collections in its scoring and treat medical and non-medical debts differently,[13] it concluded, based on detailed research, that unpaid medical debt was too predictive of delinquency to remove from credit scoring entirely.  In FICO's words, "[o]ur research has consistently found that individuals with unpaid collections are more risky (i.e., less likely to repay loans) than those who do not have unpaid accounts."[14]

### D.    Final Rule

44.    In June 2024, the CFPB proposed to upend the status quo and the statutory scheme by prohibiting creditors from making credit decisions based on solicited information about medical debt—even if all identifying medical information is coded consistent with statutory requirements.  *See* Proposed Rule, 89 Fed. Reg. at 51,682.  The CFPB claimed that it was no longer "necessary and appropriate" for creditors to consider medical debt when making credit decisions.  *Id.* at 51,691.

45.    During the notice and comment process, CDIA filed a letter explaining that the proposed rule, among other things, exceeded the CFPB's statutory authority and was arbitrary and capricious in violation of the APA.[15]  CDIA also retained Dr. Amy Crews Cutts as an expert, and she submitted a separate letter explaining that, based on an analysis of two industry studies reflecting recent reporting practices, medical debt is predictive of a borrower's future

---

[13] Ethan Dornhelm, *The Impact of Medical Debt Collections on FICO Scores* (July 13, 2015), https://www.fico.com/blogs/impact-medical-debt-collections-ficor-scores.

[14] *Id.*

[15] Consumer Data Industry Association, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), at 3–18 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0966.

delinquency.[16]  Cornerstone also submitted a comment letter urging the CFPB to withdraw the proposed rule, given the threat it posed to credit unions' lending practices.[17]  Nevertheless, the CFPB issued the Final Rule on January 7, 2025.  It will become effective in 60 days.

46.    The Final Rule dramatically changes how both creditors and CRAs can handle medical debt information.  *First*, the rule targets creditors and prohibits them from obtaining or using medical financial information—"including information about medical debt"—in connection with credit determinations.  Final Rule at 32 (to be codified at 12 C.F.R. § 1022.30).  The Final Rule allows creditors to use medical information in certain limited ways—such as to confirm income or benefits—but in general, the CFPB finds that it is "not 'necessary and appropriate[']  . . . for creditors to consider sensitive financial information concerning a consumer's medical debt for underwriting purposes."  Final Rule at 90.  Yet that contradicts 15 U.S.C. § 1681b(g)(2), which expressly permits creditors to obtain and use properly coded medical information.

47.    Not only does the Final Rule overwrite the express provision of § 1681b(g)(2), but the *second* section of the rule prohibits CRAs from reporting medical debt information that creditors would not be able to use under the first section.  The Final Rule prohibits CRAs from reporting medical debt information unless (1) they have "reason to believe the creditor intends to use the medical debt information in a manner not prohibited by § 1022.30"—in other words, not for a credit determination—and (2) they " [h]a[ve] reason to believe the creditor is not otherwise legally prohibited from obtaining or using the medical debt information, including by a State law

---

[16] Amy Crews Cutts, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), at 3–4 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0986.

[17] Suzanne Yashewski, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), at 2–3 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-1072.

that prohibits a creditor from obtaining or using medical debt information."  Final Rule at 345 (to be codified at 12 C.F.R. § 1022.38(b)(1)–(2)).

48.    The CFPB insists it can revoke the financial information exception for creditors because it is merely repealing a prior regulatory exception.  Even though the express language of § 1681b(g)(2) allows creditors to consider properly coded medical debt, the Bureau dismisses that provision as a mere "cross-reference" and claims that it does not mean what it plainly means.  *See* Final Rule at 145.  But the CFPB cannot by diktat override the statute and declare that creditors are prohibited from considering coded medical information.

49.    To demonstrate a legal basis for the Final Rule's prohibition of CRAs' reporting information about consumers' medical debt, the CFPB relies on its general rulemaking authority, claiming this restriction is necessary to operationalize the new limits on creditors.  Final Rule at 24, 26, 103–04.  But a general grant of rulemaking authority does not trump the statute, which affirmatively permits CRAs to report coded medical debt information.  15 U.S.C. § 1681b(g)(1)(C).  Indeed, because Congress has specified in detail what categories of information are impermissible on consumer reports, *see id.* §§ 1681c(a), 1681b(g)(1), the CFPB lacks authority to add additional categories of prohibited data.

50.    The CFPB also asserts that it can restrict what CRAs furnish to creditors pursuant to 15 U.S.C. § 1681b(a)(3)(A).  FCRA allows CRAs to provide a consumer report only for a statutorily defined "permissible purpose."  *Id.* § 1681b(a).  One permissible purpose is if the CRA has reason to believe that the recipient intends to use the report in a "credit transaction."  The CFPB reasons that if creditors may no longer consider medical debt information in credit decisions, then the creditor no longer has a permissible purpose to receive a consumer report that contains medical debt information.  Final Rule at 30–31.  But the statute defines what makes a

purpose "permissible," not the Bureau or any state.  As long as a CRA has reason to believe a consumer report will be used for a credit determination, it is permitted to furnish the report. Section 1681b(a)(3)(A) does not limit the furnishing of consumer reports based on the *content* of the report, and it certainly does not delegate rulemaking authority to the Bureau or any state to define when (or what) it is permissible for CRAs to furnish.

51.    The CFPB offers meager justification for this rule change.  First and foremost, the Bureau expresses concern that consumers with medical debt were "unfairly penalized" in the credit market, because medical debt is often incurred involuntarily.  Final Rule at 23, 75.  The Bureau also suggests that medical debt information is uniquely error-prone, and it has "relatively limited predictive value" for a consumer's ability to repay other debts.  *Id.* at 80–81.  It also claims that consumer reporting companies, creditors, and credit scoring companies have reduced their reliance on medical debt, pointing to the nine states that recently prohibited or limited the inclusion of medical debt on consumer reports.  *Id.* at 17.  The CFPB speculates that this trendline would support a transition towards a nationwide elimination of medical debt on consumer reports. *Id.* at 85.

52.    The CFPB defends its regulatory about-face based on a limited set of stale data. To defend its pivotal claim that "medical debt information has relatively limited predictive value," the CFPB first relies on a study from 2014.[18]  The data in that study are over ten years old, as it evaluated consumer credit records from October 2011 to September 2013.  The underlying data were also never made available for public scrutiny.  More fatally, the study reached relatively

---

[18] Kenneth P. Brevoort & Michelle Kambara, *Data point: Medical debt and credit scores*, Consumer Financial Protection Bureau (May 2014), https://files.consumerfinance.gov/f/201405_cfpb_report_data-point_medical-debt-credit-scores.pdf.

modest conclusions.  *First*, it concluded that non-medical debt was more predictive of delinquency than medical debt.  *Second*, it concluded that consumers with more paid than unpaid medical debt were as likely to be delinquent as consumers with higher credit scores.[19]  Nothing in the 2014 study concluded that medical debt lacked predictive value, nor did it consider the effect of eliminating medical debt information from consumer reporting altogether.

53.    The CFPB tries to patch the holes in the 2014 study with a more recent study, detailed in the Final Rule's Technical Appendix.  But even in the CFPB's own telling, this study is limited.  The analysis in the Technical Appendix compares the repayment performance of two groups of borrowers who had the same kind of medical debt and applied for credit: the borrowers in the first group had their debts included on their consumer reports; the other borrowers' debts were not.  Unsurprisingly, the Technical Appendix found that those two groups repaid their debt obligations at roughly the same rate.  *See* Final Rule at 222.  Put another way, the data in the Technical Appendix indicate that similarly situated individuals have similar repayment performance regardless of whether their debt is included in their consumer reports at the time a credit decision was made.  As the CFPB concedes in the Final Rule, what the Technical Appendix study did not do was compare the repayment performance of borrowers with medical debt to the repayment performance of borrowers without medical debt.  *Id.* at 299–300.  In fact, numerous well-conducted studies establish those comparisons and show that the presence of unpaid medical debt on a consumer report is predictive of that consumer's future performance.  *See* Crews Cutts,

---

[19] *Id.* at 5–6.  This second conclusion is irrelevant to the Final Rule because the nationwide CRAs have voluntarily stopped reporting paid medical collections.  *See* ¶ 41, *supra*.

Comment Letter on Prohibition, *supra*, at 4 (reviewing one FICO study and one non-public

industry study); Dornhelm, *supra*.[20]

54.     Even setting those substantive issues aside, the conclusions of the Technical

Appendix are still inherently unreliable because the underlying data have not been released and

the conclusions have not been subject to peer review.  Independent parties thus have not had the

opportunity to validate the findings or identify any issues with the conclusions or the

methodology based on analysis of the data itself, as opposed to the Bureau's self-interested

description of the methodology and conclusions.

55.     In sum, the most the CFPB's two studies show is that medical debt information is

*less* predictive than other forms of consumer debt, and whether or not medical debt is reported has

little impact on the likelihood of repayment for similarly situated borrowers.  The Final Rule thus

lacks any quantitative support for its central justifications: that medical debt is not predictive

enough of delinquency to be included in credit determinations, or that people with medical debt

are categorically worthy of the same credit on the same terms as people without medical debt.

56.     Contrary to the Bureau's assertions, numerous associations of creditors—

including Cornerstone—repeatedly explained during the notice and comment process that medical

---

[20] *See also* Equifax, Comment Letter on Prohibition on Creditors and Consumer Reporting
Agencies Concerning Medical Information (Regulation V), at 7 (Aug. 12, 2024),
https://www.regulations.gov/comment/CFPB-2024-0023-1009 (concluding that "medical
collections are predictive of a consumer's future payment performance").  The Technical
Appendix also failed to examine the effect of medical debt on other aspects of the credit
origination process, such as the terms that creditors offer based on their determination of the
borrower's ability to repay.  Beyond merely approving credit applications, creditors take the
credit profile of borrowers into account when setting terms and conditions that might affect any
realized losses in the event of default, or otherwise mitigate the potential for default.  The
Technical Appendix itself observes that, all else being equal, "consumers with medical debt have
higher expected losses," despite it also finding that the serious delinquency rate is the same
regardless of whether medical debt appeared on the consumer report at the time of origination.
Nigrinis Comment Letter, *supra*, at 41.

debt is in fact important to credit decisions and predictive of a consumer's ability to pay back other loans.[21]  Cornerstone, for example, explained that "grant[ing] loans to members without considering medical debt . . . would cause increased financing for unqualified borrowers and decreased access to credit for credit-qualified borrowers."  Cornerstone Comment Letter, *supra*, at 2.  The American Bankers Association similarly voiced its concern that "banks and others continue to consider it important to have access to information about medical debt to help evaluate ability to repay and credit risk."[22]  Other associations of financial institutions argued that "limiting the ability of lenders to consider medical debt" would "compromise[]" "creditors' ability to evaluate a consumer's ability to repay a mortgage or credit card loan, for example."[23]  "Common sense and logic dictate that including medical debt will contribute to more accurately predicting the Borrower's qualification for and ultimately the repayment of their loan."[24]  The

---

[21] Other commenters included the American Bankers Association, the Consumer Bankers Association, America's Credit Unions, the Community Bankers Association of Illinois, the Ohio Credit Union League, the Illinois Credit Union League, the Iowa Credit Union League, the Independent Community Bankers of America, and the Canandaigua National Bank and Trust.

[22] American Bankers Association, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), at 10, 13 (Aug. 13, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-1011.

[23] Consumer Bankers Association & Bank Policy Institute, Joint Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), at 5 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0991; *see also* America's Credit Unions, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), at 4 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-1001 ("The Bureau's own study indicates that medical debt information included in consumer scoring is predictive of delinquency, although it may not be as predictive as other consumer collection accounts over the studied period.").

[24] Community Bankers Association of Illinois, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), at 3 (July 29, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0347.

Bureau did not meaningfully address these well-founded concerns.  Relying on its own flawed studies, it simply asserts that "creditors will have sufficient information to accurately assess a consumer's bankruptcy risk under the rule," Final Rule at 216, and "medical collection reporting [does] not change the delinquency risk faced by creditors," *id.* at 218.

57.     Finally, the Final Rule introduces significant dissonance into the overall federal regulatory framework for consumer finance.  The Final Rule concludes that it is not "necessary and appropriate" for creditors to consider medical debt information when furnished by CRAs. Yet the Bureau continues to maintain other rules that mandate the use of medical debt information in certain circumstances when voluntarily disclosed by prospective borrowers.  The Final Rule retains the longstanding rule of construction that if a creditor receives *unsolicited* medical debt information from a consumer or a third party, it will not have "obtain[ed]" that information in violation of 15 U.S.C. § 1681b(g)(2).  Final Rule at 341 (to be codified at 12 C.F.R. § 1022.30(c)(1)).  Moreover, if a creditor receives unsolicited medical information, it may use that information in a credit determination if it can fit within a narrow exception listed in 12 C.F.R. § 1022.30(e), such as to "[t]o comply with applicable requirements of local, state, or Federal laws."  12 C.F.R. § 1022.30(e)(1)(ii).  That includes regulations issued by the CFPB that *require* creditors to consider a consumer's debt obligations—including medical debt—before making certain credit transactions.  For example, before offering credit that is secured by a dwelling, a creditor must make an "ability to repay" or "ATR" determination; "in making the repayment ability determination[,] . . . a creditor must consider . . . [t]he consumer's current debt obligations."  12 C.F.R. § 1026.43(c)(2)(vi).  These regulations mean that if an applicant self-discloses a medical debt, the creditor must consider it as part of the ability-to-repay determination, but CRAs may not report that medical debt on a consumer report.

58.     To reconcile these contradictory commands, the CFPB clarifies that creditors will not violate § 1681b(g)(2) if a consumer voluntarily discloses medical debt information and the creditor uses it to satisfy the ATR rules.  The Bureau even adds a new example in the regulations to make this clear: where a "consumer provides unsolicited medical information on [an] application" for a mortgage loan, "[t]he creditor is permitted . . . to consider the existence and the amount of . . . the current debt obligations . . . in making the repayment ability determination required under § 1026.43(c)(1). "  Final Rule at 343 (to be codified at 12 C.F.R. § 1022.30(e)(6)).[25]  Still, creditors cannot use a consumer report to determine whether a prospective borrower has a medical debt.  *Id.* at 344 ("[A] creditor or card issuer is not permitted . . . to obtain or use any medical information from a consumer reporting agency to comply" with ability-to-repay requirements "because the creditor or card issuer can comply with those rules using information provided by the consumer.").

59.     Thus, under the Final Rule, whether medical debt information is "necessary and appropriate" for a creditor to consider depends only on the source if the information.  If it is provided by a CRA, it is not necessary and appropriate to protect any legitimate interest.  Final Rule at 256.  But if the *very same information* is provided by the applicant, it is so necessary and appropriate that the law mandates its consideration.[26]  The CFPB makes no attempt to explain

---

[25] Even though the Final Rule states that creditors are "permitted" to consider the self-disclosed medical debt, as noted above, the reality is that consideration is mandatory for the hypothetical mortgage loan in the CFPB's example.  *See* Final Rule at 343 (to be codified at 12 C.F.R. § 1022.30(e)(6)).

[26] In fact, the Bureau is prohibiting creditors from considering solicited medical debt information about a borrower the same week that it is suing a mortgage originator for failing to adequately consider a borrower's debts and expenses when making loans.  *See* Compl. ¶ 21, *CFPB v. Vanderbilt Mortg. & Fin., Inc.*, 3:25-cv-00004 (E.D. Tenn. Jan. 6, 2025), available at https://files.consumerfinance.gov/f/documents/cfpb_manufactured-housing-vanderbilt-

why it is not necessary or appropriate to use CRA-furnished medical debt information, but it is *required* when self-disclosed by a prospective borrower.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the APA: Limits on CRAs Exceed the CFPB's Statutory Authority

### (5 U.S.C. § 706(2)(A), (C); 15 U.S.C. § 1681b(g)(1))

60.     Plaintiffs repeat and reincorporate all of their prior allegations.

61.     The APA instructs courts to "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).  "It is central to the real meaning of the rule of law . . . that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992) (cleaned up).  Furthermore, "[n]othing . . . authorizes an agency to modify unambiguous requirements imposed by a federal statute."  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014).

62.     The CFPB has acted contrary to law and in excess of statutory authority by prohibiting CRAs from reporting coded information about medical debt.  The FACT Act affirmatively permits CRAs to include information about a consumer's medical debt on consumer reports, as long as the information is coded so that the creditor will not know details about the underlying health condition, procedure, or provider.  15 U.S.C. § 1681b(g)(1)(C).  The Final Rule prohibits CRAs from providing even coded information to a creditor for use in credit decisions.

---

complaint_2025-01.pdf ("And [Defendant] also disregarded evidence that borrowers had multiple debts in collection.").

*See* Final Rule at 341 (to be codified at 12 C.F.R. § 1022.30).  That contradicts the plain meaning of the statutory text.

63.    The broader context of FCRA further demonstrates that the Final Rule conflicts with the statutory design.  If Congress wanted to prohibit CRAs from reporting medical debt in credit transactions, it would have done so explicitly.  In fact, before the FACT Act, that is precisely what § 1681b(g) did—it prohibited CRAs from furnishing medical information without a consumer's consent.  But through the amendments in the FACT Act, § 1681b(g) was changed to include a detailed scheme for when medical information may be reported to creditors and employers.  A separate section of the Act prohibits CRAs from reporting certain information related to a veteran's medical debt, proving that Congress clearly states its intention to prohibit CRAs from including medical debt information when it wants to do so.  15 U.S.C. § 1681c(a)(7)–(8).  The CFPB cannot use its regulatory power to sweep away the mechanics of an entire statutory framework and prohibit CRAs from furnishing coded medical debt information when Congress wrote the statute so CRAs could do precisely that.

64.    Reading § 1681b(g)(1) to permit CRAs to furnish coded medical information is also consistent with the purpose of FCRA and the FACT Act.  Both of those important pieces of legislation exist to balance the need for fair and accurate consumer reporting with the privacy rights of consumers.  Allowing CRAs to provide coded medical debt information to creditors—as § 1681b(g)(1) unambiguously permits—ensures that details about a consumer's health condition, such as his or her medical providers, will not be available to creditors, employers, and other organizations.  But it allows lenders to get an accurate picture of a potential borrower's financial obligations before making credit decisions.  The CFPB subverts the statutory balance by privileging privacy and other values over the interests of CRAs and creditors.  Congress is of

course free to select new policy objectives and amend the statutory language, but an agency cannot set a new legislative agenda and upend the purpose codified in the statute.

65.     The legislative history of the FACT Act confirms that Congress intended to protect CRAs' ability to report coded medical debt.  Both the House and Senate reports clearly state that under § 1681b(g)(1), CRAs are affirmatively permitted to report coded medical debt information.  H.R. Rep. No. 108-263, at 52; S. Rep. No. 108-166, at 23.  And Sue Kelly, one of the sponsors of the FACT Act, was explicit during the committee hearings that she intended that "the financial end of [medical bills] could be presented" on a consumer report "but the entity providing that service" would not be listed.  Hearings on H.R. 2622, *supra*, at 16 (Statement of Rep. Kelly).

66.     The CFPB admits that § 1681b(g)(1)(C) allows CRAs to report medical debt information in a coded manner, and "ensures that the medical information obtained or used by creditors would be anonymized to protect consumers' privacy."  Final Rule at 103–04.  But notwithstanding this statutory permission slip, the CFPB claims it still has authority to promulgate regulations that prohibit properly coded medical information from appearing on consumer reports. That is contrary to black-letter law.  "[A]n administrative agency . . . may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (cleaned up). There is no express statutory authority for the CFPB to override the provisions of § 1681b(g)(1), including those cited by the Bureau in the Final Rule.  The Bureau cites to section 1681b(a)(3)(A), but that merely requires that, before a CRA furnishes a consumer report, the

CRA has a "reason to believe" the recipient intends to use it for a credit transaction.  It does not limit the kinds of information CRAs may include on consumer reports.[27]

67.     The CFPB also claims it can prohibit CRAs from reporting medical debt information because of its general authority to make rules administering FCRA and to "prevent evasions" of consumer finance law, claiming that this new prohibition on CRAs is necessary to implement the restriction on creditors' use of medical debt information.  Final Rule at 24–26, 104; *see also* 12 U.S.C. § 5512(b)(1).  But the CFPB's general rulemaking authority cannot salvage the Final Rule.  A general obligation to fill in statutory gaps and prevent evasions of the statute is not an authority to prohibit activity that the statute permits.

68.     Furthermore, the CFPB lacks authority to specify new categories of information that must be excluded from consumer reports.  *Contra* Final Rule at 104.  When Congress crafts a detailed statutory scheme, like a list of exclusions, agencies generally have no authority to supplement or add to such lists.  For example, in *Texas v. United States*, the Fifth Circuit held that because the Immigration and Nationality Act listed numerous specific methods by which undocumented immigrants "can lawfully reside in the United States," the Executive Branch lacked authority to implement a broad deferred action program with different criteria.  809 F.3d at 179–82.  Similarly here, 15 U.S.C. § 1681c(a) specifies eight detailed categories of information that cannot be included on consumer reports, and § 1681b(g)(1) prohibits CRAs from reporting non-coded medical debt information.  The enumeration of these categories implies there are no additional prohibitions.  When Congress wants the CFPB to add to a statutory list, it does so

---

[27] Contrary to the Bureau's reading, the requirement that a CRA have reason to believe that the user of a consumer report intends to use it for a credit transaction does not transform § 1681b(a)(3)(A) into a vehicle for incorporating every single law and regulation governing credit transactions.  *See* ¶¶ 83–86, *infra*.

explicitly, *see, e.g.*, 12 U.S.C. § 5514(a)(1)(B) (authorizing the Bureau to promulgate rules defining "larger participants" subject to to the CFPB's supervisory authority); there is no such directive here.  The CFPB's general rulemaking authority is the power to administer the existing categories and fill in statutory gaps, not create new rules of primary conduct out of whole cloth.

69.     In our constitutional structure, Congress creates rules of primary conduct and executive branch agencies "fill up the details."  *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825).  That means when Congress offers a detailed list of what categories of information are excluded from consumer reports, an agency may not don a legislator hat and prohibit new categories of information that Congress never intended to prohibit.  That is especially true where, as here, Congress has explicitly allowed CRAs to include coded medical debt information on consumer reports.

70.     Relatedly, the CFPB's claimed authority is unlawful under the major questions doctrine.  Where an agency claims statutory authority to issue regulation with deep economic or political significance, it must be clearly authorized; the Supreme Court "requires that Congress speak clearly before a Department Secretary can unilaterally alter large sections of the American economy."  *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023).  There is no doubt that the Final Rule has deep economic significance.  The Bureau's own data indicate that medical debt is one of the most common types of debt on consumer reports; 57% of all collections tradelines in the first quarter of 2022 were medical.  *See* Final Rule at 14.  And in its press release announcing the Final Rule, the CFPB touts how it "will remove an estimated $49 billion in medical bills from the credit reports of about 15 million Americans."[28]  Banishing these data from consumer reports and

---

[28] Consumer Financial Protection Bureau, *CFPB Finalizes Rule to Remove Medical Bills from Credit Reports* (Jan. 7, 2025), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-to-remove-medical-bills-from-credit-reports/.

blinding creditors to this information will decrease the utility of consumer reports and make it harder for creditors to accurately gauge whether someone is likely to repay a loan.  That, in turn, will make credit more expensive for consumers, and the predictive products offered by CDIA's members less valuable.  In a national economy which depends in large measure on credit transactions, this will have far-reaching consequences.  The CFPB has a general authority to "administer, enforce, and otherwise implement the provisions of Federal consumer financial law."  12 U.S.C. § 5512(a).  But that boilerplate rulemaking authority contains no specific authorization to issue the Final Rule at issue here.

71.    Because the portion of the Final Rule barring CRAs from reporting coded information about medical debt is contrary to law, the Court has an obligation to declare it unlawful and set it aside.

## COUNT II

**Violation of the APA: Limits on Creditors Exceed the CFPB's Statutory Authority**

**(5 U.S.C. § 706(2)(A), (C); 15 U.S.C. § 1681b(g)(2))**

72.    Plaintiffs repeat and reincorporate all of their prior allegations.

73.    The CFPB similarly acts contrary to law and in excess of statutory authority by prohibiting creditors from obtaining or using solicited coded medical data.  15 U.S.C. § 1681b(g)(2) prohibits creditors from using medical information to make credit decisions generally, but it includes an express carveout for coded medical information:  "a creditor shall not obtain or use medical information (*other than* medical information treated in the manner required under section 1681c(a)(6) of this title)" (emphasis added).  This express carveout allows creditors to consider medical information that is "reported using codes that do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or

devices to a person other than the consumer."  15 U.S.C. § 1681c(a)(6)(A).  The Final Rule, by contrast, prohibits creditors from using even coded information about medical debt to make credit decisions.  Once again, the CFPB's rule contradicts the clear and unambiguous language of the statute.

74.    The same context, statutory purpose, and legislative history that undermine the CFPB's prohibition on CRAs (detailed in Count I) similarly demonstrate that the CFPB's prohibition on creditors using solicited medical debt information violates the terms of the statute.  In § 1681b(g)(1), Congress was unambiguous that CRAs may provide coded medical debt information "in connection with a credit transaction"; the statute only makes sense if creditors are able to use that information under § 1681b(g)(2).[29]  That is also consistent with the statutory purpose and with Congress's evident intent in the legislative history.  Allowing creditors to make credit decisions based on coded medical debt information protects consumers' privacy but allows for fair and accurate assessments of a consumer's creditworthiness.

75.    Despite the clear statutory authorization for creditors to use coded medical information, the CFPB claims it can prohibit such conduct because it is merely revoking an existing regulatory exception.  *See, e.g.*, Final Rule at 151.  But the Bureau misunderstands both the exception and the scope of its own authority.  First of all, it is the statute, and not the existing financial information regulatory exception, that permits creditors to use coded medical information in credit decisions.  15 U.S.C. § 1681b(g)(2).  The CFPB has authority to permit additional uses of medical information by regulation, and it certainly has authority to rescind

---

[29] Indeed, the key provision allowing creditors to make use of "medical information treated in the manner required under" section 1681c(a)(6) was added as a "Technical and Conforming Amendment[]" to the FACT Act, seemingly to align §§ 1681b(g)(1) and (g)(2).  *See* 117 Stat. at 2003.

those rules through lawful processes.  But the statute sets a floor: although most types of medical information are off limits in the credit process, coded medical debt information may be used.  The CFPB may "permit" additional "transactions . . . that are determined to be necessary and appropriate to protect legitimate operational, transactional, risk, consumer, and other needs," but it cannot prohibit the use of information that the statute expressly allows.  *See* 15 U.S.C. § 1681b(g)(5)(A).  Under the guise of repealing an exception, the Bureau takes a red pen to the statutory language.

76.     The CFPB contends that it is not contravening the statute because § 1681b(g)(2) does not protect creditors' ability to consider coded medical debt information.  According to the Bureau, the carveout in § 1681b(g)(2) is no carveout at all; rather, the provision that exempts coded medical debt from the prohibition on creditor consideration of medical information is "nothing more than an acknowledgment" that coded medical debt "exists."  Final Rule at 145.  In other words, under the Bureau's reading, this clause in § 1681b(g)(2) merely highlights a type of medical information that comes within the prohibition on creditor consideration of medical information; i.e., a creditor is prohibited from using all medical information, including the coded medical debt information discussed in paragraph (g)(1).  But that reading contravenes the statute's plain text.  More specifically, the CFPB reads the phrase "other than" in the carveout to mean "including."  This it cannot do.  The words "other than" clearly exclude from the prohibition in § 1681b(g)(2) medical information that is properly coded, rather than highlight information that comes *within* the prohibition.

77.     Plaintiffs' reading perfectly harmonizes paragraphs (g)(1) and (g)(2), whereas the CFPB's interpretation ignores "other than" and renders the parenthetical to be surplusage.  "When interpreting a statute," courts must "read all parts of the statute together to produce a harmonious

whole." *Doe v. KPMG, LLP*, 398 F.3d 686, 688 (5th Cir. 2005).  Because § 1681b(g)(1)(C) plainly permits CRAs to report coded medical debt information, it makes sense that Congress in 1681b(g)(2) would also permit creditors to use that information when making credit decisions. The CFPB tries to treat paragraphs (g)(1) and (g)(2) as hermetically sealed off from one another. Regardless of what paragraph (g)(1) provides for creditors, the CFPB treats (g)(2) as a separate and broad prohibition on creditors using medical information and claims the parenthetical exclusion from paragraph (g)(2) is no exception at all.  The best and natural reading is instead that (g)(1) and (g)(2) work together, allowing CRAs to report—and creditors to use—coded medical debt information but precluding consideration of non-coded medical debt information unless otherwise permitted by regulatory exception.

78.     The CFPB attempts to justify its atextual reading of the statute by asserting that giving the statute its proper reading "would swallow much of the creditor prohibition that Congress added" in § 1681b(g)(2).  Final Rule at 145.  But the Bureau gets this wrong as well. First, § 1681b(g)(2) still prohibits a huge swath of medical information from being obtained or used by creditors, even with the exception for properly coded medical debt.  Second, rather than an exception swallowing the rule, this represents the statute operating exactly as Congress intended.  As noted above, the statutory text is in place "so that the financial end" of medical debt is available to creditors "but the entity providing that service is not listed."  Hearings on H.R. 2622, *supra*, at 16 (Statement of Rep. Kelly).  That this creates a legal regime and market dynamics that are contrary to the Bureau's policy goals is irrelevant; Congress has spoken and the CFPB is powerless to say otherwise.

79.     As in Count I, the second section of the Final Rule also violates the major

questions doctrine because the agency lacks a clear statutory basis for its claimed authority,

especially on a question of major economic significance.

80.     Because the portion of the Final Rule barring creditors from considering coded

information about medical debt is contrary to law, the Court has an obligation to declare it

unlawful and set it aside.

**COUNT III**

**Violation of the APA: The Final Rule Improperly Imposes Additional Requirements Based on State Law**

**(5 U.S.C. §§ 552(a), 706(2)(A), (D); 1 C.F.R. § 51.5)**

81.     Plaintiffs repeat and reincorporate all of their prior allegations.

82.     The Proposed Rule sought to further limit what CRAs could do by prohibiting

them from providing consumer reports that contain medical debt information if applicable state

law would prohibit them from doing so.  Proposed Rule, 89 Fed. Reg. at 51,736.  Perhaps

recognizing that this proposed provision would improperly incorporate state law by reference—

and that those state laws are preempted by FCRA in any event—the CFPB now tries to reach the

same goal by a different road.  The last section of the Final Rule provides that CRAs "may

include medical debt information . . . in a consumer report furnished to a creditor only if the

consumer reporting agency: (1) [h]as reason to believe the creditor intends to use the medical debt

information in a manner not prohibited by § 1022.30; and (2) [h]as reason to believe the creditor

is not otherwise legally prohibited from obtaining or using the medical debt information,

*including by a State law* that prohibits a creditor from obtaining or using medical debt

information."  Final Rule at 345 (to be codified at 12 C.F.R. § 1022.38(b)) (emphasis added).  In

other words, the CFPB makes it impermissible under federal law to furnish a consumer report that

contains medical debt information if, under state-imposed standards, it would be unlawful for creditors to use that information.  The Bureau's modified approach is still unlawful, for a number of reasons.

83.     *First*, the CFPB misreads the relevant FCRA provisions.  As noted above, FCRA only allows CRAs to furnish consumer reports to individuals who have one or more statutorily defined permissible purposes.  One of those permissible purposes is where the CRA "has reason to believe" the recipient of the consumer report "intends to use the information in connection with a credit transaction."  15 U.S.C. § 1681b(a)(3)(A).  There are no caveats or limits, and certainly nothing that makes the permissible purpose determination hinge on whether state law permits the creditor to receive or use the information inside the report.

84.     Despite the limited nature of this provision, the CFPB claims § 1681b(a)(3)(A) restricts the kinds of information CRAs may report to creditors.  With almost no explanation or justification, the CFPB contends that CRAs are responsible for not only having reason to believe that the consumer report recipient intends to use it in connection with a credit transaction (one of the permissible purposes defined by statute), but that the recipient is not under any other (unspecified by the rule)[30] legal obligation to refrain from using any of the information contained in the consumer report (a newly-minted limitation that exists nowhere in the statute).  This argument is novel and unsupported.  The Bureau cites no case or agency precedent to support its reading.

---

[30] Even though the provisions of the Final Rule are specific to medical debt, there is no limiting principle to the Bureau's logic.  The CFPB's reasoning could be used to transform any state or local regulation related to a creditor's underwriting into an additional permissible purpose requirement for CRAs to comply with before furnishing a consumer report.

85.     The CFPB's newly-minted restriction on the content of consumer reports is unlawful.  By its terms, § 1681b(a)(3)(A) asks only one question—does the CRA have reason to believe that the person to whom a CRA is furnishing a report intend to use that report for a credit determination?  If so, the recipient has a "permissible purpose," and the CRA may furnish a consumer report.  Section 1681b(a)(3)(A) is not concerned with how a creditor goes about making a credit decision or the contents of the consumer report.  Any number of legal authorities may restrict the way in which a creditor goes about extending credit and what information they may consider:  for example, creditors have contractual obligations and are subject to federal, state, and local lending laws.  Whether a creditor has a "permissible purpose" for a consumer report does not depend on whether they are subject to those rules.  In fact, under the CFPB's interpretation of § 1681b(a)(3)(A), the CRAs would have to determine whether a creditor is legally permitted to consider medical debt information before providing a consumer report.  Not only is this a task well beyond the expertise of CRAs, it would put the onus on CRAs to police creditors' lending practices.  Unsurprisingly, FCRA does no such thing.

86.     In short, § 1681b(a)(3)(A) neither limits the kind of information that CRAs may furnish to creditors, nor does it authorize the CFPB to prohibit CRAs from furnishing consumer reports based on rules applicable to creditors.

87.     *Second*, FCRA expressly preempts some of the state laws that the Final Rule indirectly incorporates to limit a CRA's ability to furnish consumer reports.  Under the Constitution's Supremacy Clause, validly enacted federal law supersedes and voids conflicting state laws.  U.S. Const. art. VI, cl. 2.  Likewise, FCRA contains an express preemption provision that supersedes all state laws "to the extent that those laws are inconsistent with any provision of this subchapter."  15 U.S.C. § 1681t(a).  As discussed above, § 1681b(g)(2) of FCRA expressly

permits creditors to consider coded medical debt information when determining a consumer's creditworthiness.  Therefore, any "State law that prohibits a creditor from obtaining or using" coded "medical debt information" is preempted by § 1681t(a).  Yet the Final Rule purports to prohibit CRAs from reporting coded medical debt information to creditors based on such preempted state laws.  That is unlawful.

88.    But the preemption issues are not limited to the express conflict with § 1681(g)(2).  In the proposed rule, the CFPB originally sought to preclude CRAs from including medical debt information on consumer reports if they (the CRAs) would be prohibited from doing so under state law.  *See* Proposed Rule, 89 Fed. Reg. at 51,736.  This would have run afoul of FCRA's *other* preemption provision that sweeps much more broadly, as commenters pointed out. *See* 15 U.S.C. § 1681t(b)(1)(E); *see also* CDIA Comment Letter, *supra*, at 21–27.  That provision declares off limits from state law vast areas that are regulated by FCRA, including requirements "relating to information contained in consumer reports."  15 U.S.C. § 1681t(b)(1)(E).  Any state law regulating what medical debt information may be included on consumer reports is preempted. In the Bureau's view, state laws that purport to regulate creditors also indirectly govern the content of consumer reports, since consumer reports can only be furnished to creditors in those states if they do not contain impermissible information (whether medical debt information or otherwise).  This backdoor attempt to incorporate state law, through the "permissible purpose" paradigm, is still preempted.

89.    In sum, § 1681b(a)(3)(A) does not prohibit CRAs from furnishing a consumer report that includes coded medical debt information based on state laws that purport to restrict the creditor's use of that information, nor does it authorize the CFPB to enact such a regulation. Furthermore, by making it a federal regulatory violation to furnish a consumer report in violation

of preempted state law, the Final Rule unlawfully gives legal effect to state laws that FCRA preempts. That violates the plain text of § 1681t(a). The Court has an obligation to hold unlawful and set aside the Final Rule as "not in accordance with law." 5 U.S.C. § 706(2)(A).

90. Independent of its decision to rely on preempted state law, the CFPB also ignored the requirements for incorporating state law and failed to provide regulated parties adequate notice of the substance of the new requirements. The APA requires agencies to publish all "substantive rules of general applicability" in the Federal Register. 5 U.S.C. § 552(a)(1)(D). It may "incorporate[] by reference" other standards so long as they are "reasonably available to the class of persons affected thereby" and the incorporation receives "the approval of the Director of the Federal Register." *Id.* § 552(a). If an agency proposes a rule that includes material that needs to be incorporated by reference, the agency "must: (1) [d]iscuss, in the preamble of the proposed rule, the ways that the materials it proposes to incorporate by reference are reasonably available" and "(2) [s]ummarize, in the preamble of the proposed rule, the material it proposes to incorporate by reference." 1 C.F.R. § 51.5(a). For final rules, the agency "must," among other things, "request formal approval" from the Director of the Federal Register and discuss in the preamble of the final rule the incorporated material and how the material is reasonably available to interested parties. *Id.* § 51.5(b).

91. None of the necessary procedures for incorporating state law were followed here. By making the permissible purpose requirement dependent on state law, the CFPB triggered the APA's requirement to publish those rules in the Federal Register or lawfully incorporate the standards by reference. *See* 5 U.S.C. § 552(a).[31] Yet the Proposed Rule contained no discussion

---

[31] *See also* Office of the Federal Register, *Incorporation by Reference Handbook*, at 2 (June 2023), https://www.archives.gov/files/federal-register/write/handbook/ibr-chi.pdf.

about how the patchwork of state laws were reasonably available to affected parties.  Neither does the Final Rule.  Nor is there any indication that the approval of the Director of the Federal Register was sought or obtained.

92.    The CFPB wrongly claims it is "not . . . incorporating by reference State laws, deeming a violation of State law to be a violation of the FCRA, or otherwise affecting the enforcement of State laws."  Final Rule at 108.  But on the very same page, the Bureau notes that under the Final Rule, whether it is lawful for a CRA to report medical debt information depends on whether the CRA has "reason to believe" that a creditor is "legally prohibited from obtaining or using medical debt information"—including by state law.  *Id.*  That is, to comply with the Final Rule, CRAs must know the content of state laws regulating the use of medical debt information by creditors.  Yet regulated parties could read every word of the Final Rule and would gain no insight about what state laws exist on the subject, which of them are relevant, and what those laws say.

93.    These failures are significant, as they deny regulated parties fair notice of the state laws being incorporated (and thus the scope of their obligations under the Final Rule).  When federal agencies want to incorporate state standards into federal law, they identify specific state laws—including the effective date.  For example, the Environmental Protection Agency promulgated a rule in 1994 setting vehicle emissions standards.  The rule clarified that "[t]he standards in this section shall be administered and enforced in accordance with the California Regulatory Requirements Applicable to the Clean Fuel Fleet and California Pilot Programs, April 1, 1994, which are incorporated by reference."  Emission Standards for Clean-Fuel Vehicles and Engines, Requirements for Clean-Fuel Vehicle Conversions, and California Pilot Test Program, 59 Fed. Reg. 50,042, 50,075 (Sept. 30, 1994); *accord, e.g.*, Nebraska: Final Approval of State

Underground Storage Tank Program Revisions, Codification, and Incorporation by Reference, 89 Fed. Reg. 97,550, 97,556 (Dec. 9, 2024) (incorporating specific Nebraska statutes by reference and explaining where those rules were available for review).  The Final Rule at issue here contains none of that information:  there was no identification of the specific state laws being incorporated, and no identification of the effective dates of those laws.  Because of this, the CFPB did not offer to make the relevant state rules available for review or copying.  This creates a situation where a regulated entity cannot know the scope of the prohibition on including medical debt information on a consumer report by simply reading the Final Rule.  This is fundamentally contrary to the APA's goal of providing fair notice about the requirements of federal law.  *See* 5 U.S.C. § 552; *cf. Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328–29 (D.C. Cir. 1995) ("In the absence of notice—for example, where [a] regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not . . . impos[e] civil or criminal liability.").

94.    Because the Final Rule was issued "without observance of procedure required by law," the Court has an obligation to set it aside.  5 U.S.C. § 706(2)(D).

## COUNT IV

### Violation of the APA: The Final Rule is Arbitrary and Capricious

### (5 U.S.C. § 706(2)(A))

95.    Plaintiffs repeat and reincorporate all of their prior allegations.

96.    In addition to violating the plain language of FCRA, the CFPB reversed twenty years of settled consumer reporting practice based on a limited data set and half-baked policy rationales.  Worse, it created fundamental contradictions in its own regulations.  The APA prohibits agencies from making fundamentally unreasoned decisions, failing to consider relevant evidence, or inappropriately weighing the available evidence.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Therefore, the CFPB's Final Rule is

arbitrary and capricious and must be set aside.  5 U.S.C. § 706(2)(A).  That is so for at least three reasons.

### A.      Reliance on the 2014 Study and Technical Appendix

97.     First, the CFPB's central policy justification for the Final Rule is that medical debt is not predictive of consumer delinquency.  That conclusion depends heavily on an internal 2014 study which cannot reasonably support the agency action.  At the outset, the underlying data in that study were never made available for public scrutiny.  But what is public is sufficient to demonstrate that the 2014 study falls far short of justifying a wholesale ban on medical debt information in consumer reports.  The data are over ten years old; the study uses a credit history sample between 2011 and 2013.  Much has changed in the national economy and in the world of consumer reporting since then.

98.     Moreover, the 2014 study reached two limited conclusions: (1) medical and non-medical collections do not equally predict a consumer's subsequent credit performance—consumers with more medical than non-medical collections outperformed their credit score by about 10 points; and (2) consumers with most of their medical collections paid were "less likely to be delinquent than other consumers with the same credit score."  Brevoort & Kambara, *supra*, at 5–6.  Neither of those conclusions demonstrate that consumers with unpaid medical debt present the same risk of delinquency as those without.  Indeed, the CFPB does not even claim that medical debt is not predictive, only that "medical debt collections tradelines . . . are *less* predictive of future consumer credit performance than nonmedical collections."  Final Rule at 80 (emphasis added).  It is unreasonable for the Bureau to conclude that it is not "necessary and appropriate" for a creditor to consider medical debt when making a credit decision (and thereby

command that medical debt be removed from consumer reports) merely because medical debt is less predictive than other forms of debt.

99.    The CFPB supplements the 2014 study with its own study in the Technical Appendix, which allegedly shows that "medical debt information . . . has limited value for credit underwriting."  Proposed Rule, 89 Fed. Reg. at 51,692; *see also* Final Rule at 174.  But the data collected by the CFPB have shockingly little to do with whether medical debt is predictive of delinquency.

100.    The Bureau in the Technical Appendix compares two sets of consumers: both had unpaid medical debts, but only one group's debts were included on consumer reports that creditors used when making a credit decision.[32]  The Bureau compared the performance of the two groups and found that both groups had equivalent delinquency risk.  From those data, the CFPB concludes that whether or not medical debt is reported to creditors has no bearing on delinquency and "creditors [can] underwrite credit without information about consumers' medical debts."  Final Rule at 80.  This completely misunderstands the problem.  If having unpaid medical debt has any effect on a borrower's ability to pay other debts, it will have that effect regardless of whether that effect is made known to creditors.  The question is not whether reporting medical debt to creditors changes the likelihood of delinquency, the question is whether a consumer with medical debt is more likely to be delinquent than a consumer *without* medical debt.  Nothing in

---

[32] Even this gives the CFPB too much credit.  Among other issues, the study depends on linking specific new credit accounts (i.e., new tradelines) with creditors' requests for consumer reports, or inquiries.  But in creating the data set to analyze, the CFPB could not affirmatively link any given inquiry from a creditor with a new credit account opened by the consumer; instead, it assumed that any new account opened within a certain time after an inquiry was a result of the inquiry.  Final Rule at 286–87.  Simply put, "the CFPB cannot be certain that the observed inquiry is associated with a specific opened tradeline."  *Id.* at 287.

the Technical Appendix undermines the economic reality that a consumer's debt profile is highly relevant to his or her creditworthiness.

101.    Indeed, studies presented to the Bureau during the notice and comment period showed that the presence of unpaid medical debt *is* predictive of future borrower performance. They directly contradict the CFPB's naked assertion that a consumer with more medical debt is similarly likely to be delinquent as a debt-free consumer.  For example, in 2015, FICO reported that "[o]ur research has consistently found that individuals with unpaid collections are more risky (i.e., less likely to repay loans) than those who do not have unpaid accounts."  Dornhelm, *supra*. Thus, "ignoring ALL medical collections, regardless of whether those accounts have been paid, can have an adverse impact on score predictiveness."  *Id.*

102.    Similarly, CDIA's expert Dr. Amy Crews Cutts submitted a report during the notice and comment period explaining that, based on the FICO study and another nationwide CRA's internal study, "removing all medical debt in collections from consumer reports negatively affects the accuracy of credit models."  Crews Cutts, Comment Letter on Prohibition, *supra*, at 4. She continued, "it is not accurate to claim that empirical evidence shows that, especially in the current credit environment, medical debt is not predictive of future borrower performance and that it is not necessary and appropriate for creditors to obtain or consider medical debt information as part of the credit decision process.  *The opposite is closer to the truth*."  *Id.* at 5 (emphasis added). Similarly, Equifax submitted a comment letter describing its analysis of credit and delinquency data, and concluded that its "models demonstrated that medical collections were predictive of a consumer's payment/delinquency rate.  Furthermore, when medical collections are added to a model with non-medical collections, the addition of medical collections yields 34 percent predictive lift."  Equifax Comment Letter, *supra*, at 7.

103.    Most recently, four researchers found that "debt relief causes a statistically significant and economically meaningful reduction in payment of existing medical bills."[33] In other words, reducing the consequences for not paying one debt leads consumers to not pay other debts.  These studies were made known to CFPB in the notice and comment process.

104.    The CFPB gives cursory treatment to these studies in the Final Rule.  It responds to the FICO study merely by falling back on its own research.  *See* Final Rule at 82.  It claims the Equifax study contained insufficient detail.  *Id.* at 173–74.  And although it engages directly with some third-party studies submitted during the notice and comment process, it does not address the report of Dr. Crews Cutts or the negative findings in Kluender et al.  By selectively choosing which studies to credit and which to disregard, the Bureau unreasonably concludes that the data support its action.  *See id.* 160–174.  Worse than that, in the face of these data and studies, the Bureau claims without evidence or citation to authority that it "expects that removing medical collections from consumer reports used in credit eligibility determinations would instead improve the accuracy of consumer reporting."  Final Rule at 209.

105.    Another reason the Bureau's myopic reliance on the 2014 study and the Technical Appendix is flawed is that it does not account for the significant changes made by the nationwide CRAs over the past two years in how they report medical debt.  This also undermines the purported justifications for the Final Rule.  Importantly, the nationwide CRAs no longer report medical debt collections below $500 or medical debt collections that have been paid, putting the focus on substantial debts that remain unpaid.  One study indicated that this caused the number of

---

[33] Raymond Kluender, Neale Mahoney, Francis Wong, & Wesley Yin, The Effects of Medical Debt Relief: Evidence from Two Randomized Experiments, National Bureau of Economic Research, at 4 (Apr. 2024) https://www.accountsrecovery.net/wp-content/uploads/2024/04/w32315.pdf.

consumer reports with medical debt on them to be cut in half.[34]  Additionally, the nationwide

CRAs now delay furnishing information about medical debt collections to account for delays in

insurance repayment.  This means consumer reports more accurately reflect a consumer's

financial obligations.  Quite simply, the medical debt information that appears on a consumer

report in 2025 is markedly different than what may have been on any given consumer report prior

to 2022 (which describes all of the CFPB data in both the 2014 study and most of the data in the

Technical Appendix).  For example, the CFPB made no effort to determine the portion of the

medical debt tradelines studied in 2014 that were under $500.  Since those tradelines are no

longer included on consumer reports issued by the nationwide CRAs, analysis that relies on those

types of debts is not helpful in determining the predictiveness of medical debts that appear on

consumer reports today.

106.    Although the CFPB pays lip service to these changes in the Final Rule, it treats

the changes as evidence that medical debt information can be completely removed from the

consumer reporting process, rather than important changes whose impact needs to be studied and

accounted for.  *See* Final Rule at 84–87.  No logic supports that conclusion.  The obvious import

of these changes is that the market has adjusted to a new equilibrium where the kinds of medical

debt that are reported are those that benefit consumers and creditors.  To rely on these reforms as

the basis for a *per se* ban on the use of medical debt information in credit decisions, while relying

primarily on a 2014 study that predates these significant industry changes, is not the product of

reasoned decision making.

---

[34] See Fredric Blavin, Breno Braga, & Michael Karpman, *Medical Debt Was Erased from Credit Records for Most Consumers, Potentially Improving Many Americans' Lives* (Nov. 2, 2023), https://www.urban.org/urban-wire/medical-debt-was-erased-credit-records-most-consumers-potentially-improving-many.

B.     **Inadequate Cost-Benefit Analysis**

107.     The CFPB's cost-benefit analysis is also flawed because it fails to meaningfully account for the potential costs to consumers that will result from a less accurate credit underwriting process.  "An agency's decision to rely on a cost-benefit analysis as part of its rulemaking can 'render the rule unreasonable' if the analysis rests on a 'serious flaw.'"  *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)).  Here, in weighing the costs and benefits of the Final Rule, the agency radically underestimates the adverse effect on consumers.  Because recent research shows that medical debt information is predictive of delinquency, *see supra* ¶¶ 101–03, if creditors may no longer consider such information in making credit decisions, more consumers will be approved for loans they cannot afford and more borrowers will default.  Creditors will then invariably raise interest rates to compensate for the increased risk or offer credit on less favorable terms, making credit more expensive for borrowers.  Commenters warned the CFPB that under the Final Rule, "creditors [may] raise interest rates and fees to account for anticipated increased delinquency rates."  Final Rule at 221.

108.     Relatedly, consumers will be harmed by the fact that their credit scores will be less predictive.  Credit scores are calculated using the information in consumer reports.  If those reports no longer include a major category of debt, consumer credit scores will increase, but only artificially—a person's credit score will not reflect the full picture of his or her financial obligations.  *See* Consumer Bankers Association Comment Letter, *supra*, at 5 ("[C]redit scores . . . would only rise because certain relevant data would be suppressed. Thus, credit scores would be less reliable, . . . and credit markets would become less efficient as a result."); *cf.* Final Rule at 232 (anticipating that one effect of the Final Rule will be increased consumer credit scores).

This will lead to some consumers getting loans they are not qualified for—leading to increased delinquencies and defaults.  Additionally, if credit scores are inflated, creditors' underwriting models will be less predictive and loans will be riskier.  "[L]enders may have to increase the cost of, or reduce the availability of, credit, which would make it more difficult for low-and-moderate income consumers to access credit."  Consumer Bankers Association Comment Letter, *supra*, at 5.  In both ways, consumers will suffer.

109.    The CFPB claims that "the predictive performance of underwriting models would not be impaired by the removal of all medical collections information," largely because some credit scoring companies have already devalued or removed medical collections data from their scores.  Final Rule at 214.  But it cites to a press release by FICO as an example, even though FICO did not eliminate medical debt from its credit scoring model and in fact found that "ignoring ALL medical collections, regardless of whether those accounts have been paid, can have an adverse impact on score predictiveness."  Dornhelm, *supra*.  Although the credit scoring company VantageScore found that removing medical debt had "minimal effects on predictive performance" and decided to remove such debt from its most recent scoring model,[35] it did not quantify the loss in predictiveness.

110.    The Bureau also dismisses any concern about increased credit costs based on its analysis of the data in the Technical Appendix, which it claims demonstrates that creditors would "provide more credit accounts that have similar delinquency risk" under the Final Rule.  Final

---

[35] *See* VantageScore, *What was the rationale for removing Medical Debt from VantageScore* 4.0?, https://www.vantagescore.com/faq/what-was-the-rationale-for-removing-medical-debt-from-vantagescore-4-0/ (last accessed Jan. 6, 2025).  Further, VantageScore cited anticipated regulatory changes as an additional reason to remove medical debt from its models.  This undermines any claim the Bureau might make that VantageScore's change was only motivated by a conclusion that medical debt is not predictive.

Rule at 221.  As described more fully above, however, the Technical Appendix does not demonstrate that consumers with medical debt have an equivalent delinquency risk to consumers without such debt; and research that *does* compare consumers with and without medical debt demonstrates that medical debt is in fact correlated with higher delinquency.  *See* ¶¶ 101–03, *supra.*  Once again, the CFPB unreasonably relies on its own studies and closes its eyes to the full impact of its Final Rule on the cost of credit and the availability of that credit to consumers.  The Bureau's failure to reasonably weigh the costs and benefits of the Final Rule is arbitrary and capricious.

### C.      Introducing Fundamental Contradictions Into the Regulatory Framework

111.    Finally, the CFPB fails to acknowledge—let alone explain—fundamental contradictions in its rulemaking.  As described more fully above in Paragraphs 57–59, the Final Rule, read in concert with other rules over which the CFPB has authority, imposes different obligations on creditors' consideration of medical debt information based solely on the source of the information.  If the creditor receives the information from a CRA, the Final Rule would deem its consideration not "necessary and appropriate" to further any legitimate interest of the creditor.  But if the creditor receives it directly from the borrower, then its consideration is so important that it is legally required (at least in lending contexts with a mandatory ATR determination).  Such a distinction is the definition of arbitrary and unreasoned agency action, particularly where (as here) the CFPB has not even attempted to explain or rationalize this dissonance.

112.    For all these reasons, the Court has an obligation to hold unlawful and set aside the Final Rule as arbitrary and capricious.  5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for an order and judgment in their favor and against Defendants comprising the following relief:

1.     A declaration that the Final Rule violates the APA and FCRA, as amended.

2.     An order and judgment holding unlawful, enjoining, and setting aside the Final Rule as not in accordance with law.

3.     Any other relief that the Court deems just and appropriate.


Dated: January 7, 2025

Ryan T. Scarborough (*pro hac vice pending*)
DC Bar. No. 466956
Jesse T. Smallwood (*pro hac vice pending*)
DC Bar. No. 495961
William R. Murray, Jr. (*pro hac vice pending*)
DC Bar. No. 384797
Christopher J. Baldacci (*pro hac vice pending*)
DC Bar. No. 90007281
WILLIAMS & CONNOLLY LLP
680 Maine Ave., SW
Washington, DC 20024
Tel: (202) 434-5000
rscarborough@wc.com
jsmallwood@wc.com
bmurray@wc.com
cbaldacci@wc.com

Respectfully Submitted,

By: /s/ *Alex More*
Alex More
TX Bar No. 24065789
Andrea C. Reed
TX Bar No. 24121791
CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street
Suite 5500
Dallas, TX 75202
Tel: (214) 855-3053
amore@ccsb.com

Eric Blankenstein (*pro hac vice pending*)
DC Bar No. 997865
LAW OFFICES OF ERIC BLANKENSTEIN PLLC
1701 Pennsylvania Ave., NW, #200
Washington, DC 20006
eric@blankensteinlegal.com