# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| CORNERSTONE CREDIT UNION LEAGUE AND CONSUMER DATA INDUSTRY ASSOCIATION, | |
| *Plaintiffs*, | |
| v. | No. 4:25-cv-00016-SDJ |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA in his official capacity as Director of the CFPB, | |
| *Defendants.* | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 1

ARGUMENT ........................................................................................................... 6

   I.   Plaintiffs are unlikely to succeed on the merits of their statutory claims. ........................... 7

      A.  The Bureau acted within its statutory authority in rescinding a regulatory exception from FCRA's general prohibition on creditors using medical information in underwriting. ................................................................................................... 7

      B.  The Bureau acted within its statutory authority by limiting CRAs' ability to share medical debt information with creditors who are prohibited from using it under the Rule. .............................................................................................................. 10

      C.  The Bureau acted within its statutory authority by limiting CRAs' ability to share medical debt information with creditors who are prohibited from using it by other laws. ............................................................................................................... 13

  II.  Plaintiffs have not demonstrated that irreparable injury is likely. ...................................... 14

      A.  Plaintiffs have not demonstrated an imminent likelihood of irreparable injury from the Rule's amendments to the restriction on creditors. ........................................... 15

      B.  Plaintiffs have not demonstrated an imminent likelihood of irreparable injury from the Rule's restrictions on consumer reporting agencies. ....................................... 16

 III.  The balance of equities and public interest favor Defendants. .......................................... 19

CONCLUSION ....................................................................................................... 20

i

## INTRODUCTION

The Fair Credit Reporting Act (FCRA) prohibits creditors, subject to regulatory exceptions, from considering a consumer's medical information in connection with any determination of that consumer's eligibility for credit. 15 U.S.C. § 1681b(g)(2). In the rule challenged by Plaintiffs, "Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V)" (Medical Debt Rule or Rule), 90 Fed. Reg. 3276 (Jan. 14, 2025), the Consumer Financial Protection Bureau rescinded a discretionary regulatory exception that allowed creditors to consider certain medical information so that the law once again generally shields medical information from creditors' underwriting. The Rule also limits the ability of consumer reporting agencies (CRAs) to provide that shielded information to creditors in consumer reports.

The Rule effectuates Congress's objectives and is consistent with FCRA, and Plaintiffs are unlikely to succeed on the merits of their claims to the contrary. Plaintiffs also have not carried their burden to demonstrate a likelihood of irreparable injury, and the balance of equities and public interest favor Defendants. Accordingly, Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

## BACKGROUND

FCRA was one of the world's first data privacy laws, and it responded to public concern about the widespread dissemination of sensitive information about Americans. 90 Fed. Reg. at 3282. One of its main purposes was enshrining a respect for consumers' right to privacy. *See* 15 U.S.C. § 1681(a)(4). The law has been amended several times since its passage in 1970, including through the Fair and Accurate Credit Transactions Act of 2003 (FACT Act), Pub. L.

108-159, 117 Stat. 1952 (2003), which added yet more privacy protections, including by restricting the use and transfer of consumers' medical information in the financial system.

Section 411 of the FACT Act added, at 15 U.S.C. § 1681b(g)(2), a broad limitation on creditors' ability to obtain or use medical information in underwriting (the creditor prohibition) by providing that, except as permitted by certain regulatory actions, "a creditor shall not obtain or use medical information pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit." Pub. L. 108-159, § 411. The "medical information" that the FACT Act protects includes information "created by or derived from a health care provider or the consumer, that relates to … the payment for the provision of health care to an individual," *i.e.*, information about medical debts. 15 U.S.C. § 1681a(i).

The FACT Act also limited CRAs' ability to provide consumer reports containing medical information. Pub. L. 108-159, §§ 411(a), 412(b) (codified at 15 U.S.C. §§ 1681b(g)(1), 1681c(a)(6)). Section 412 of the FACT Act added 15 U.S.C. § 1681c(a)(6), which generally bars CRAs from including on any consumer report "[t]he name, address, and telephone number" of any medical information furnisher who has identified itself as such without restricting that information or coding it so as to "not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer." [1] *Id.* § 412(b) (codified at 15 U.S.C. § 1681c(a)(6)(A)). Separately, the FACT Act

---

[1] As relevant here, "[a] furnisher is an entity which transmits information concerning a particular debt owed by a particular consumer to consumer reporting agencies." *Meisel v. USA Shade & Fabric Structures Inc., 79*5 F. Supp. 2d 481, 484 (N.D. Tex. 2011). A medical information furnisher is a "person whose primary business is providing medical services, products, or devices, or the person's agent or assignee, who furnishes information to a consumer reporting agency on a consumer …." 15 U.S.C. § 1681s-2(a)(9). Section 412(a) of the FACT Act, codified at 15 U.S.C. § 1681s-2(a)(9), requires medical information furnishers to identify themselves as such to CRAs.

2

revised 15 U.S.C. § 1681b(g) to bar CRAs from including medical information on a consumer

report, with certain exceptions. Pub. L. 108-159, § 411(a) (codified at § 1681b(g)(1)). Pursuant

to one such exception, the prohibition does not extend to information that relates solely to

medical debts, so long as the information is restricted or coded as provided in § 1681c(a)(6).

Section 412 of the FACT Act also included a "technical and conforming amendment[]"

that added cross-references to the newly enacted § 1681c(a)(6) to the creditor and CRA

prohibitions enacted by § 411 and codified at 15 U.S.C. § 1681b(g)(1) and (2). With those

"technical" amendments, those prohibitions refer to medical information "(other than medical

[contact] information treated in the manner required under [§ 1681c(a)(6)])." *Id.* § 412(f)(1)–(2)

(codified at 15 U.S.C. § 1681b(g)(1)–(2)) (bracketed text only in § 1681b(g)(1)).

The FACT Act also granted authority to the federal financial banking agencies and the

National Credit Union Administration (Agencies) to prescribe regulations that would permit

exceptions to the Act's creditor prohibition—but only where such exceptions were "necessary

and appropriate to protect legitimate operational, transactional, risk, consumer, and other needs"

(including administrative verification purposes), "consistent with the intent … to restrict the use

of medical information for inappropriate purposes." Pub. L. 108-159, § 411(g)(5)(A) (previously

codified at 15 U.S.C. § 1681b(g)(5)(A) (2003)).

In 2005, the Agencies codified the FACT Act's creditor prohibition in a rule but provided

certain exceptions to it. 70 Fed. Reg. 70664, 70667–71 (Nov. 22, 2005); *see* 12 C.F.R. §

1022.30(b) (2024). As relevant here, the Agencies promulgated the "financial information

exception," permitting creditors to obtain and use medical information about a consumer so long

as: (1) the information was the type of information routinely used in making credit eligibility

determinations (such as information about debts); (2) the creditor used the information in a

manner and to an extent no less favorably than comparable nonmedical information; and (3) the creditor did not take the consumer's physical, mental, or behavioral health, condition or history, type of treatment, or prognosis into account when making the determination. 70 Fed. Reg. at 70667–68; *see* 12 C.F.R. § 1022.30(d) (2024). But even where the financial information exception applied, creditors still could only obtain or use medical information in a consumer report where that information was properly coded in accordance with FCRA § 1681c(a)(6). *See* 70 Fed. Reg. at 70668. The Agencies provided no evidence or reasoning to support their decision to promulgate this exception with respect to medical debts, other than a single sentence in the notice of proposed rulemaking that "[a] creditor should not be prohibited from obtaining or using information about a debt … in connection with making a credit decision, just because that debt happens to be for medical products or services." 69 Fed. Reg. 23380, 23384 (Apr. 28, 2004).

In 2011, Congress transferred rulemaking authority under much of FCRA to the Bureau, *see* Pub. L. 111-203, § 1088 (2010), and in the Medical Debt Rule, the Bureau reconsidered the Agencies' central premise underlying the financial information exception. In addition to acknowledging the Agencies' lack of evidence or reasoning to support the exception nearly twenty years ago, the Bureau noted in the Rule that more recent research shows that medical debt has less value than other types of debts in predicting future default for credit underwriting purposes. 90 Fed. Reg. at 3276. Moreover, market participants, including the three largest nationwide consumer reporting agencies (NCRAs), have already dramatically reduced their use of medical debt. The NCRAs have removed certain medical debts from consumer reports, and major credit scoring companies have afforded less weight to, or excluded entirely, medical debt information in their latest scoring models. *Id.* Accordingly, the Bureau rescinded the financial information exception previously codified at 12 C.F.R. § 1022.30(d). That left in place

§ 1022.30(b), which generally bars a creditor from "obtain[ing] or us[ing] medical information pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit," subject only to the remaining exceptions. *See id.* § 1022.30(b), (e)(1)(i)–(x).

The Rule also includes provisions addressing CRAs' responsibilities in providing creditors consumer reports containing medical debt information. Specifically, the Rule permits a CRA to include medical debt information in a consumer report furnished to a creditor only if the CRA (1) has reason to believe the creditor intends to use the medical debt information in a manner not prohibited by § 1022.30, and (2) has reason to believe the creditor is not otherwise legally prohibited from obtaining or using the medical debt information, including by a state law. 90 Fed. Reg. at 3373–74. This new § 1022.38(b) of the Rule implements FCRA's "permissible purposes" provision, which authorizes CRAs to furnish consumer reports only under certain enumerated circumstances, including where the CRA "has reason to believe" the recipient intends to use the information in connection with a credit transaction involving the consumer. 15 U.S.C. § 1681b(a)(3)(A). The Bureau reasoned that if a creditor is restricted from using such information by FCRA § 1681b(g)(2) or § 1022.30(b) of the Rule, or any other applicable law (including state law), the CRA would not have "reason to believe" the recipient intended to use the information for credit purposes. 90 Fed. Reg. at 3307–08. The Bureau also determined that § 1022.38(b)(1)'s authorization for CRAs to share medical debt information was separately warranted as a way to foster creditors' compliance with FCRA's limitation on creditors' use of medical information and consistent with the Bureau's authority to "prescribe regulations as may be necessary or appropriate" to "prevent evasions" or "facilitate compliance" with FCRA, 15 U.S.C. § 1681s(e)(1). *See* 90 Fed. Reg. at 3308.

5

Plaintiffs Cornerstone Credit Union League and the Consumer Data Industry Association filed suit the day the Rule was issued, raising multiple claims under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. Compl., ECF No. 1. Shortly thereafter, Plaintiffs filed a motion seeking a preliminary injunction and stay of the Rule's effective date under § 705 of the Administrative Procedure Act. ECF No. 9 (Mot.). That motion claims that the Medical Debt Rule exceeds the Bureau's statutory authority by (1) limiting creditors' ability to obtain and use medical information in connection with credit underwriting, (2) limiting CRAs' ability to share medical debt information with creditors, and (3) (as Plaintiffs put it) improperly imposing additional requirements based on state law. *Id.* at 7–15.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must "by a clear showing," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest, *Winter*, 555 U.S. at 20. Failure to satisfy any of these requirements precludes injunctive relief, *see Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and Plaintiffs bear a heavy burden as to each, *Enter. Int'l, Inc. v. Corp. Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). In addition, "[a]n analysis of whether a stay is appropriate under [5 U.S.C.] § 705 considers the same elements required for injunctive relief." *Watterson v. Bureau of Alcohol*, *Tobacco, Firearms & Explosives*, No. 4:23-CV-00080, 2024 WL 897595, at *20 (E.D. Tex. Mar. 1, 2024). Because Plaintiffs meet none of the four factors warranting such extraordinary relief, the Court should deny their motion.

I.    **Plaintiffs are unlikely to succeed on the merits of their statutory claims.**

    A.  **The Bureau acted within its statutory authority in rescinding a regulatory exception from FCRA's general prohibition on creditors using medical information in underwriting.**

FCRA prohibits creditors from obtaining or using medical information about a consumer—including information that relates to "the payment for the provision of health care," 15 U.S.C. § 1681a(i)—in connection with "any determination of the consumer's eligibility, or continued eligibility, for credit." *Id.* § 1681b(g)(2). That prohibition is qualified only by regulatory exceptions that the Bureau may promulgate. *Id.* § 1681b(g)(5).[2] And Congress put constraints on the Bureau's regulatory exception authority. To adopt an exception, the Bureau must determine that allowing creditors to obtain or use medical information is "necessary and appropriate to protect legitimate operational, transactional, risk, consumer, and other needs," and that determination must be "consistent with [Congress's] intent … to restrict the use of medical information for inappropriate purposes." *Id.* Here, after conducting thorough analysis of empirical evidence, and soliciting, reviewing, and responding to public comments, the Bureau determined that allowing creditors to use medical information under the prior financial information exception does not meet this standard. 90 Fed. Reg. at 3277. Plaintiffs challenge this determination, and wrongly argue that the Bureau lacked statutory authority to remove the prior regulatory exception and thereby restore Congress's general prohibition on creditors considering medical debt information in underwriting decisions. Plaintiffs' argument ignores the explicit instructions Congress gave the Bureau in defining its regulatory authority under FCRA.

---

[2] The statute also provides an exception, not relevant to this Rule, for regulatory determinations under § 1681b(g)(3)(C), which permits the Bureau or state insurance authorities to exclude certain communications from the definition of "consumer report."

As with all disputes of statutory interpretation, "we begin with the text of the statute." *United States v. Lauderdale Cnty., Mississippi*, 914 F.3d 960, 961 (5th Cir. 2019). Here, FCRA's limitation on creditors' access to medical information provides:

> Limitation on creditors[:] Except as permitted pursuant to paragraph (3)(C) or regulations prescribed under paragraph (5)(A), a creditor shall not obtain or use medical information (other than medical information treated in the manner required under section 1681c(a)(6) of this title) pertaining to a consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit.

15 U.S.C. § 1681b(g)(2). The provision defines only two exceptions to the creditor prohibition: as permitted by certain regulatory action under § 1681b(g)(3)(C), *see supra*, n.2, or pursuant to regulatory exceptions promulgated under § 1681b(g)(5)(A). And even where a regulatory exception "permit[s]" the use of *some* medical information in underwriting, it may only permit the use of medical information "*other than* medical information treated in the manner required under section 1681c(a)(6)." *Id.* § 1681b(g)(2), (5) (emphasis added). Thus, § 1681b(g)(2)'s cross-reference to § 1681c(a)(6) ensures that, if regulations permitted creditors to obtain or use medical information in underwriting, creditors are nevertheless prohibited from obtaining or using a consumer report containing the unmasked "name, address, and telephone number" of any medical information furnisher that has notified the CRA of its status as such a furnisher.[3] 15 U.S.C. § 1681c(a)(6); *see also id.* § 1681s-2(a)(9).

The FACT Act's structure and purpose further demonstrate that this is what FCRA means. *See Sw. Elec. Power Co. v. United States Env't Prot. Agency*, 920 F.3d 999, 1028 (5th Cir. 2019) (courts interpret statutes by "looking at the full text of the statute … along with the

---

[3] Contrary to Plaintiffs' claim (at 12), the Bureau does not read the phrase "other than" in the statutory parenthetical as meaning "including." Rather, the phrase "other than" in paragraph (g)(2)'s parenthetical serves to limit the scope of information that the Bureau may "permit[]" under paragraph (3)(C) or paragraph (5)(A).

statute's structure and its … purpose"). There can be no doubt that the FACT Act sought to "restrict the use of medical information" in the financial system. 15 U.S.C. § 1681b(g)(5)(A). To achieve this, the FACT Act included two separate provisions. First, § 411 added the limitation on creditors' use of medical information in underwriting—*i.e.*, § 1681b(g)(2)—subject to exceptions the Agencies might authorize by regulation. Pub. L. 108-159, § 411. Then, § 412 required that CRAs mask medical furnishers' identity and contact information in consumer reports—*i.e.*, § 1681c(a)(6). Notably, § 411 of the FACT Act did not include the parenthetical cross-referencing § 1681c(a)(6) on masking. That parenthetical was added only in a "technical and conforming amendment[]" in § 412. Pub. L. 108-159, § 412(f). This cross-reference ensures that any regulatory exception is consistent with the Act's masking provision barring consumer reports from disclosing a health care provider's identifying information.

Under Plaintiffs' interpretation of the § 1681b(g)(2) parenthetical, by contrast, Congress enacted a broad prohibition on creditors' consideration of medical information, and then, through a technical and conforming amendment, allowed an exception that eviscerates the prohibition. "But Congress does not make radical … change[s] through technical and conforming amendments." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 431 (2018) (internal quotation marks and citation omitted); *see also Matter of GFS Indus., LLC*, 99 F.4th 223, 229 (5th Cir. 2024) (concluding Congress would not have drastically modified a statute "through a cross-reference in a 'mere conforming amendment'" (quoting *Cyan*, 583 U.S. at 431)). Plaintiffs' interpretation cannot be squared with Congress's stated intention to restrict the use of medical information in the financial system.

Notably, the Bureau's predecessor Agencies agreed with the Bureau's interpretation. When they promulgated the financial information exception, the Agencies expressly stated that

9

§ 1681b(g)(2) "prohibits all creditors from obtaining or using key financial information that is also medical information in the credit underwriting process. [The statute] does not contain any specific statutory exception to this broad prohibition." [4] 70 Fed. Reg. at 33962; *accord* 69 Fed. Reg. at 23383 ("Section 411(a) of the FACT Act adds a broad new limitation on the ability of creditors to obtain medical information…. Specifically, new section [§1681b](g)(2) provides that, *except as permitted by regulations*, a creditor shall not obtain or use medical information" for credit underwriting (emphasis added)).

Because Plaintiffs' reading of FCRA is incorrect, they are not likely to succeed on the merits of their challenge to the Rule's rescission of the financial information exception.[5]

## B. The Bureau acted within its statutory authority by limiting CRAs' ability to share medical debt information with creditors who are prohibited from using it under the Rule.

Section 1022.38(b)(1) of the Rule provides that a CRA may include medical debt information in a consumer report only if the CRA "[h]as reason to believe the creditor intends to use the medical debt information in a manner not prohibited by § 1022.30." 90 Fed. Reg. at 3373–74. This portion of the Rule is authorized on two independent grounds. First, it is an appropriate exercise of the Bureau's authority to "prescribe regulations as may be necessary or appropriate … to prevent evasions or to facilitate compliance" with FCRA. 15 U.S.C.

---

[4] Plaintiffs suggest that the now-rescinded financial information exception "allowed creditors to use even non-coded medical information" contained in consumer reports. Mot. at 2. Not so: The Agencies explicitly declined to permit sharing of non-coded information in consumer reports. *See* 70 Fed. Reg. at 70668.

[5] Plaintiffs repeatedly cite the statement of a single congressperson from the bill's floor debate. *See* Mot. at 9, 12. But Committee Reports are "more authoritative" than lawmakers' floor statements. *Dunn McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 964 F. Supp. 1125, 1137 (S.D. Tex. 1995), *aff'd*, 112 F.3d 1283 (5th Cir. 1997). And the Committee Report accompanying the FACT Act is unequivocal that the Act's creditor prohibition sought to "establish[] that creditors are not allowed to obtain or use medical information for credit granting purposes." H.R. Rep. No. 108-263, pt. 1, at 53.

§ 1681s(e)(1). In particular, this provision facilitates creditors' compliance with, and prevents evasion of, the creditor prohibition by generally barring CRAs from providing creditors with medical debt information they are prohibited from obtaining or using pursuant to FCRA § 1681b(g)(2) and § 1022.30 of the Rule. *See* 90 Fed. Reg. at 3308.

Second, § 1022.38(b)(1) implements FCRA's permissible purpose provision, 15 U.S.C. § 1681b(a), consistent with the Bureau's general authority to promulgate rules to "carry out the purposes and objectives of [the statute]," 15 U.S.C. § 1681s(e)(1). FCRA's permissible purpose provision enumerates a list of purposes for which CRAs may provide consumer reports, *see id.* § 1681b(a), and the Act generally bars CRAs from providing, and bars anyone from obtaining or using, a consumer report unless it is for one of the listed permissible purposes, *id.* § 1681b(f). Section 1681b(a)(3)(A) provides that one permissible purpose is when a CRA has "reason to believe" a recipient intends to use the information in connection with a credit transaction involving the consumer. *Id.* § 1681b(a)(3)(A). With the old financial information exception removed, a creditor is once again generally prohibited from obtaining or using medical debt information—a subcategory of medical information—in connection with any determination of the consumer's eligibility for credit. 90 Fed. Reg. at 3307. Accordingly, a creditor cannot permissibly use a consumer report containing that information in connection with a credit transaction (unless a specific exception applies). *Id.* As a result, a CRA would not have reason to believe that such a creditor could intend to use the prohibited information in connection with an extension of credit—after all, it should not have reason to believe the creditor would violate the law—and thus FCRA § 1681b(a)(3)(A) would not supply a "permissible purpose" for the CRA to provide the information to the creditor. Section 1022.38(b)(1) of the Rule implements the permissible purpose provision by providing that a CRA may provide medical debt information to

a creditor only if the CRA "[h]as reason to believe the creditor intends to use the medical debt information in a manner not prohibited by § 1022.30." 90 Fed Reg. at 3307.

Plaintiffs turn the statute on its head, arguing that § 1681b(g)(1) expressly permits CRAs to report medical information to creditors. Not so. That section contains a *prohibition* on CRAs' furnishing consumer reports containing medical information, with certain exceptions. 15 U.S.C. § 1681b(g)(1). Under one such exception, the prohibition does not extend to certain anonymized debt-related information. *See id.* § 1681b(g)(1)(C). But that does not mean that FCRA affirmatively grants CRAs permission to share that anonymized information. And the limits on the prohibition do not trump the independent prohibition imposed by FCRA's permissible purpose requirement, *see* § 1681b(a), nor does it foreclose the Bureau from promulgating regulations under § 1681s(e)(1) to effectuate that requirement or to facilitate compliance with the statute.

Plaintiffs' remaining arguments challenging § 1022.38(b)(1) also fail. First, that FCRA prior to the FACT Act prohibited CRAs from providing medical information to creditors without consumer consent does nothing to alter the statute's current authorization of the Bureau to promulgate regulations both to implement FCRA and to facilitate compliance therewith. *See* 15 U.S.C. § 1681s(e)(1). Second, the statement of a single congressperson made during a floor debate is not a persuasive tool of statutory interpretation. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."). Third, the exercise of the Bureau's authority here is far from "unprecedented." *Contra* Mot. at 10. As the Bureau explained, *see* 90 Fed. Reg. at 3316–17, this is not an "extraordinary case" in which the "history and the breadth of the authority that the agency has asserted, … provide a reason to hesitate before concluding that Congress meant to

confer such authority." *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up). Here, the Bureau rescinded a discretionary regulatory exception and added provisions to facilitate compliance, as it was expressly authorized to do in § 1681s(e)(1).

### C. The Bureau acted within its statutory authority by limiting CRAs' ability to share medical debt information with creditors who are prohibited from using it by other laws.

For similar reasons, Plaintiffs' challenge to § 1022.38(b)(2) is unlikely to succeed. That provision permits CRAs to share medical debt information with a creditor only if the CRA has "reason to believe the creditor is not otherwise legally prohibited from obtaining or using the medical debt information," including by state law. 12 C.F.R. § 1022.38(b)(2). Where a creditor is legally prohibited from obtaining or using medical debt information by virtue of state law or some other law, a CRA would have no "reason to believe" that the creditor will (unlawfully) use that information in connection with a credit transaction. 90 Fed. Reg. at 3307–08. Thus, as above, the Bureau appropriately exercised its authority to implement FCRA's permissible purposes provision by promulgating a rule prohibiting CRAs from providing a creditor a consumer report containing medical debt information when that creditor cannot lawfully use that information in connection with a credit transaction.

Plaintiffs advance (at 13) an atextual argument that § 1681b(a) of FCRA does not limit CRAs based on the content of the information in a consumer report. But that is precisely what § 1681b(a) does: It provides that a CRA may only furnish a consumer report in connection with a credit transaction where the CRA "has reason to believe" that the person requesting the report "intends to use *the information*" contained therein in connection with that transaction. 15 U.S.C. § 1681b(a)(3)(A) (emphasis added). Plaintiffs' argument (at 14) that the Bureau's understanding of FCRA would require CRAs to police creditors' compliance with lending regulations is

unpersuasive. Neither FCRA's permissible purposes provision nor § 1022.38(b)(2) of the Rule requires a CRA to conduct a wide-ranging assessment of a creditor's compliance with any applicable lending laws, but they do require a CRA to consider whether the creditor is prohibited from using *the information* contained in the consumer report. If a creditor is prohibited from obtaining or using certain information in a credit transaction, a CRA should have no "reason to believe" that the creditor will use that information in connection with a credit transaction.[6]

Plaintiffs next claim (at 14) that the Rule unlawfully gives effect to preempted state law. Wrong again. Section 1022.38(b)(2) does not affect what laws are and are not preempted. 90 Fed. Reg. at 3305 n.150. If a particular state law is preempted or otherwise invalid, § 1022.38(b)(2) would not prevent a CRA from including on a consumer report information that would have otherwise violated such law. *See id.* Whether FCRA or any other federal law preempts any particular state law was beyond the scope of the rulemaking, and, notwithstanding Plaintiffs' claims, the Rule does not purport to resurrect otherwise-preempted state laws.

*     *     *

For all these reasons, Plaintiffs have no likelihood of success on the merits.[7]

## II.    Plaintiffs have not demonstrated that irreparable injury is likely.

To prevail on their motion, Plaintiffs must also "clearly carr[y] [their] burden of persuasion," *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005), to demonstrate "a substantial threat that [they] will suffer irreparable injury if the injunction is not

---

[6] The cases Plaintiffs cite on this point (at 14 n.2) are inapposite. None concern a claim that the creditor was prohibited from considering the information contained in the reports provided.

[7] If the Court concluded that Plaintiffs were likely to succeed on some, but not all, claims, the Court should enjoin only those "the portions of the Rule … for which [the plaintiff] has shown a likelihood of success on the merits." *Int'l Fresh Produce Ass'n v. United States Dep't of Lab.*, 2024 WL 4886058, at *5 (S.D. Miss. Nov. 25, 2024); *see also* 90 Fed. Reg. at 3351 (discussing severability of Rule's components).

granted," *Morrell v. City of Shreveport*, 536 F. App'x 433, 434 (5th Cir. 2013). Plaintiffs do not

meet that burden. Plaintiffs have not produced sufficient evidence to show that either the

creditor-facing or the CRA-facing provisions of the Rule are likely to cause irreparable injury

either to Plaintiffs' members or to Plaintiffs themselves.[8]

> ### A. Plaintiffs have not demonstrated an imminent likelihood of irreparable injury from the Rule's amendments to the restriction on creditors.

Plaintiffs fail to establish irreparable harm from the creditor-facing provisions of the

Rule. While they claim that credit union members of Cornerstone and Cornerstone itself will

suffer such harm, they provide no competent evidence establishing it. As for Cornerstone's

members, Plaintiffs provide a single declaration from a creditor claiming irreparable injury from

the Rule—a declaration purporting to be from an executive at "Anonymous Credit Union A," a

professed member of Cornerstone. *See* ECF No. 9-2. But this is not competent evidence. The

witness purporting to sign the declaration is anonymous, depriving this Court of its power to hold

a declarant to account for their statements under penalty of perjury. *See, e.g.*, *Williams v.*

*D'Argent Franchising, L.L.C.*, 2023 WL 3059192, at *13-14 (W.D. La. Apr. 24, 2023) ("The

lack of a signatory for a declaration prevents any person or entity from being held to the

statements within under penalty of perjury."). This Court's Local Rules provide a process for

litigants to file material under seal by seeking the court's permission to do so via motion. *See*

L.R. CV-5(a)(7). Instead, Plaintiffs have contravened the basic principle that witnesses do not

testify anonymously—and provided no justification whatsoever. Anonymous Credit Union A's

---

[8] Only the provisions of the Rule that Plaintiffs can establish will cause them irreparable harm
can be enjoined, as a preliminary injunction "should be no more burdensome to the defendant
than necessary to provide complete relief" to plaintiffs who have met their burden of persuasion,
*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (cleaned up).

declaration is not competent evidence, and Plaintiffs thus fail to demonstrate that any of their members is likely to suffer irreparable injury from the Rule's restrictions on creditors.

Plaintiffs also claim that Cornerstone itself will suffer irreparable harm from the creditor-facing provisions absent a preliminary injunction. ECF No. 9-1 at ¶ 9. That claim does not withstand scrutiny. Cornerstone says it will expend resources to update its training materials for member credit unions. ECF No. 9-1 at ¶ 7. But Cornerstone fails to mention that its membership is a paid service whose value is grounded in its offering of training and education to increase members' compliance with applicable laws and regulations. *See, e.g.*, Cornerstone, *Compliance Assistance, Services Available to League Members*, a*vailable at* https://www.cornerstoneleague .coop/services/compliance (offering "an extensive array of compliance services" to assist members in the face of "consistently changing" rules and regulations). The Rule may well improve Cornerstone's financial outlook via increased demand for its membership. At a minimum, the net effect of the Rule on Cornerstone's financial future is uncertain. And as a result, Cornerstone fails to meet its burden.

Because Plaintiffs fail to establish that the Rule's creditor-facing provisions will cause irreparable injury to Plaintiffs or any of their members, there is no basis to preliminarily enjoin those parts of the Rule.

**B. Plaintiffs have not demonstrated an imminent likelihood of irreparable injury from the Rule's restrictions on consumer reporting agencies.**

Plaintiffs similarly fail to establish irreparable injury from the Rule's CRA-facing provisions. While they claim that CDIA's members and CDIA itself will suffer such harm, their claims do not withstand scrutiny.

As for members, Plaintiffs have offered declarations from each of the three NCRAs, each of which states it is a member of CDIA, but none of the declarations demonstrates that the

16

purported harm they claim is "real, imminent, and significant—not merely speculative or potential[.]" *Tex. Health & Hum. Servs. Comm'n v. United States*, 166 F. Supp. 3d 706, 710 (N.D. Tex. 2016). In considering whether to grant a preliminary injunction, "the harm considered by the district court is necessarily confined to that which might occur in the interval between the ruling on the preliminary injunction and trial on the merits." *Aquifer Guardians in Urb. Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 573 (W.D. Tex. 2011) (internal citation omitted). The NCRA declarations all fail to establish irreparable harm during that relevant interval. TransUnion claims that it will incur costs "over the next couple of years," ECF No. 9-6 at ¶ 6, but makes no claims about specific costs that it will incur during the pendency of this action. Similarly, Experian and Equifax claim they will incur costs but decline to give any timeline at all. *See* ECF No. 9-5 at ¶ 6; ECF No. 9-4 at ¶ 7. These statements fail to satisfy Plaintiffs' burden to establish that any such costs must be incurred before a merits decision can be issued.[9]

The other assertions the NCRAs make about potential operational steps they might take to comply with the Rule don't help Plaintiffs meet their burden either. Plaintiffs must establish that any harm they stand to incur before a final judgment is "more than de minimis[.]" *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022). But while the NCRAs spin out higher-effort implementation options, they admit that they have an option involving only de minimis effort: suppression of all medical debt tradelines from consumers' reports, at least until a merits decision is reached in this case. *See* ECF No. 9-4 at ¶ 6a; ECF No. 9-6 at ¶ 5a.

There can be little doubt that operationalizing this suppression option is readily doable: Each NCRA has already voluntarily removed a host of medical debts from consumer credit

---

[9] While Plaintiffs also offer an anonymous declaration purportedly from an executive at "anonymous CRA A," ECF No. 9-7, that declaration is not competent evidence for the reasons discussed above. *See supra* at IIA.

reports—those reported by debt collectors that have balances of $500 or less, are less than 12 months past due, and that have been paid. *See* ECF No. 9-4 at ¶ 5; ECF No. 9-5 at ¶ 4; ECF No. 9-6 at ¶ 4. Those changes eliminated an estimated 70% of medical debt collection tradelines from consumer reports.[10] Having already made "extensive," ECF No. 9-4 at ¶ 5, changes to their systems to identify medical debts reported by debt collectors (how else could the NCRAs remove medical debts under $500?), it is simply not plausible that they lack the infrastructure to suppress the remaining debts reported by debt collectors too—and the NCRAs do not provide evidence to suggest otherwise. The NCRAs can also readily identify the remaining medical debts covered by the Rule—those reported by the few healthcare providers who report debts[11]—because those providers have long been required to self-identify to CRAs, *see* 15 U.S.C. § 1681s-2(a)(9). The kind of de minimis effort required to suppress already-identified information does not qualify as irreparable harm.[12] And because the NCRAs give no rationale why more intricate implementation must take place before a merits decision is reached, the NCRAs offer only the kind of "unsupported, conclusory statements" that are "insufficient to demonstrate entitlement to

---

[10] *See* BusinessWire, *Equifax, Experian, and TransUnion Support U.S. Consumers With Changes to Medical Collection Debt Reporting* (March 18, 2022), https://www.businesswire.com/news/home/20220318005244/en/Equifax-Experian-and-TransUnion-Support-U.S.-Consumers-With-Changes-to-Medical-Collection-Debt-Reporting.

[11] *See* Experian, *First Changes to Reporting of Medical Collection Debt Roll Out July 1, 2022*, https://www.experianplc.com/newsroom/press-releases/2022/first-changes-to-reporting-of-medical-collection-debt-roll-out-july-1-2022 (last visited Jan. 23, 2025) (explaining that most healthcare providers "do not directly report" to the NCRAs).

[12] Plaintiffs also argue that suppression would be costly because restoring suppressed data would be "difficult[.]" *See* Mot. at 17. But Plaintiffs provide no explanation why the infrastructure they already built to identify and filter medical debt would not easily facilitate restoration. And their claim that suppression would have "irreversible" results would only occur if they "chose[] to delete" the information, *id.*, which nothing in the Rule requires them to do.

the extraordinary relief" of a preliminary injunction.[13] *Coleman v. Bank of N.Y Mellon*, 2013 WL 1187158, at *8 (N.D. Tex. Mar. 4, 2013), *R&R adopted*, 2013 WL 1189264 (N.D. Tex. Mar. 21, 2013).

Like Cornerstone, CDIA also attempts to demonstrate that it itself is harmed by the Rule. Like Cornerstone, CDIA fails to meet its burden. CDIA argues that *if* medical debt furnishers stop furnishing to CRAs, CDIA may lose revenue "as a result of fewer companies enrolling in Metro2 education classes." ECF No. 9-3 at ¶ 9. CDIA does not disclose, however, that it also stands to benefit financially from the Rule, as it offers classes on FCRA compliance at a cost of $127 per person to cover topics including permissible purposes, compliance procedures, and user requirements. *See, e.g.*, https://www.cdiaonline.org/certificate-program-for-cras/. Indeed, CDIA currently offers a $175 seminar on the proposed rule. *See* https://www.cdiaonline.org/cfpb-proposed-rule-to-ban-medical-debt/. Even taking CDIA's speculation at face value that it *may* see a decrease in course demand by medical debt furnishers, it is at least equally plausible that it will see an increase in course demand by CRAs and others. These facts fall far short of establishing that the Rule's CRA-facing provisions will likely cause CDIA irreparable harm.

For these reasons, Plaintiffs have failed to meet their burden on the irreparable-injury requirement for a preliminary injunction.

## III.   The balance of equities and public interest favor Defendants.

The final two preliminary injunction factors, the balance of equities and the public interest, "merge" when the government opposes an injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, they weigh against an injunction because Plaintiffs' speculative assertion of de

---

[13] No declaration attributes costs to § 1022.38(b)(2). Plaintiffs thus fail to establish that that provision gives rise to irreparable harm. And even if they had provided evidence specifying harm due to § 1022.38(b)(2), the NCRAs still face only de minimis costs if they suppress the data.

minimis harm during the pendency of this matter is outweighed by the government's and the public's interest in implementing the consumer protections Congress enacted. *See, e.g., Maryland v. King,* 567 U.S. 1301, 1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (Roberts, C.J., in chambers (cleaned up))); *cf. E.T. v. Paxton*, 19 F.4th 760, 769–70 (5th Cir. 2021) (government suffers irreparable harm from circumvention of executive branch action).

The Rule implements the strong privacy protections for consumers' sensitive medical information that Congress established via the FACT Act nearly 20 years ago. And the Bureau's analysis of its benefits and costs concludes that, indeed, consumers stand to benefit from "increased access to credit and a reduction in the use of consumer reporting to induce payment of medical collections, including those that may be inaccurate." 90 Fed. Reg. at 3323.

As for Plaintiffs' claim that the Rule will increase credit risk, the Bureau's analysis of the relevant evidence concluded that the use of medical debt "does not improve the predictiveness of credit eligibility determinations[.]" *Id.* at 3335. That's no surprise—an industry evaluation of the NCRAs' voluntary elimination of most medical debts found virtually no change in lenders' ability to rank-order risk using FICO Scores. *Id.* at 3333–34. And the Rule fares better than doing no harm to creditors—it would affirmatively benefit them. According to the Bureau's empirical analysis, the increase in access to credit for consumers means that their lenders "would experience an increase in profitable loan volume[.]" *Id.* at 3335.

The balance of equities weighs in favor of denying Plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for preliminary relief.

Date: January 23, 2025                    Respectfully submitted,

Seth Frotman
   *General Counsel*
Steven Y. Bressler
   *Deputy General Counsel*
Kristin Bateman
   *Assistant General Counsel*

*/s/ Amanda J. Krause*
Amanda J. Krause (N.Y. Reg. No. 5323357)
   *Pro hac vice*
Andrea J. Matthews (M.A. Bar No. 694538)
   *Pro hac vice*
   *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
(202) 435-7965 (phone) (Krause)
(202) 407-2324 (phone) (Matthews)
(202) 435-7024 (fax)
Amanda.Krause@cfpb.gov
Andrea.Matthews@cfpb.gov

*Counsel for Defendants the Consumer*
*Financial Protection Bureau and Rohit*
*Chopra*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of this Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction was filed electronically through the Court's ECF system.

Date: January 23, 2025                                   *<u>/s/ Amanda J. Krause</u>*