IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

CORNERSTONE CREDIT UNION
LEAGUE and CONSUMER DATA
INDUSTRY ASSOCIATION,

        *Plaintiffs*,

    v.

CONSUMER FINANCIAL PROTECTION
BUREAU and RUSSELL VOUGHT, in his
official capacity as Acting Director of the
CFPB,

        *Defendants*.

No. 4:25-cv-00016-SDJ

**BRIEF OF DISABILITY RIGHTS TEXAS, JUSTICE IN AGING, AMERICAN CANCER SOCIETY CANCER ACTION NETWORK, THE LEUKEMIA & LYMPHOMA SOCIETY, SMALL BUSINESS MAJORITY, COMMUNITY CATALYST, NATIONAL HEALTH LAW PROGRAM, AND RAISE TEXAS, AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO JOINT MOTION TO APPROVE CONSENT JUDGMENT [ECF NO. 31] AND THE MOTION FOR PRELIMINARY INJUNCTION [ECF NO. 9]**

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ ii

INTERESTS OF AMICI.............................................................................................. 1

ARGUMENT ............................................................................................................... 1

    I.     HEALTH CARE DEBT CAUSES SERIOUS HARM TO MILLIONS OF
          PEOPLE. ......................................................................................................... 1

    II.    MEDICAL DEBT HARMS PEOPLE WITH DISABILITIES. ............................ 5

    III.   MEDICAL DEBT HARMS PEOPLE WITH CANCER. .................................... 6

    IV.   MEDICAL DEBT HARMS OLDER ADULTS................................................... 8

    V.    MEDICAL DEBT DISPROPORTIONATELY HARMS COMMUNITIES OF
          COLOR. ......................................................................................................... 11

    VI.   MEDICAL DEBT HARMS SMALL BUSINESSES. ....................................... 12

CONCLUSION.......................................................................................................... 14

CERTIFICATE OF SERVICE .................................................................................. 15

# TABLE OF AUTHORITIES

**Statutes**

25 U.S.C. § 1621u(a) ................................................................................................ 11

**Other Authorities**

AAPD, Explaining Medical Debt and the CFPB Rule: What's Going on with Medical Debt, and How Does it Impact Consumers with Disabilities? (Apr. 25, 2025), https://www.aapd.com/cfpb-explainer/ ................................................................................. 5

ACS CAN Comments to CFPB on Medical Debt in Credit Reporting (Aug. 9, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0873 ................................................ 7

ACS CAN, Survivor Views: Cancer & Medical Debt: February 2022 Survey Findings Summary (April 2024), https://www.fightcancer.org/survivor-views ........................................ 7

Alex Cottrill et al., KFF, *What are the Consequences of Health Care Debt Among Older Adults?* (2024), https://www.kff.org/medicare/issue-brief/what-are-the-consequences-of-health-care-debt-among-older-adults/#:~:text=may%20be%20lasting.-,Nearly%20three%20in%20ten%20Medicare%2Dage%20adults%20with%20health%20care,credit%20score%20(Figure%204) .............................................. 10

ALSO*, Housing Crisis 2022: Its Outsized Impact on People with Disabilities*, https://alsoweb.org/nonprofit-blog/housing-crisis-2022-its-outsized-impact-on-people-with-disabilities/ .............................................................................................. 6

Audrey Bui Khac, *A Not So Small Portfolio Optimization Opportunity: How Advanced Analytics Can Help Banks Better Engage with Small Businesses* (Dec. 2022), https://www.mastercardservices.com/en/advisors/consumer-engagement-loyalty-consulting/insights/not-so-small-portfolio-optimization#:~:text=To%20help%20banks%20build%20personalized%20approaches%20to,likelihood%20to%20respond%20to%20spend%20stimulation%20invitations ....................... 13

Brandon G. Wilson & Colin Killick, Comm'ty Catalyst, *Paying the Price: How Medical Debt Disproportionately Hurts People with Disabilities* (Oct 31, 2024)*, https://communitycatalyst.org/posts/paying-the-price-how-medical-debt-disproportionately-hurts-people-with-disabilities/ .............................................................. 3, 4, 5, 6

CFPB, *Paid and Low-Balance Medical Collections on Consumer Credit Reports* (July 27, 2022), https://www.consumerfinance.gov/data-research/research-reports/paid-and-low-balance-medical-collections-on-consumer-credit-reports/ ................................................ 4

COMM. ON HEALTH CARE UTILIZATION ON ADULTS WITH DISABILITIES, HEALTH-CARE UTILIZATION AS A PROXY IN DISABILITY DETERMINATION, Nat'l Academies Press (2018), https://www.ncbi.nlm.nih.gov/books/NBK500097/#: .................................................. 5

Community Catalyst, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information at 2, Docket CFPB-2024-0023-0989 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0989 ................................... 12

Consumer Financial Protection Bureau, *Consumer Credit Reports: A Study of Medical and Non-Medical Collections* at 16 (2014), https://files.consumerfinance.gov/f/201412_cfpb_reports_consumer-credit-medical-and-non-medical-collections.pdf ........................................................................... 13

Consumer Financial Protection Bureau, Medical Billing and Collections Among Older Americans (2023), https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-medical-billing-and-collections-among-older-americans/ .................................... 9, 10

Consumer Financial Protection Bureau, Medical Collections on Credit Reports in Native American Communities 3 (2024), https://files.consumerfinance.gov/f/documents/cfpb_aian-medical-debt_2024-12.pdf ................................................................ 11

Consumer Financial Protection Bureau, NURSING HOME DEBT COLLECTION 2 (2022), https://files.consumerfinance.gov/f/documents/cfpb_issue-spotlight-nursing-home-debt-collection_report_2022-09.pdf ......................................................... 10

Ctrs. For Medicare & Medicaid Servs., Medicare Monthly Enrollment, https://data.cms.gov/summary-statistics-on-beneficiary-enrollment/medicare-and-medicaid-reports/medicare-monthly-enrollment (last modified April 24, 2025). ..................................... 9

FEDERAL RESERVE BANKS, 2020 REPORT ON EMPLOYER FIRMS SMALL BUSINESS CREDIT SURVEY 8 (2020).......................................................................... 13

FEDERAL RESERVE BANKS, SMALL BUSINESS CREDIT SURVEY: REPORT ON EMPLOYER FIRMS at 9 (2019)................................................................................. 13

Gabriela Dieguez et al., Milliman Research Report, *The Cost Burden of Blood Cancer Care: A Longitudinal Analysis of Commercially Insured Patients Diagnosed with Blood Cancer* (Oct. 2018), https://www.lls.org/sites/default/files/Milliman%20study%20cost%20burden%20of%20blood%20cancer%20care.pdf ................................................................ 7

Hank Cardello & Annie Morino, Georgetown Univ., *Annual Medical Debt Report: The Casualties of Medical Debt: Sicker Consumers and Sicker Hospitals* at 9, https://georgetown.app.box.com/s/ik3svw19cwxdiixt4svn5jb5tgz3rlpx ................................. 4

Jae Kennedy et al., *Disparities in Insurance Coverage, Health Services Use, and Access Following Implementation of the Affordable Care Act:  A Comparison of Disabled and Nondisabled Working-Age Adults,* 54 INQUIRY 1 (2017) https://pmc.ncbi.nlm.nih.gov/articles/PMC5798675/................................................. 5

Justice in Aging, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information at 2, Docket CFPB-2024-0023-0949 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0949................................. 11

Kyle J. Moon et al., *Medical Debt and Forgone Mental Health Care Due to Cost Among Adults*, 6 JAMA HEALTH FORUM 2 (2025), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2832767#:~:text=Any%20medical%20debt%20was%20associated,increasing%20medical%20debt%20(Table) ........................................................................... 3

Lunna Lopes *et al.*, Kaiser Family Fnd., *Health Care Debt in the U.S.: The Broad Consequences of Medical and Dental Bills* (Jun. 16, 2022) https://www.kff.org/report-section/kff-health-care-debt-survey-main-findings/.................................................................. passim

Medicare.gov, Costs, https://www.medicare.gov/basics/costs/medicare-costs (last visited April 30, 2025) ............................................................................................................ 9

Michael Karpman et al., Urban Institute, *How Many Consumers Would Be Affected by a Potential Ban on Medical Debt in Credit Reports? Findings by State and Congressional District* at 3, (Apr. 2023), https://www.urban.org/research/publication/how-many-consumers-would-be-affected-potential-ban-medical-debt-credit-reports.................................. 4, 5

Michelle Sternthal *et al.*, *Racial Disparities in Health: How Much Does Stress Really Matter?*, 8 DU BOIS REVIEW 95 (Apr. 15, 2011), https://pmc.ncbi.nlm.nih.gov/articles/PMC5993442/..... 3

Nat'l Inst. of Health, *Advisory Committee to the Director, Working Group on Diversity, Subgroup on Individuals with Disabilities, Report* (Dec. 9, 2022), https://cpresource.org/sites/www/files/2023-09/Disabilities%20Subgroup.pdf........................ 5

National Consumer Law Center, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information at 5, Docket CFPB-02024-0023-0900 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0900 .................. 12

National Disability Institute, Comment on the Consumer Financial Protection Bureau's proposed rule Prohibition on consumers and Creditor and Consumer Reporting Agencies Concerning

iv

Medical Information, Docket No. CFPB-2024-0023, Aug. 12, 2024,
https://www.regulations.gov/comment/CFPB-2024-0023-1034 ....................................... 2, 4, 6

Patients Protecting Care, Comment on Prohibition of Creditors and Consumer Reporting
Agencies Concerning Medical Information (Regulation V), Docket CFPB-2024-0023-0993
(Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0993 ............... 1, 2

Perry Undem, *Impacts of Medical Debt: Findings from a National Survey* (Oct. 2023),
https://www.lls.org/sites/default/files/2023-10/Medical%20Debt%20Report.pdf..................... 3

Priya Chidambaram & Alice Burns, Kaiser Family Fnd., *10 Things About Long-Term Services
and Supports (LTSS)* (2024), https://www.kff.org/medicaid/issue-brief/10-things-about-long-
term-services-and-supports-ltss/ ................................................................................................ 10

Robin A. Cohen et al., *Problems Paying Medical Bills: United States, 2021*, 180 NAT'L HEALTH
STATISTICS 11 (2023), https://www.cdc.gov/nchs/data/nhsr/nhsr180.pdf ................................ 10

Rohit Chopra, Prepared Remarks of CFPB Director Rohit Chopra at a White House Convening
on Medical Debt (Oct. 1, 2024), https://www.consumerfinance.gov/about-
us/newsroom/prepared-remarks-of-cfpb-director-rohit-chopra-at-a-white-house-convening-on-
medical-debt/ ................................................................................................................................ 3

Shameek Rakshit et al., The Burden of Medical Debt in the United States (2024),
https://www.healthsystemtracker.org/brief/the-burden-of-medical-debt-in-the-united-
states/#Share%20of%20adults%20who%20have%20medical%20debt,%20by%20health%20st
atus%20and%20disability%20status,%202021 ........................................................................ 12

Small Business Majority, *Comment Letter on Prohibition on Creditors and Consumer Reporting
Agencies Concerning Medical Information* at 1 (Aug. 6, 2024),
https://www.regulations.gov/comment/CFPB-2024-0023-0536 ................................................ 14

SMALL BUSINESS MAJORITY, SURVEY: SMALL BUSINESSES OPTIMISTIC ABOUT THE FUTURE,
DESPITE CONCERNS ABOUT INFLATION AND BARRIERS TO CAPITAL 2 (2022),
https://smallbusinessmajority.org/sites/default/files/research-reports/2022-SSTB-SBM-
Network-Poll-Report.pdf .......................................................................................................... 13

Surya P. Kolluri et al., TIAA Institute, *Playing the long game: How longevity affects financial
planning and family caregiving* (2023),
https://www.tiaa.org/content/dam/tiaa/institute/pdf/insights-report/2023-10/tiaa-institute-
upenn-how-longevity-affects-financial-planning-ti-november-2023.pdf ................................. 11

The Century Foundation, Economic Justice is Disability Justice (April 21, 2022),
https://tcf.org/content/event/economic-justice-is-disability-justice/..................................... 5, 6

The Commonwealth Fund, The Federal Rule on Medical Debt (Feb. 27, 2025),
https://www.commonwealthfund.org/publications/explainer/2025/feb/federal-rule-on-medical-debt.................................................................................................................... 2

Victor Duarte *et al.*, Nat'l Bd. of Econ. Rev., Working Paper 33644, *The Effects of Deleting Medical Debt from Consumer Credit Reports* at 1 (Apr. 2025) ................................................ 4

Xuesong Han et al., *Associations of Medical Debt With Health Status, Premature Death, and Mortality in the US*, JAMA Network Open (Mar. 4, 2024),
https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2815530 ................................ 3

## INTERESTS OF AMICI

*Amici curiae* Disability Rights Texas, Justice in Aging, American Cancer Society Cancer Action Network, Leukemia & Lymphoma Society, Small Business Majority, National Health Law Program (NHeLP), Community Catalyst, and RAISE Texas are national and Texas-based non-profit advocacy organizations that have an interest in preserving the final rule titled, *Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V)*, 90 Fed. Reg. 3,276 (Jan. 14, 2025). They represent the interests of low-income people, people with disabilities, older adults, people with cancer, small business owners and employees, and Texas-based organizations working to expand asset-building opportunities. Therefore, they oppose the motions for preliminary injunction and consent judgment in this action.

## ARGUMENT

### I.    HEALTH CARE DEBT CAUSES SERIOUS HARM TO MILLIONS OF PEOPLE.

*The consequences of [medical debt] are overwhelming, particularly for patients with chronic and acute conditions. . . . [T]oo often, patients and their families must make difficult tradeoffs to manage their debt, including by juggling payments for basic household needs, such as utilities, rent or mortgage, and food, with those required to get care and manage their health conditions. The stress involved in facing this debt can worsen their health condition, as can hardships such as not being able to afford nutritious food due to their medical debt.[1]*

---

[1] Patients Protecting Care, Comment on Prohibition of Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), Docket CFPB-2024-0023-0993 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0993 (collecting studies). Patients Protecting Care includes more than 25 non-profit and non-partisan organizations representing patients, including the American Lung Association, Epilepsy Foundation, National Alliance on Mental Illness, and the AIDS Institute.

Medical and dental costs have steadily increased for decades and often, particularly when unexpected, leave people in debt.[2] A recent study found that nearly 100 million people have health care debt.[3] At one point, it was the most common type of debt listed on credit reports; in 2021, it made up 58% of reported debt.[4] Almost half of adults surveyed in the South reported having health care debt, particularly those in states that, like Texas, have not expanded Medicaid.[5] One study found that 99 of the 100 counties with the largest shares of adults unable to pay their medical bills are located in Southern states, while 79 of those 100 counties have not expanded Medicaid.[6]

Including medical debt on credit reports harms people in many ways. They may delay or avoid necessary treatments, medications, or doctor visits, or have a provider deny care because of poor credit.[7] Many people with debt report skipping payment on other bills, cutting back on food or basic household items, delaying college or home purchase, or changing housing.[8] In a recent survey, half of adults with medical debt report making a difficult sacrifice to pay the debt, leaving

---

[2] Lunna Lopes et al., KFF, *Health Care Debt in the U.S.: The Broad Consequences of Medical and Dental Bills* (Jun. 16, 2022) https://www.kff.org/report-section/kff-health-care-debt-survey-main-findings/.

[3] Patients Protecting Care, Comment on Prohibition of Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), Docket CFPB-2024-0023-0993 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0993, citing Lopes, *supra* note 2.

[4] *See, e.g.,* The Commonwealth Fund, *The Federal Rule on Medical Debt* (Feb. 27, 2025), https://www.commonwealthfund.org/publications/explainer/2025/feb/federal-rule-on-medical-debt.

[5] Lopes et al., *supra* note 2. Medical debt is higher in the 10 states that have not expanded Medicaid, which have larger populations of Black residents.

[6] *See also* National Disability Institute, Comment on the Consumer Financial Protection Bureau's proposed rule Prohibition on consumers and Creditor and Consumer Reporting Agencies Concerning Medical Information at 8, Docket CFPB-2024-0023, Aug. 12, 2024, https://www.regulations.gov/comment/CFPB-2024-0023-1034 (citation omitted).

[7] *Id.*

[8] *Id.*

some feeling that they could not provide a good life for their families.[9] Another recent survey shows that 63% of respondents say they are delaying dental care, skipping doctor appointments, changing the foods they eat, delaying paying medical bills, or making other sacrifices as they struggle with healthcare costs.[10] Almost half of the respondents from the same survey report feeling "trapped" by their medical debt.[11] People are also likely to pay more in interest on car or personal loans because of poor credit or be denied loans or credit to make purchases.[12] Debt also causes stress and anxiety, increasing mental health challenges, which are exacerbated by debt collector harassment and intimidation.[13] Unfortunately, adults with medical debt are five times more likely to forgo mental health treatment due to costs.[14] Thus, it is not surprising that medical debt is associated with increased physical and mental health problems and higher mortality rates.[15]

---

[9] *Id.*

[10] Perry Undem, *Impacts of Medical Debt: Findings from a National Survey* (Oct. 2023), https://www.lls.org/sites/default/files/2023-10/Medical%20Debt%20Report.pdf.

[11] *Id.*

[12] Lopes et al., *supra* note 2.

[13] *See* Brandon G. Wilson & Colin Killick, Comm'ty Catalyst, *Paying the Price: How Medical Debt Disproportionately Hurts People with Disabilities* (Oct 31, 2024), https://communitycatalyst.org/posts/paying-the-price-how-medical-debt-disproportionately-hurts-people-with-disabilities/; Lopes et al., *supra* note 2. *See also* Michelle Sternthal et al., *Racial Disparities in Health: How Much Does Stress Really Matter?*, 8 DU BOIS REV. 95 (Apr. 15, 2011), https://pmc.ncbi.nlm.nih.gov/articles/PMC5993442/. Unscrupulous companies threaten to put debt on credit reports, where accuracy is wrongly presumed. This adds pressure on people to pay off bills so as to avoid further financial harm, even when charges are inaccurate or fake. Rohit Chopra, Prepared Remarks of CFPB Director Rohit Chopra at a White House Convening on Medical Debt (Oct. 1, 2024), https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-of-cfpb-director-rohit-chopra-at-a-white-house-convening-on-medical-debt/.

[14] Kyle J. Moon et al., *Medical Debt and Forgone Mental Health Care Due to Cost Among Adults*, 6 JAMA HEALTH FORUM 2 (2025), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2832767#:~:text=Any%20medical%20debt%20was%20associated,increasing%20medical%20debt%20(Table).

[15] Xuesong Han et al., *Associations of Medical Debt With Health Status, Premature Death, and Mortality in the US*, JAMA Network Open (Mar. 4, 2024), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2815530.

At the same time, there is little evidence that the rule will have negative effects on entities like the Plaintiff.  The three major credit bureaus have already announced that they will no longer include medical debt collections below $500 in their credit reports.[16] Eleven states already do not allow medical debt information in credit reports, including California, Illinois, and New Jersey.[17]

In addition, a recent study found that medical debt is a poor predictor of creditworthiness and likelihood of default.[18] People almost never incur medical debt voluntarily, and disease and injury occur for many reasons, often without any fault on the part of the patient.[19] Also the challenged rule and resulting elimination of medical collections from credit reports is unlikely to affect the accuracy of credit scoring models.[20] Medical debt information that appears on credit reports can also be unreliable.[21] More than half of people (53%) report receiving a medical bill they believe is incorrect.[22]

---

[16] Victor Duarte et al., Nat'l Bd. of Econ. Rev., Working Paper 33644, *The Effects of Deleting Medical Debt from Consumer Credit Reports* at 1 (Apr. 2025).

[17] Michael Karpman et al., Urban Institute, *How Many Consumers Would Be Affected by a Potential Ban on Medical Debt in Credit Reports? Findings by State and Congressional District* at 3, (Apr. 2023), https://www.urban.org/research/publication/how-many-consumers-would-be-affected-potential-ban-medical-debt-credit-reports.  The other states are Colorado, Connecticut, Maryland, Minnesota, Rhode Island, Virginia, and Washington.

[18] Duarte et al., *supra* note 16, at 1.

[19] Hank Cardello & Annie Morino, Georgetown Univ., *Annual Medical Debt Report: The Casualties of Medical Debt: Sicker Consumers and Sicker Hospitals* at 9, https://georgetown.app.box.com/s/ik3svw19cwxdiixt4svn5jb5tgz3rlpx.

[20] Duarte et al., *supra* note 16, at 8.

[21] Karpman et al., *supra* note 17.

[22] Wilson & Killick, *supra* note 13. In a recent survey by KFF, 44% of adults with health care debt reported nonpayment of a bill because they were not sure it was accurate. Lopes, *Health Care Debt in the U.S*, *supra* note 2. *See also* National Disability Institute, *supra* note 6 (discussing high prevalence of erroneous medical debt reported). *See also* CFPB, *Paid and Low-Balance Medical Collections on Consumer Credit Reports* (July 27, 2022) (noting medical collections are disputed almost three times as frequently as credit card collections), https://www.consumerfinance.gov/data-research/research-reports/paid-and-low-balance-medical-collections-on-consumer-credit-reports/.

## II.    MEDICAL DEBT HARMS PEOPLE WITH DISABILITIES.

Medical debt imposes a heavy burden on the 67 million Americans with disabilities.[23] They have more frequent interactions with the health care system,[24] and they have health care expenses that are 5 to 6 times higher than people who do not have disabilities.[25]  In addition to regular doctor visits and prescription medications, they may require specialty care, durable medical equipment such as wheelchairs or hearing aids, or home health care services. Some of these expenses may not be covered by insurance, such as maintenance for medical equipment or respite care for a caregiver.[26]

Not surprisingly, given these facts, people with disabilities are twice as likely to report a medical debt.[27] A recent study found that adults with disabilities were more than twice as likely (24.9%) as people without disabilities (12.5%) to carry medical debt.[28]  Over 25% of people with disabilities live in poverty, more than double the rate of non-disabled people.[29] This means that debt is "far more likely to have catastrophic consequences for them."[30]

---

[23] Nat'l Inst. of Health, *Advisory Committee to the Director, Working Group on Diversity, Subgroup on Individuals with Disabilities, Report* (Dec. 9, 2022), https://cpresource.org/sites/www/files/2023-09/Disabilities%20Subgroup.pdf.

[24] Wilson & Killick, *supra* note 13, citing COMM. ON HEALTH CARE UTILIZATION ON ADULTS WITH DISABILITIES, HEALTH-CARE UTILIZATION AS A PROXY IN DISABILITY DETERMINATION at 32, Nat'l Academies Press (2018), https://www.ncbi.nlm.nih.gov/books/NBK500097/#:

[25] Wilson & Killick, *supra* note 13, citing Jae Kennedy et al., *Disparities in Insurance Coverage, Health Services Use, and Access Following Implementation of the Affordable Care Act: A Comparison of Disabled and Nondisabled Working-Age Adults,* 54 INQUIRY 1 (2017) https://pmc.ncbi.nlm.nih.gov/articles/PMC5798675/.

[26] AAPD, Explaining Medical Debt and the CFPB Rule: What's Going on with Medical Debt, and How Does it Impact Consumers with Disabilities? (Apr. 25, 2025), https://www.aapd.com/cfpb-explainer/.

[27] Lopes et al., *supra* note 2.

[28] Karpman et al., *supra* note 17.

[29] Wilson & Killick, *supra* note 13, citing The Century Foundation, Economic Justice is Disability Justice (April 21, 2022), https://tcf.org/content/event/economic-justice-is-disability-justice/.

[30] Wilson & Killick, *supra* note 13.

The problems caused by medical debt are magnified for people with disabilities. Pervasive barriers to employment make it more likely that people with disabilities will be un- or underemployed and have lower-paying work.[31] Higher rates of medical debt and structural barriers to finding accessible housing make it a particular challenge for people with disabilities. They have higher rates of housing insecurity, higher rates of discrimination, and barriers to finding accessible housing.[32] They also are more likely to skimp on food or other necessities and to have a lower quality of life than people without disabilities.[33]

People with disabilities are also at more at risk from harm caused by billing and collections than others. Medical bills are difficult for most people to decipher and are even more inaccessible for the 7 million people with visual impairments, as medical billing is often not provided in an accessible format or plain language.[34] People with disabilities may also be more vulnerable to aggressive medical debt collection practices and fraudulent schemes.[35]

## III.    MEDICAL DEBT HARMS PEOPLE WITH CANCER.

People with cancer often have significant health care costs because they have high medical needs, require service from many different medical practitioners, and sometimes need more expensive treatments. All too often, this combination leads to debt. A recent survey by the American Cancer Society Cancer Action Network found that nearly half of cancer patients and survivors (47%) had medical debt related to cancer and nearly half of that group had more than $5,000 in debt. More than two-thirds carried the debt for more than a year, and a third carried debt

---

[31] The Century Foundation, *supra* note 29.

[32] Wilson & Killick, *supra* note 13.  *See also* ALSO, *Housing Crisis 2022: Its Outsized Impact on People with Disabilities*, https://alsoweb.org/nonprofit-blog/housing-crisis-2022-its-outsized-impact-on-people-with-disabilities/.

[33] *See* National Disability Institute, *supra* note 6.

[34] Wilson & Killick, *supra* note 13 (referring to people over age 16).

[35] Wilson & Killick, *supra* note 13.

for more than three years. Nearly all (98%) were insured, although a third had a high-deductible health plan.[36]

Many people with cancer already suffer financial hardship.[37] Debt resulting from cancer exacerbates this problem: nearly half of survey respondents (49%) saw their credit scores decrease, and 30% had difficulty qualifying for loans. Carrying medical debt also results in health care providers denying care, more often for Black and Hispanic patients and survivors: 7% of White respondents with medical debt reported denials of care, compared to 13% of Black respondents, and 14% of Hispanic respondents. Fifty-five percent of people with cancer-related medical debt have been contacted by a collection agency, and nearly two-thirds of them felt harassed.  Black respondents are more likely to report contact from collection agencies over medical debt (66%) and feeling harassed by them (44%).[38]

A research study commissioned by the Leukemia & Lymphoma Society found that patients' cumulative out-of-pocket spending in the three years following a blood cancer diagnosis ranged from $7800 to $9127, depending on subtype.[39] The study also found that a patient's out-of-pocket spending *never* returns to pre-diagnosis levels, meaning that financial toxicity (the extraordinary financial pressure that cancer patients experience resulting from their diagnosis and

---

[36] ACS CAN, Survivor Views on Medical Debt (April 2024), sv_debt_summary_24.pdf. *See also* ACS CAN Comments to CFPB on Medical Debt in Credit Reporting (Aug. 9, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0873.

[37] ACS CAN Comments, *id.*

[38] ACS CAN Comments, *supra* note 36.

[39] Gabriela Dieguez et al., Milliman Research Report, *The Cost Burden of Blood Cancer Care: A Longitudinal Analysis of Commercially Insured Patients Diagnosed with Blood Cancer* (Oct. 2018), https://www.lls.org/sites/default/files/Milliman%20study%20cost%20burden%20of%20blood%20cancer%20care.pdf.

treatment) is a burden associated not only with cancer diagnosis and treatment, but also survivorship.[40]

This financial hardship results in part because cancer treatment is incredibly disruptive to employment. Nearly 47% of adults who had cancer report that they made changes to their regular employment after diagnosis, including taking extended leave (35.6%), making changes to schedules or roles (15.9%) such as taking a flexible schedule, moving to part time or less demanding job, or retiring early (27.2%). More than a quarter of working age adults with cancer history report being unable to work because of health problems, compared to 15.3% without cancer, and they are also more likely to be limited in the type of work they can perform (12% vs. 6.1%).[41]

Finally, the medical and non-medical financial hardships that accompany cancer can lead to housing insecurity. This insecurity includes risking foreclosure or eviction to afford medical treatment or moving in with family or friends to save money. This scenario is particularly true for low-income households and those with minor children.[42]

## IV.    MEDICAL DEBT HARMS OLDER ADULTS.

Older adults are likely to accumulate medical debt and be negatively impacted when it is reported to underwriters. This debt is due, in large part, to structural gaps in coverage in the healthcare system. Insurance does not protect older adults from racking up medical debt. Individuals covered by Medicare, the federal health insurance which serves over 61 million older

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

adults in the United States,[43] are ultimately responsible for about 20% of approved services, meaning that even an insured older adult is one medical emergency away from being buried in medical debt from their out-of-pocket costs.[44] In fact, 4 million older adults report having medial debt despite the fact that 98% of them have health insurance.[45] Common sources of medical debt for older adults include hospitalization, emergency care, and ambulance services.[46]  Relatedly, 44% of older adults who are under 65 and thus not yet Medicare eligible and do not have other sources of healthcare coverage, have amassed medical debt.[47]

In addition, under traditional Medicare, dental, vision, and auditory care are not covered, leaving older adults to pay for these necessary services out of pocket. The cost of these services can be devastating, especially for the millions of low-income older adults, and these gaps in Medicare coverage lead many older adults to accumulate medical debt. For example, one of the leading causes of medical debt for older adults are bills related to dental services.[48]

Older adults with difficulties performing daily tasks independently may rely on long-term care, such as nursing facility care or home- or community-based care. Long-term care services are not covered through Medicare and can be extremely expensive, limited in availability and

---

[43]  *See* Ctrs. for Medicare & Medicaid Servs., Medicare Monthly Enrollment, https://data.cms.gov/summary-statistics-on-beneficiary-enrollment/medicare-and-medicaid-reports/medicare-monthly-enrollment (last visited May 15, 2025).

[44]  Medicare.gov, Costs, https://www.medicare.gov/basics/costs/medicare-costs (last visited May 15, 2025).

[45]  *See* Consumer Financial Protection Bureau, Medical Billing and Collections Among Older Americans (2023), https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-medical-billing-and-collections-among-older-americans/.

[46]  *Id.*

[47]  *Id.*

[48]  *See* Lopes et al., *supra* note 2.

9

administratively burdensome to access for Medicaid-eligible older adults.[49] Many older adults without unpaid family caregivers must go into debt to bear the high cost of long-term care.[50] In fact, in 2020, more than 1.2 million people age 65 and older accumulated medical debt related to their long-term care services, either in home or residential facilities.[51]

Among adults age 65 and older who lived in households reporting medical debt in the past 12 months, 11.3% are dually eligible for Medicare and Medicaid.[52] The rate of these dually eligible people reporting payment challenges is over double the rate of those older adults with private insurance.[53] These debts are the results of inaccurate medical bills that should have been covered by one or the other of these insurance plans in the first place.[54] These improper medical bills negatively impact the lives of low-income older adults by lowering their credit score, leading to dangerous cost-saving choices (such as rationing medication or skipping meals), using credit cards to pay off medical debt, and placing avoidable financial burdens on their caregivers.[55]

---

[49] *See* Priya Chidambaram & Alice Burns, KFF, *10 Things About Long-Term Services and Supports (LTSS)* (2024), https://www.kff.org/medicaid/issue-brief/10-things-about-long-term-services-and-supports-ltss/.

[50] *See* Consumer Financial Protection Bureau, NURSING HOME DEBT COLLECTION 2 (2022), https://files.consumerfinance.gov/f/documents/cfpb_issue-spotlight-nursing-home-debt-collection_report_2022-09.pdf (noting that the median annual cost of a nursing home in 2021 was $108,405).

[51] *See* Lopes et al., *supra* note 2, at Fig. 7.

[52] Dual eligibility means they meet the low income and very low asset thresholds for their state's Medicaid program while also being Medicare eligible.

[53] *See* Robin A. Cohen et al., *Problems Paying Medical Bills: United States, 2021*, 180 NAT'L HEALTH STATISTICS 11 (2023), https://www.cdc.gov/nchs/data/nhsr/nhsr180.pdf.

[54] *See* Consumer Financial Protection Bureau, Medical Billing and Collections Among Older Americans (2023), https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-medical-billing-and-collections-among-older-americans/.

[55] *See* Alex Cottrill et al., KFF, *What are the Consequences of Health Care Debt Among Older Adults?* (2024), https://www.kff.org/medicare/issue-brief/what-are-the-consequences-of-health-care-debt-among-older-adults/#:~:text=may%20be%20lasting.-,Nearly%20three%20in%20ten%20Medicare%2Dage%20adults%20with%20health%20care,cre

## V.    MEDICAL DEBT DISPROPORTIONATELY HARMS COMMUNITIES OF COLOR.

Medical debts have a uniquely harmful impact in communities of color. For example, Native Americans bear a substantially higher part of the debt burden, having twice the amount of medical debt compared to the national average.[56] These disparities correlate with the healthcare access barriers experienced by many Native Americans, such as geographic and administrative barriers to accessing Indian Health Services facilities and the lack of Medicaid expansion in some states.[57] For 25% of Native Americans, medical debt is the only type of debt that appears in their credit record.[58] In many of these cases, they should not have been billed for medical services in the first place, as federal law prohibits billing, collections, and reporting for many health services approved for Native American populations.[59] Native Americans often pay higher prices for credit through mortgage loans and lower credit limits, and the inclusion of improperly billed medical debt in their credit reporting exacerbates these disparities.[60]

---

dit%20score%20(Figure%204) (noting that medical debt has negatively impacted credit scores for 23% of older adults and 62% have delayed, skipped, or sought alternatives to health care or prescriptions); Surya P. Kolluri et al., TIAA Institute, *Playing the long game: How longevity affects financial planning and family caregiving* 5-6 (2023), https://www.tiaa.org/content/dam/tiaa/institute/pdf/insights-report/2023-10/tiaa-institute-upenn-how-longevity-affects-financial-planning-ti-november-2023.pdf (noting 23% of caregivers have taken on more debt as a result of their caregiving and paying for necessary expenses like housing, home modification, and transportation). *See also* Justice in Aging, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information at 2, Docket CFPB-2024-0023-0949 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0949.

[56] Consumer Financial Protection Bureau, Medical Collections on Credit Reports in Native American Communities 3 (2024), https://files.consumerfinance.gov/f/documents/cfpb_aian-medical-debt_2024-12.pdf.

[57] *Id.* at 4.

[58] *Id.*

[59] 25 U.S.C. § 1621u(a) (2025).

[60] Consumer Financial Protection Bureau, *supra* note 56.

Black and Hispanic communities face similar disparities. At least half of Black (56%) and Hispanic adults (50%) report having medical or dental debt, compared to 37% of White adults. [61] Relatedly, 46% of Black adults say medical debt negatively impacted their credit score compared to 32% of White Americans, and over one fifth of Black adults report being denied medical or dental care due to their debt.[62] Almost a quarter of Black adults report that they do not think they will ever be able to pay off their medical debt, which exacerbates existing economic inequities for Black communities.[63] Among Hispanic adults, many report cut backs on food, clothing and household expenses (73%), depleting all or most of their savings (56%), and increasing credit card debt for their other non-medical expenses (41%).[64]

## VI.   MEDICAL DEBT HARMS SMALL BUSINESSES.

Medical debt reporting negatively impacts small businesses. Small business owners must navigate many economic challenges, from seeking capital to recovering from situations such as COVID-19, natural disasters, and economic downturns. Research shows that the vast majority of

---

[61] Lopes et al., *supra* note 2.

[62] *Id.*

[63] Shameek Rakshit et al., *The Burden of Medical Debt in the United States* (2024), https://www.healthsystemtracker.org/brief/the-burden-of-medical-debt-in-the-united-states/#Share%20of%20adults%20who%20have%20medical%20debt,%20by%20health%20status%20and%20disability%20status,%202021; *see also* Community Catalyst, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information at 2, Docket CFPB-2024-0023-0989 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0989 ("Black and Hispanic individuals are also more likely to have no credit or a poor to fair credit score. Poor credit can result in significant consequences, such as being denied a credit card or paying higher interests rates on loans."); National Consumer Law Center, Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information at 5, Docket CFPB-02024-0023-0900 (Aug. 12, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0900 ("Black and Latino workers also face occupational segregation into jobs with less health care coverage and low quality health insurance. . . . These systemic inequalities continue to leave Black and Latino individuals with greater amounts of medical debt.").

[64] *See* Lopes et al., *supra* note 2.

small business owners (75%) face challenges obtaining capital.[65] For small businesses and entrepreneurs who are just starting out, or for those who lack a strong credit history, obtaining financing to start a business is even more difficult. As a result, small business owners often rely on their personal credit scores to obtain the capital to finance their businesses. The 2019 Small Business Credit Survey showed that 86% of small business owners use their personal credit scores to obtain financing,[66] and a 2022 study by Mastercard found that 53% of small businesses used both businesses and personal credit cards to help finance their businesses.[67] Given the strong reliance on personal credit for the majority of small employer and non-employer firms, unpaid medical bills can significantly impact a small business' ability to obtain financing. Unpaid medical debt is not an accurate indicator of a borrower's ability to repay a loan, but when reported to credit agencies it reflects poorly on a borrower's credit report.[68] The practice of factoring medical debt into individual credit reporting not only prevents small businesses from starting and expanding

---

[65] *See* SMALL BUSINESS MAJORITY, SURVEY: SMALL BUSINESSES OPTIMISTIC ABOUT THE FUTURE, DESPITE CONCERNS ABOUT INFLATION AND BARRIERS TO CAPITAL 2 (2022), https://smallbusinessmajority.org/sites/default/files/research-reports/2022-SSTB-SBM-Network-Poll-Report.pdf.

[66] *See* FEDERAL RESERVE BANKS, SMALL BUSINESS CREDIT SURVEY: REPORT ON EMPLOYER FIRMS at 9 (2019). *See also* FEDERAL RESERVE BANKS, 2020 REPORT ON EMPLOYER FIRMS SMALL BUSINESS CREDIT SURVEY 8 (2020) (finding that 88% of employers rely on an owner's personal credit score for financing, and 40% rely solely on the owner's personal credit score).

[67] Audrey Bui Khac, *A Not So Small Portfolio Optimization Opportunity: How Advanced Analytics Can Help Banks Better Engage with Small Businesses* (Dec. 2022), https://www.mastercardservices.com/en/advisors/consumer-engagement-loyalty-consulting/insights/not-so-small-portfolio-optimization#:~:text=To%20help%20banks%20build%20personalized%20approaches%20to,likelihood%20to%20respond%20to%20spend%20stimulation%20invitations.

[68] *See* Consumer Financial Protection Bureau, *Consumer Credit Reports: A Study of Medical and Non-Medical Collections* at 16 (2014), https://files.consumerfinance.gov/f/201412_cfpb_reports_consumer-credit-medical-and-non-medical-collections.pdf.

their business but may make them more susceptible to working with predatory lenders that often target venerable borrowers.[69]

## CONCLUSION

Health care debt harms millions of people, hampering their ability obtain medical care, and making it more difficult to work and to find housing. The burdens of debt weigh heavier on many marginalized populations—people with disabilities, older adults, and people of color—as well as cancer patients and survivors. Small businesses and entrepreneurs are also negatively affected. The Final Rule insulates people from some of the hardships associated with medical debt. For these reasons, *Amici* oppose entry of a preliminary injunction.

Dated: May 22, 2025

Respectfully submitted,

   /s/ Brian East
BRIAN EAST
Texas Bar No. 06360800
DISABILITY RIGHTS TEXAS
2222 W. Braker Ln.
Austin, Texas 78758
(512) 407-2718 (Phone)
(512) 454-3999 (Fax)
beast@drtx.org

SAHAR TAKSHI
*Application for pro hac vice pending*
District of Columbia Bar No. 1736599
JUSTICE IN AGING
1444 I Street N.W., Ste. 1100
Washington, DC 20005
(202) 683-1991 (Phone)
stakshi@justiceinaging.org

*Counsel for Amicus Curiae*

---

[69] *See* Small Business Majority, *Comment Letter on Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information* at 1 (Aug. 6, 2024), https://www.regulations.gov/comment/CFPB-2024-0023-0536.

**CERTIFICATE OF SERVICE**

I certify that on May 22, 2025, the foregoing document was filed on the Court's CM/ECF

system which sent notification of such filing to all counsel of record.

/s/ Brian East
BRIAN EAST