**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

CORNERSTONE CREDIT UNION
LEAGUE and CONSUMER DATA
INDUSTRY ASSOCIATION,

*Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU and RUSSELL VOUGHT in his
official capacity as Acting Director of the
CFPB,

*Defendants.*

**Civil Action No. 4:25-cv-00016-SDJ**

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF CONSENT JUDGMENT AND
PRELIMINARY OR PERMANENT INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

    I.     The Court Can Enter Final Judgment for Plaintiffs. ................................2

          A.     The Court Has Authority to Enter the Proposed Consent Judgment. ..........2

          B.     The Court Can Proceed to Summary Judgment. .........................................6

    II.    The Medical Debt Rule Is Contrary to Law. ..........................................6

          A.     The Ban on CRAs' Reporting Medical Debt Violates § 1681b(g)(1). ..........7

          B.     The Ban on Creditors' Obtaining or Using Coded Medical Debt Information Violates § 1681b(g)(2). .........................................................11

          C.     The Incorporation of Other Law Exceeds the CFPB's Statutory Authority. ..................................................................................................16

    III.   Vacatur Is the Necessary and Required Remedy. ..................................17

CONCLUSION ..................................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672 (5th Cir. 2024) ..............................18

*Arizona v. City & County of San Francisco*, 596 U.S. 763 (2022) (Roberts, C.J.,
    concurring) ...............................................................................................................5

*Barnhart v. Thomas*, 540 U.S. 20 (2003) ..................................................................15

*BCFS Health & Hum. Servs. v. U.S. Dep't of Lab.*, 591 F. Supp. 3d 154 (W.D. Tex.
    2022) .........................................................................................................................6

*Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930 (5th Cir. 2024) ..............................18

*Chamber of Com. of U.S. v. CFPB*, 2025 WL 1110761 (N.D. Tex. Apr. 15, 2025) ......................3

*Clean Water Action v. EPA*, 936 F.3d 308 (5th Cir. 2019)...........................................11

*Conservation Nw. v. Sherman*, 715 F.3d 1181 (9th Cir. 2013)........................................5

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846 (5th Cir. 2022)..................................17

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .............................10

*FTC v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204 (9th Cir. 2004)...................................3

*Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986) ......................3

*Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015) .......................................5

*Rest. L. Ctr. v. U.S. Dep't of Lab.*, 120 F.4th 163 (5th Cir. 2024).................................18

*SEC v. Recile*, 10 F.3d 1093 (5th Cir. 1993) (per curiam)............................................18

*Sweet v. Cardona*, 641 F. Supp. 3d 814 (N.D. Cal. 2022)..............................................4

*Swift & Co. v. United States*, 276 U.S. 311 (1928).........................................................3

*Teamsters Loc. 177 v. United Parcel Serv.*, 966 F.3d 245 (3d Cir. 2020).......................................3

*Texas v. Biden*, 10 F.4th 538 (5th Cir. 2021) (per curiam) ...........................................18

*Texas v. New Mexico*, 602 U.S. 943 (2024)...................................................................4

*Texas v. U.S. Dep't of Lab.*, 756 F. Supp. 3d 361 (E.D. Tex. 2024) ......................................11, 18

*Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160 (9th Cir. 2012)........4, 5

*United States v. City of New Orleans*, 731 F.3d 434 (5th Cir. 2013) ................................................3

*United States v. Texas*, 599 U.S. 670 (2023) (Gorsuch, J., concurring in the judgment) ...............5

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ...........................................................................8

**Statutes**

5 U.S.C. § 705 .......................................................................................................................................5

5 U.S.C. § 706(2) ...................................................................................................................2, 4, 17, 18

15 U.S.C. § 1681a(d) ............................................................................................................................9

15 U.S.C. § 1681b(a) ..................................................................................................................9, 10, 17

15 U.S.C. § 1681b(g)(1) ................................................................................................................ passim

15 U.S.C. § 1681b(g)(2) ................................................................................................................ passim

15 U.S.C. § 1681b(g)(5) .....................................................................................................................14

15 U.S.C. § 1681s(e)(1) ..................................................................................................................10, 17

15 U.S.C. § 1681b(g) (2000) ...............................................................................................................8

117 Stat. 1952 (2003) .........................................................................................................................13

**Regulations**

12 C.F.R. § 1022.30(b) .......................................................................................................................12

12 C.F.R. § 1022.30(c) .......................................................................................................................12

12 C.F.R. § 1022.30(d) .......................................................................................................................13

Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical
   Information (Regulation V), 90 Fed. Reg. 3276 (Jan. 14, 2025) ...................................... passim

**Other Authorities**

Fair and Accurate Credit Transactions Act of 2003: Hearings on H.R. 2622 Before the
   Comm. on Fin. Servs. 16 (2003) (statement of Rep. Kelly) ...................................................13

Fed. R. Civ. P. 65(a)(2) .......................................................................................................................6

## INTRODUCTION

The Consumer Financial Protection Bureau ("CFPB" or "Bureau") now agrees that its rule "Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V)," 90 Fed. Reg. 3276 (Jan. 14, 2025) ("Medical Debt Rule"), violates the plain text of the Fair Credit Reporting Act ("FCRA"). The Medical Debt Rule bars consumer reporting agencies ("CRAs") from including medical debt information on consumer reports and prohibits creditors from considering such information when making credit decisions. It does this even though the statute expressly allows CRAs to report—and creditors to obtain and consider—coded medical debt information. Now, in a last-ditch effort to thwart the rule from being set aside, two individuals and two advocacy groups have intervened, contending that the Rule is consistent with the statute.

The picture Intervenors paint, however, distorts the statute and regulations beyond all recognition. According to Intervenors: (1) FCRA flatly prohibits CRAs from sharing and creditors from obtaining and using medical debt information unless agency regulations allow it; (2) the current regulations—first adopted in 2005—are the only authority that permits creditors to use coded medical debt information; and (3) the CFPB can thus revoke that permission at will.

That narrative is wrong from top to bottom. FCRA does *not* flatly prohibit the use of medical debt information. While it once did—starting in 1996, FCRA categorically prohibited CRAs from sharing medical debt information without consumer consent—Congress amended the statute in 2003 to adopt a more nuanced approach. The text now strikes a balance between protecting consumer privacy and allowing creditors to consider valuable information about a consumer's financial profile; it does so by generally prohibiting CRAs and creditors from sharing and using medical information, "*unless*" the information is properly coded to mask identifying

1

health information.  15 U.S.C. § 1681b(g)(1)(C), (g)(2) (emphasis added).  The currently operative 2005 regulations, in turn, reaffirm creditors' right to use coded medical debt information, but then go further, allowing creditors to consider *any* medical debt information, regardless of whether it is coded, subject to a few limitations.  The Medical Debt Rule thus does not simply repeal a prior regulation; it eliminates the right Congress explicitly provided for creditors to use, and CRAs to report, coded medical debt information.  The Rule, therefore, runs roughshod over the careful balance Congress enacted in FCRA and well exceeds the CFPB's statutory authority.  The CFPB now agrees.

If the Court likewise agrees, that ends the case.  All of Intervenors' arguments stem from their fundamental misreading of the statute.  Of course, the Court need not reach the merits at all—the agency that promulgated the Rule now agrees it is unlawful, and the Court can enter the proposed consent judgment vacating the Rule.  But the Court can reach the same result by treating the motion for preliminary injunction as a motion for summary judgment and vacating the Rule as "not in accordance with law" and "in excess of [the CFPB's] statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).  Either way, the result is the same.

## ARGUMENT

### I.    The Court Can Enter Final Judgment for Plaintiffs.

The Court can enter final judgment for Plaintiffs on Counts I, II, and III of the complaint in one of two ways: (1) it can enter the proposed consent judgment, or (2) it can consolidate the preliminary injunction hearing with a hearing on the merits and enter summary judgment.

### A.  The Court Has Authority to Enter the Proposed Consent Judgment.

As an initial matter, the Court has the authority to enter the proposed consent judgment without making further findings.  A consent judgment is nothing more than an agreement between

litigating parties to resolve the suit where a court order is a component of the settlement.  *FTC v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1218 (9th Cir. 2004).  A federal judge can enter a consent judgment if the court has subject matter jurisdiction, the judgment resolves the dispute between the parties, and the judgment does not violate federal law.  *Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525–26 (1986).  "District courts have the power to enter consent decrees without first determining that a statutory . . . violation has occurred." *Teamsters Loc. 177 v. United Parcel Serv.*, 966 F.3d 245, 254 (3d Cir. 2020); *accord Swift & Co. v. United States*, 276 U.S. 311, 327 (1928).  So long as the settling parties consent, and the consent decree is "fair, reasonable and lawful," a court has authority to enter the agreed-upon relief.  *See United States v. City of New Orleans*, 731 F.3d 434, 439 (5th Cir. 2013).

Here, Plaintiffs and Defendants agree that the Medical Debt Rule is unlawful for the reasons explained in Counts I, II, and III of the Complaint, and Defendants agree to the entry of an order vacating the Rule (ECF 31).  There is no argument that the Court lacks subject matter jurisdiction, nor is there any argument that the settlement would not resolve a dispute within the scope of the original complaint.  *See City of Cleveland*, 478 U.S. at 525–26.  And the relief sought in the proposed consent judgment—vacatur of the Rule—is the exact relief Plaintiffs otherwise would be entitled to for prevailing on the claims they have asserted.  Not surprisingly, then, Intervenors do not identify any statute that limits the CFPB's ability to enter into consent judgments or prohibits the relief sought here.  In that respect, this case resembles the challenge to the CFPB's erstwhile credit card late fee rule.  Just last month, the CFPB agreed with the plaintiffs in that case that the late fee rule was contrary to law, the parties submitted a joint motion for consent judgment, and the district court vacated the rule.  *Chamber of Com. of U.S. v. CFPB*, 2025 WL 1110761, at *1 (N.D. Tex. Apr. 15, 2025).  Nothing stops the Court from doing the same here.

Although Intervenors may file objections to a consent decree, they cannot unilaterally prevent a lawful consent judgment. *Texas v. New Mexico*, 602 U.S. 943, 953 (2024).[1] And Intervenors' only objection to the consent judgment (at 8) is that it violates the Administrative Procedure Act ("APA"), which requires agencies to use notice-and-comment procedures to repeal previously issued rules. But the consent judgment does not conflict with the APA. Although the APA governs how agencies must conduct the rulemaking process, it does not limit agencies' authority to settle cases via vacatur—indeed, the decision to settle litigation (and on what terms) is an area of core and traditional executive discretion. *See Sweet v. Cardona*, 641 F. Supp. 3d 814, 822–23 (N.D. Cal. 2022). Nor does the APA limit courts' authority to enter consent decrees against agencies. To the contrary, the relief in the proposed consent judgment is the remedy the APA *requires*, and the relief Plaintiffs would be entitled to if they prevailed on the merits. 5 U.S.C. § 706(2). The only difference is that the Bureau now (correctly) agrees with the proposed relief.

The proposed consent judgment is therefore comparable to the one approved in *Turtle Island Restoration Network v. U.S. Department of Commerce*, 672 F.3d 1160 (9th Cir. 2012). There, plaintiffs sued several federal agencies over the lawfulness of a final rule before jointly proposing a consent decree. *Id.* at 1162–63. The proposed judgment vacated portions of the final rule and reinstated the prior regulations. *Id.* at 1164. Although intervenors argued the consent judgment was improper because the agencies "engaged in unlawful rulemaking" without notice and comment, the district court entered the proposed decree. *Id.* at 1165–66. On appeal, the Ninth Circuit distinguished between a consent decree requiring the government to "make substantive changes to regulations," and an agreement to "vacate[] a portion of a regulation . . . to settle

---

[1] A consent decree cannot extinguish an intervenor's valid "claims," *Texas*, 602 U.S. at 953–54, but Intervenors here do not raise any claim for relief against either Plaintiffs or Defendants. They asserted an interest in the action and merely oppose Plaintiffs' claims for relief.

4

litigation." *Id.* at 1166. Because the consent decree merely "vacate[d] . . . a portion of the Final Rule" and did not "impos[e] any substantive requirements" on future action, the consent judgment did not run afoul of the APA. *Id.* at 1168–69. So too here. Indeed, Intervenors' argument to the contrary would mean an agency can almost never settle litigation against it. The APA does not so tie the Executive Branch's hands.

The few authorities Intervenors rely on (at 9) are neither controlling nor applicable. In *Conservation Northwest v. Sherman*, 715 F.3d 1181, 1188 (9th Cir. 2013), for example, the consent judgment required federal agencies "effectively to promulgate a substantial and permanent amendment" to an existing rule, something which cannot occur under the APA without notice-and-comment rulemaking. And *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015), did not involve a consent judgment at all. The petitioners there asked for a stay under APA § 705, but the court denied the request because petitioners had failed to demonstrate the requisite irreparable harm. *Id.* at 557. Intervenors quote only the court's later dicta that it would not enter a stay based on the EPA's halfhearted consent—in fact, the EPA maintained no stay was warranted because petitioners' claims were unexhausted. *Id.*[2] Neither of these cases, therefore, address the situation here, where the CFPB has fully agreed to APA-prescribed vacatur, and the proposed consent judgment does not compel the CFPB to do anything unlawful.[3] Indeed, the judgment does

---

[2] Although notably, then-Judge Kavanaugh dissented to explain that APA § 705's specific provision for a stay combined with the EPA's consent was a sufficient basis to enter a multi-year stay via consent judgment. *Mexichem*, 787 F.3d at 562 (Kavanaugh, J., dissenting in part).

[3] As for the concurrences Intervenors cite, they are not persuasive authority here where the authoring Justices were concerned with the general availability of vacatur under the APA or other case-specific agency maneuvering. *See United States v. Texas*, 599 U.S. 670, 694 (2023) (Gorsuch, J., concurring in the judgment); *Arizona v. City & County of San Francisco*, 596 U.S. 763, 765–66 (2022) (Roberts, C.J., concurring).

not compel the CFPB to do anything at all:  The Court would merely exercise its undisputed remedial authority under the APA to set aside an unlawful rule.

### B.  The Court Can Proceed to Summary Judgment.

Any doubts about the propriety of a consent judgment should make no difference here, as the Court can reach the same result by proceeding to summary judgment and entering a permanent injunction.  As the Court has already noted (ECF 36), Federal Rule of Civil Procedure 65(a)(2) permits courts to consolidate a preliminary injunction hearing with a hearing on the merits, and neither Plaintiffs nor Intervenors have objected to the Court's notice of its intent to do that here. Thus, the Court may treat Plaintiffs' motion for preliminary injunction (and associated exhibits) as a motion for summary judgment.  *See, e.g.*, *BCFS Health & Hum. Servs. v. U.S. Dep't of Lab.*, 591 F. Supp. 3d 154, 160 (W.D. Tex. 2022).  Plaintiffs have thrice detailed the glaring illegality at the heart of the Medical Debt Rule.  *See* Complaint (ECF 1), ¶¶ 60–94; Plfs' Mot. for Prelim. Inj. ("PI Mot.") (ECF 9); Plfs' Reply ISO Prelim. Inj. ("PI Reply Br.") (ECF 20).  Their claims for relief present pure questions of law, and the existing submissions lay out all the evidence necessary to issue permanent relief on the merits.

## II.    The Medical Debt Rule Is Contrary to Law.

Plaintiffs and Defendants agree the Medical Debt Rule violates FCRA and exceeds the Bureau's statutory authority.  Intervenors' contrary arguments all flow from a fundamental misunderstanding: They believe the statute does not authorize the reporting and use of coded medical debt.  From that starting point, Intervenors contend that only a regulatory exception can allow creditors to obtain and consider coded medical debt information (a regulation the CFPB can repeal), and the CFPB can use its general rulemaking authority to further limit the kinds of information CRAs can report.  But Intervenors go wrong at each step.  The statute expressly allows

CRAs to report—and creditors to obtain and consider—coded medical debt information.  This reflects the careful balance Congress struck between respecting medical privacy and fostering a fully informed credit market.  And regardless, the Bureau's general authority to implement FCRA is not the authority to contravene the statute.

### A.  The Ban on CRAs' Reporting Medical Debt Violates § 1681b(g)(1).

Start first with CRAs.  FCRA generally prohibits CRAs from furnishing "a consumer report that contains medical information."  15 U.S.C. § 1681b(g)(1).  But the statute includes a number of exceptions to that prohibition.  The exception most relevant here is that a CRA may furnish a consumer report that includes medical debt information if "the information to be furnished pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services, products, or devi[c]es," and any non-financial information "is restricted or reported using codes that do not identify, or do not provide information sufficient to infer, the specific provider or the nature of such services, products, or devices, as provided in section 1681c(a)(6) of this title." *Id.* § 1681b(g)(1)(C).[4]  In short, while most medical information is off-limits for consumer reports, CRAs may report properly coded information about the financial aspects of medical debt.

The Medical Debt Rule says the opposite.  It prohibits CRAs from reporting medical debt information to a creditor if the creditor is prohibited from considering it.  90 Fed. Reg. at 3373–74.  Because the Medical Debt Rule also generally prohibits creditors from considering medical debt, the Rule radically limits "the circumstances under which [CRAs] may furnish medical debt information." *Id.* at 3278.  But the Bureau cannot by regulation prohibit CRAs from furnishing

---

[4] 15 U.S.C. § 1681c(a)(6)(A) specifically requires CRAs to report medical information to creditors "using codes that do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer."

information that FCRA explicitly permits them to report.  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

Intervenors' do not dispute (nor could they) that an agency lacks authority to override what Congress has expressly allowed.  Instead, Intervenors take the implausible position (at 18, 20) that § 1681b(g)(1)(C) "does not grant its own exception."  By this Intervenors mean that FCRA permits CRAs to report coded medical debt information *only if* the CFPB first allows creditors to obtain and consider medical debt information in underwriting.  In Intervenors' view, when Congress says "a CRA may not *A*, unless it does *B*," a CRA may do *B* only if the agency first authorizes some related activity.  But nothing in the text of § 1681b(g)(1) suggests that CRAs need a permission slip from the Bureau to include coded medical debt on consumer reports.  Imagine that a health-conscious municipality wrote this statute: "No restaurant within city limits may sell fountain drinks, unless the beverage is 16 ounces or fewer."  No court or citizen would conclude that businesses may not sell sub-16-ounce sodas until another statute authorized citizens to consume Coke products.  So too, when Congress provided that CRAs may not furnish medical information to employers, insurers, and creditors "*unless*" they furnish properly coded debt information, Congress permitted CRAs to report medical debt information.  15 U.S.C. § 1681b(g)(1)(C) (emphasis added).  Absent some statutory authority not present here, agencies do not get to decide when a statutory exception turns on or off.  Intervenors' vision of administrative primacy sidelines Congress and ignores the legislative compromise embodied in the statute's plain directives.

Intervenors' interpretation also makes little sense given the history of the provision.  From 1996 to 2003, FCRA flatly prohibited CRAs from providing medical information to creditors without consumer consent.  *See* 15 U.S.C. § 1681b(g) (2000).  But Congress passed today's § 1681b(g)(1)(C) to change course and better balance consumer privacy and the needs of the credit

market.  Indeed, Congress clearly gave substantial thought as to how medical debt information should be handled under its new regime.  As amended, FCRA's definitions section references medical debt or medical payments four times over, *see* 15 U.S.C. § 1681a(d)(3), (i), (x)(1), (aa), and at least six of FCRA's substantive provisions govern the treatment of medical debt information in consumer reporting, *see id.* §§ 1681b(g)(1)(C), 1681b(g)(2), 1681c(a)(6), 1681c(a)(8), 1681i(g), 1681s-2(a)(9).  Congress would be shocked to learn that its considered and explicit exception for CRAs' reporting of coded medical debt had no force of its own.

As an alternative to their broad position, Intervenors contend (at 19) that even if coded medical debt information is generally exempt from § 1681b(g)(1)'s prohibition on CRAs, that does not immunize CRAs from complying with other prohibitions.  That is true, of course, for statutory restrictions.  For example, FCRA prohibits CRAs from reporting "[a]ny . . . adverse item of information" over seven years older than the consumer report.  *Id.* § 1681c(a)(5).  That would apply to coded medical debt, even if CRAs are otherwise permitted to report such information.

The problem for Intervenors is that no statutory provision (in FCRA or otherwise) prohibits CRAs from furnishing the coded medical debt information that FCRA permits them to report.  The only statutory text Intervenors point to (at 20) is FCRA's "permissible purposes" provision, which states that CRAs may furnish consumer reports only for certain enumerated purposes.  *Id.* § 1681b(a).  According to Intervenors, if a creditor is barred from considering medical debt information, then it would not be permissible for a CRA to provide a creditor with a report containing that information.  That is wrong on multiple levels.  First, whether a purpose is "permissible" depends on the report as a whole, not particular line items on the report.  For instance, a creditor has a permissible purpose for a "*report*" if it "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be

furnished." *Id.* § 1681b(a)(3)(A) (emphasis added). Even if a creditor could not (or chooses not to) use or consider specific items on the report, it could still lawfully request a report, and therefore a CRA could lawfully provide it. *See* 90 Fed. Reg. at 3305. Moreover, FCRA identifies the exhaustive list of permissible purposes for a consumer report—a CRA "may furnish a consumer report under the following circumstances and no other." 15 U.S.C. § 1681b(a). Yet none of the enumerated permissible purposes have anything to do with medical debt information. There is simply nothing in § 1681b(a) to trump subsection (g)(1)'s authorization for CRAs to report coded medical debt information.

Unable to identify a statutory provision prohibiting CRAs from reporting coded medical debt information, Intervenors fall back (at 20–21) on the Bureau's general FCRA rulemaking authority. They theorize that if creditors are prohibited from considering medical debt information, then the Bureau can effectuate both that prohibition and the permissible purposes provision by barring CRAs from reporting such information. *See* 15 U.S.C. § 1681s(e)(1). This argument fails on multiple levels. First, creditors are *not* prohibited from obtaining or using coded medical debt information; the statute in fact expressly *permits* them to obtain and use such information. *See infra* pp. 11–16. Second, as discussed above, when creditors request a consumer report to assist with a credit transaction, that is a "permissible purpose" for the report, regardless of the information within that report. Section 1681b(a) does not transform CRAs into policemen who must monitor whether creditors are permitted to use or obtain every item that might be included on a credit report. *See* PI Mot. 14. Third, and most fundamentally, the CFPB's implementing regulations cannot undo "the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (citation omitted). Notwithstanding the permissible purpose provisions or the limits on creditors, Congress saw fit to

allow CRAs to report coded medical debt information.  15 U.S.C. § 1681b(g)(1)(C).  The Bureau cannot use its rulemaking authority to obviate that exception.

Intervenors complain (at 19) that this straightforward reading of the statute would "limit the [CFPB's] broad grant of rulemaking authority."  Precisely.  Statutes draw lines that agencies cannot cross.  After all, agencies are "mere creatures of statute," and they enjoy only the authority Congress granted to them.  *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019).  Because the CFPB has "enact[ed] rules that replace" express statutory terms, its Medical Debt Rule is unlawful.  *Texas v. U.S. Dep't of Lab.*, 756 F. Supp. 3d 361, 397 (E.D. Tex. 2024) (cleaned up).

### B. The Ban on Creditors' Obtaining or Using Coded Medical Debt Information Violates § 1681b(g)(2).

The Medical Debt Rule's inconsistency with § 1681b(g)(2) is as plain as its inconsistency with (g)(1).  Just as FCRA generally prohibits CRAs from reporting medical information "*unless*" the information is properly coded to mask identifying health information, 15 U.S.C. § 1681b(g)(1)(C) (emphasis added), FCRA prohibits creditors from obtaining or using medical information "*other than* medical information treated in the manner required under section 1681c(a)(6) of this title," *id.* § 1681b(g)(2) (emphasis added).  The "manner required under section 1681c(a)(6)" is "using codes that do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer."  *Id.* § 1681c(a)(6)(A).  In short, FCRA expressly allows creditors to obtain and use properly coded medical debt information in credit decisions, whereas the Medical Debt Rule prohibits them from doing so.  This conflict is fatal to the rule.

Intervenors understand the importance of the "other than" clause—indeed, the first time they quote § 1681b(g)(2), they omit the all-important parenthetical language in favor of ellipses.

11

Intervenors' Br. 2.  They, like the prior CFPB leadership, would doubtless prefer that Congress wrote a different statute.  But both the Bureau and the Court are bound by the statute that Congress actually wrote.  And Congress wrote a symmetrical set of prohibitions and exceptions:  Both CRAs and creditors generally may not report or use medical information, but CRAs may report and creditors may consider properly coded medical debt information.  15 U.S.C. § 1681b(g)(1)(C), (g)(2).  The Bureau cannot dictate otherwise.

Intervenors twist themselves in knots trying to escape this conclusion, but none of their arguments are persuasive.  They first assert (at 12–13) that the Medical Debt Rule merely repealed a 2005 regulatory exception, and an agency always has authority to undo what it previously did.  But that truism is irrelevant here because the Medical Debt Rule does more than repeal a regulatory exception.  The original regulations implementing § 1681b(g)(2) were passed by the CFPB's predecessor agencies in 2005 and, like the statute itself, contained two components.  First, the regulations generally barred creditors from "obtain[ing] or us[ing] medical information pertaining to a consumer" during a credit transaction.  12 C.F.R. § 1022.30(b).[5]  But second, the regulations included a "[f]inancial information exception" that allowed creditors to use "medical information . . . relating to debts" if, among other things, "[t]he creditor does not take the consumer's physical, mental, or behavioral health, condition or history . . . into account."  *Id.* § 1022.30(d)(i), (iii).  These two rules tracked the statutory language: creditors could not use most medical information in underwriting, but they could use medical debt information.  If anything, the 2005 financial information exception was broader than the statute—by its terms it was not limited to coded

---

[5] According to the 2005 regulation, a creditor did not "obtain medical information in violation of the prohibition" if it received a consumer report that contained medical information, so long as the medical information was not specifically requested.  12 C.F.R. § 1022.30(c).

medical debt.[6]  The Medical Debt Rule repeals that financial information exception, leaving in place only § 1022.30(b)'s blanket prohibition on the use of medical information—a regulation which has never existed alone and is manifestly more restrictive than the text of § 1681b(g)(2). *See* 90 Fed. Reg. 3372–73.  While agencies can generally repeal existing regulations, the Medical Debt Rule illicitly fashions a new regulatory scheme that goes below the baseline set by Congress.

Intervenors next try to minimize the parenthetical, noting (at 14, 16) that it was added as a "technical and conforming amendment" during the drafting process.  This is true:  What we now know as § 1681b(g)(1) and (g)(2) were added in the FACT Act's 2003 amendments to FCRA. Almost all the language originated in § 411 of that Act, but the parenthetical in (g)(2) was added in § 412, not § 411.[7]  But technical amendments are no less part of the statutory text.  That the provision was added at the end of the drafting process is also unremarkable.  The more detailed § 1681b(g)(1) already made clear that CRAs could report coded medical debt information to creditors; the parenthetical in (g)(2) just ensures that creditors can use the information they receive.

---

[6] Indeed, contrary to Intervenors' characterization (at 4 n.2), while the statute requires *CRAs* to mask the identity of any "specific provider . . . of [medical] services," 15 U.S.C. § 1681b(g)(1)(C), and the regulation did not disturb that requirement (nor could it), the regulations permitted creditors to know (from sources other than consumer reports) "[t]he identity of creditors to whom outstanding medical debts are owed," such as a "medical facility that specializes in treating a potentially terminal disease," 12 C.F.R. § 1022.30(d)(2)(i)(D), (ii)(C).

[7] Section 412 also had a later effective date than did 411, *see* 117 Stat. 1952, 2002–03 (2003), leading to an atypical situation where § 1681b(g)(1) and (g)(2) (via § 411) originally became effective *without* the parenthetical in (g)(2).  This is why some sources in the legislative history (and the regulatory agencies at first) sometimes spoke as if there were no parenthetical.  *See* Intervenors' Br. 3, 11–12, 16 n.11.  Once § 412's effective date passed, however, the parenthetical became law, permitting creditors to obtain and use the medical debt information that § 411 allowed CRAs to report from the beginning.  The CFPB cannot now controvert the statutory text.  Indeed, allowing creditors to see "the financial end" of medical debt while masking identifying health information was a core part of the legislative compromise.  *See* Fair and Accurate Credit Transactions Act of 2003: Hearings on H.R. 2622 Before the Comm. on Fin. Servs. 16 (2003) (statement of Rep. Kelly).

Intervenors next make a variation of the argument they made with respect to (g)(1): They claim (at 15) that the parenthetical in (g)(2) applies *only if* the CFPB chooses to allow creditors to consider medical debt information. This is the third attempt by the Rule's defenders to make the statutory text mean something other than what it does. In the Rule itself, the CFPB asserted that the parenthetical is "nothing more than an acknowledgment" that coded medical debt "exists." 90 Fed. Reg. at 3315. Likely recognizing the weakness of that approach, the Bureau argued in its opposition to Plaintiffs' motion for preliminary injunction that the parenthetical acted as a check on the Bureau's regulatory authority, specifically that the CFPB may permit the use of medical information "other than" coded medical information, but creditors may never obtain or use coded medical information. Defs' Opp. to Mot. for Prelim. Inj. (ECF 16), at 8 n.3. Intervenors have abandoned that rationale as well, but their latest theory fares no better than the first two.

Creditors' ability to consider coded medical debt information does not depend on the Bureau's first allowing them to do so by regulation. Congress was very capable of writing a statute that allowed creditors to conditionally use coded medical debt, but it did not do so. Instead, it wrote a statute that categorically bars creditors from using medical information, "other than" properly coded medical debt information. The CFPB can "permit" creditors to use additional categories of information, 15 U.S.C. § 1681b(g)(5)(A), but it cannot restrict the universe of permissible information allowed by the statute.

There is no grammatical way to make (g)(2) say what Intervenors want it to say. The statute says that "[e]xcept as permitted pursuant to . . . regulations," creditors "shall not obtain or use medical information (other than [coded] medical information[)]," *id.* § 1681b(g)(2), meaning creditors cannot use medical information generally, but they can use properly coded information, and the CFPB may "permit[]" (i.e., increase the number of) additional uses of medical information.

14

Intervenors' claim (at 15) is that creditors shall not obtain or use medical information (*including* coded medical information), except as permitted by CFPB regulations, in which case creditors can consider coded but not un-coded medical debt information.  That requires a substantial rewrite of the statutory text.  It also requires the "other than" parenthetical to modify the Bureau's authority to "permit[]" uses of medical information, even though a limiting parenthetical usually modifies the "noun or phrase that it immediately follows."  *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).  That such gymnastics are necessary to explain how the Medical Debt Rule is consistent with the statute is itself evidence that the Rule is anything but.

Intervenors' interpretation of the "other than" clause not only has no basis in the statutory text, but it is also inconsistent with the longstanding 2005 regulations.  As noted above, Intervenors construe the parenthetical not as an exception granting creditors the authority to consider coded medical information but as a limit on the *Bureau*'s rulemaking authority.  In other words, they argue (at 15) that whatever medical information the Bureau permits creditors to use, they cannot permit creditors to use uncoded medical debt information.  But that reading is inconsistent with the 2005 regulations, which permit creditors to consider some non-coded medical information from non-CRA sources—something Intervenors implicitly recognize.  *See supra* pp. 12–13 & n.6; Intervenors' Br. 15 n.10.[8]

Without a plausible textual hook, Intervenors resort to policy arguments.  They claim (at 16) that if creditors can consider coded medical debt information, the exception would swallow

---

[8] The Intervenors' claim that the parenthetical limits the reach of Bureau regulations would also logically apply to the activities allowed by § 1681b(g)(3)(C), since there is nothing in the text or structure that suggests the parenthetical applies to one of the (g)(2) exceptions but not the other.  But the activities in (g)(3)(C) include the businesses of "insurance or annuities," which often involve the type of private medical information that CRAs must obscure pursuant to § 1681b(g)(1)(C).

the rule.  Yet the statute still prohibits most consumer medical data from being shared by CRAs and used by creditors.  It merely allows creditors to consider how the financial aspects of a person's medical debt impact their credit profile.  Indeed, the 2005 regulations have allowed creditors to consider the financial aspects of medical debt for two decades, and § 1681b(g)(2) has hardly been neutered.  Vacating the Medical Debt Rule merely returns to that world.

Intervenors further claim (at 16) that if Plaintiffs' interpretation of the statute is accurate, creditors may lawfully consider all of a consumer's medical information, including evidence of a medical condition like cancer.  But this misstates the statutory coding requirements, which demand that medical information be reported "using codes that do not identify, or provide information sufficient to infer, the specific provider or the nature of such [medical] services, products, or devices to a person other than the consumer."  15 U.S.C. § 1681c(a)(6)(A).  It also ignores (g)(1), which expressly limits CRAs to reporting information that "pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services, products, or devi[c]es."  *Id.* § 1681b(g)(1)(C).  CRAs cannot explicitly report a consumer's specific health condition, and coding the nature of medical services and devices further obscures any identifying health condition.  And again, the longstanding financial information exception also permits the use of medical information generally (with fewer coding restrictions than the statute requires).

### C.  The Incorporation of Other Law Exceeds the CFPB's Statutory Authority.

The Medical Debt Rule also unlawfully prohibits CRAs from reporting medical debt information if they have "reason to believe the creditor" is "otherwise legally prohibited from obtaining or using the medical debt information, including by a State law."  90 Fed. Reg. at 3374 (to be codified at 12 C.F.R. § 1022.38(b)(2)).  The Bureau has no authority to limit the contents of consumer reports based on state and other law.  Again, the CFPB now agrees.

Intervenors suggest two possible sources of authority, but neither works.  First, Intervenors point (at 17) to the Bureau's general authority to prescribe "necessary" regulations to carry out FCRA's purposes. 15 U.S.C. § 1681s(e)(1).  But neither FCRA's text nor its statement of purposes seek to limit CRAs' reporting based on the information that a *creditor* may consider.  *See id.* § 1681(b).  Second, Intervenors gesture (at 18) towards FCRA's requirement that CRAs provide consumer reports only for "permissible purpose[s]," but this again misreads this statutory provision.  The Bureau does not have a blank check to define what in a consumer report is "permissible."  Congress has defined the permissible purposes of a consumer report, and a creditor has a permissible purpose if it intends to use the report for a credit transaction.  *Id.* § 1681b(a)(3)(A).  Even if state law prohibited that creditor from considering medical debt information on the report, they would still have a permissible purpose for the report as a whole, as they could fairly use the other information to gauge creditworthiness.  As previously described, the permissible purposes provision is not a font of rulemaking authority for the Bureau to decide that state law applicable to creditors makes furnishing a report impermissible.  Absent any statutory authority for this provision, § 1022.38(b)(2) must fall as well.

## III.    Vacatur Is the Necessary and Required Remedy.

Because the Medical Debt Rule violates FCRA and exceeds the Bureau's statutory authority, the Court is required to set it aside. 5 U.S.C. § 706(2).[9]  Vacatur is the "default" and "appropriate remedy" under the APA.  *See Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022).  "[D]istrict courts should generally 'nullify and revoke' illegal agency action," and Intervenors have not suggested that this is one of the rare exceptions where alternate

---

[9] The amicus brief in support of Intervenors filed by Disability Rights Texas et al. (ECF 41) raises exclusively policy arguments that are wholly irrelevant to the legal issues before the Court.

relief is appropriate. *Texas*, 756 F. Supp. 3d at 399. Moreover, vacatur is a special statutory remedy for unlawful agency action, and so the Court need not "consider[] . . . the various equities at stake before determining [that] a party is entitled to vacatur. Section 706, after all, provides that a 'reviewing court *shall*' set aside unlawful agency action." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024); *see also, e.g.*, *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 120 F.4th 163, 177 (5th Cir. 2024) (vacating agency rule under APA § 706 without considering irreparable harm or the balance of the equities). Intervenors concede this point (at 23 n.15).[10] Because the Medical Debt Rule is unlawful, then, it must be set aside.

## CONCLUSION

For the foregoing reasons, the Court should either enter the proposed consent judgment or—after reaching the merits—grant summary judgment to Plaintiffs, permanently vacating the Medical Debt Rule.

---

[10] Even if the Court considers the other equitable factors, Plaintiffs have amply satisfied them. *See* PI Mot. 15–20; PI Reply Br. 4–5. Any costs Plaintiffs incur to comply with the Rule are definitionally irreparable, as sovereign immunity bars any recovery against the government. And irreparable harm need only be more than *de minimis* to justify equitable relief. *Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672, 677 (5th Cir. 2024). Intervenors insist (at 23-24) the nationwide CRAs have not identified "specific timelines that demonstrate how the purported costs will be specifically incurred," in part because they claim the CRAs have already eliminated much medical debt from credit reports and could easily do more. But Plaintiffs' sworn declarations explain that both CRAs and creditors will immediately incur substantial financial harms if forced to fully eliminate medical debt from reporting and underwriting. PI Mot. 15–19. On summary judgment, Intervenors' bare denial cannot defeat competent evidence. *See, e.g.*, *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993) (per curiam). Finally, there is no public interest in the maintenance of an unlawful agency rule. *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (per curiam).

Dated:  May 30, 2025

Ryan T. Scarborough (admitted *pro hac vice*)
DC Bar No. 466956
Jesse T. Smallwood (admitted *pro hac vice*)
DC Bar No. 495961
William R. Murray, Jr. (admitted *pro hac vice*)
DC Bar No. 384797
Christopher J. Baldacci (admitted *pro hac vice*)
DC Bar No. 90007281
WILLIAMS & CONNOLLY LLP
680 Maine Ave., SW
Washington, DC 20024
Tel: (202) 434-5000
rscarborough@wc.com
jsmallwood@wc.com
bmurray@wc.com
cbaldacci@wc.com

Respectfully Submitted,

By: /s/  *Alex More*
Alex More
TX Bar No. 24065789
Andrea C. Reed
TX Bar No. 24121791
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street
Suite 5500
Dallas, TX 75202
Tel: (214) 855-3053
amore@ccsb.com

Eric Blankenstein (admitted *pro hac vice*)
DC Bar No. 997865
LAW OFFICES OF ERIC BLANKENSTEIN PLLC
1701 Pennsylvania Ave., NW, #200
Washington, DC 20006
eric@blankensteinlegal.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this Reply Brief in Support of Consent Judgment and Preliminary or Permanent Injunction was filed electronically through the Court's ECF system. *See* Fed. R. Civ. P. 5(b)(2)(E).

*/s/  Alex More*