UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| CORNERSTONE CREDIT UNION LEAGUE, ET AL. | § § § | |
| v. | § | CIVIL NO. 4:25-CV-16-SDJ |
| | § | |
| CONSUMER FINANCIAL PROTECTION BUREAU, ET AL. | § § | |

### MEMORANDUM OPINION AND ORDER

The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*., permits consumer reporting agencies ("CRAs") to report information about consumers' medical debt that has been coded to protect their medical privacy. It also authorizes creditors to consider such information when making credit decisions. Contrary to this statutory authorization, the Consumer Financial Protection Bureau published a final rule (the "Medical Debt Rule")[1] precluding CRAs from including medical-debt information—coded or otherwise—in consumer reports when provided to creditors for making credit determinations, and forbidding creditors from considering medical-debt information—coded or otherwise—when making credit decisions.

Plaintiffs[2]—two trade associations ("Trade Associations")—sued the Bureau in response, alleging that the Medical Debt Rule exceeds the Bureau's authority and

---

[1] Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), 90 Fed. Reg. 3276 (Jan. 14, 2025).

[2] Plaintiffs include Cornerstone Credit Union League—a regional trade association of credit unions, and Consumer Data Industry Association—a national trade association of credit-reporting agencies and background-check companies.

violates the APA. (Dkt. #1).[3] After the Trade Associations moved for a preliminary injunction, (Dkt. #9), the Bureau, under new leadership, requested a three-month stay to consider its position, (Dkt. #23). The Court granted that stay and postponed the effective date of the Rule. (Dkt. #24). During this period, two clinics and two individuals ("Defendant-Intervenors")[4] moved to intervene, anticipating that the Bureau would not defend the validity of the Rule. (Dkt. #26).

Thereafter, the Trade Associations and the Bureau (collectively, the "Consenting Parties") filed a Joint Motion for Consent Judgment in which they agreed that "the Medical Debt Rule exceeds the Bureau's authority[.]" (Dkt. #31 at 3–4). Consistent with that agreement, the Consenting Parties request that the Court enter a final judgment holding unlawful and vacating the Medical Debt Rule because it exceeds the Bureau's statutory authority and violates both FCRA and the APA. The Bureau then moved the Court to allow Defendant-Intervenors to intervene and to set a briefing schedule and a hearing for the proposed consent judgment. (Dkt. #33). After granting that motion, (Dkt. #36), the Court allowed Defendant-Intervenors to submit objections to the proposed consent judgment, (Dkt. #38, #41). The Court then held a fairness hearing, (Dkt. #48), permitting Defendant-Intervenors and the Consenting Parties to submit supplemental briefing on several issues central to the consent judgment, (Dkt. #50, #51). The motion is ripe for review.

---

[3] In addition to the Bureau, Plaintiffs sued the Director of the Bureau—currently Russell Vought.

[4] Intervenors include two individuals who have medical debt—David Deeds and Harvey Coleman—and two clinics who devote resources to helping individuals with related issues—New Mexico Center on Law and Poverty and Tzedek DC.

After full consideration of the parties' arguments, Defendant-Intervenors' objections, and the relevant law, the Court finds that the proposed consent judgment is fair, adequate, and reasonable. The Court will grant the Consenting Parties' Joint Motion for Consent Judgment. (Dkt. #31).

## I. BACKGROUND

### A. FCRA's Medical Debt Provisions

FCRA was passed in 1970 to protect the privacy of individuals whose information was furnished by CRAs and to ensure that consumer reports contained accurate information. *See* Fair Credit Reporting Act, Pub. L. No. 91-508, 84 Stat. 1127 (1970).[5] The Act limited the kind of information that CRAs could include in consumer reports, as well as the use and disclosure of the reported information. *See, e.g.*, *id.* §§ 604–10, 84 Stat. at 1129–32.

For more than twenty-five years, FCRA did not address medical-debt information. But in 1996, Congress prohibited CRAs from reporting a consumer's medical information without their consent. Economic Growth and Regulatory Paperwork Reduction Act of 1996 (Title II of Omnibus Consolidated Appropriations Act, 1997), Pub. L. No. 104-208, subtit. D, ch. 1, § 2405, 110 Stat. 3009–394 (codified at 15 U.S.C. § 1681b(g) (2000)). In 2003, Congress adjusted its approach to medical information by amending FCRA through the Fair and Accurate Credit Transactions Act ("FACT Act"), Pub. L. No. 108-159, 117 Stat. 1952 (2003). Although Congress maintained FCRA's general bar on the dissemination and use of consumers' medical

---

[5] Consumer reports are also commonly referenced as credit reports.

3

information, it allowed CRAs and creditors to make use of coded financial information related to medical debts.

The FACT Act's medical-debt provisions are found in two sections: one regulating CRAs; the other regulating creditors. First, the Act allows CRAs to furnish information about medical debt if that information is reported in a way that does not identify the provider of the services or expose the underlying medical condition:

> A consumer reporting agency shall not furnish for employment purposes, or in connection with a credit or insurance transaction, a consumer report that contains medical information (other than medical contact information treated in the manner required under section 1681c(a)(6) of this title) about a consumer, unless . . . the information to be furnished pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services, products, or devises, *where such information, other than account status or amounts, is restricted or reported using codes that do not identify, or do not provide information sufficient to infer, the specific provider or the nature of such services, products, or devices, as provided in section 1681c(a)(6) of this title.*

15 U.S.C. § 1681b(g)(1) (emphasis added). Section 1681c(a)(6) describes how to code the name, address, and telephone number of a medical-information furnisher to ensure the codes "do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer[.]" 15 U.S.C. § 1681c(a)(6).

Second, the Act included a parallel provision for creditors that permits them to use medical-debt information for credit decisions if the information is coded:

> Except as permitted pursuant to paragraph (3)(C) or regulations prescribed under paragraph (5)(A), a creditor shall not obtain or use medical information (*other than medical information treated in the manner required under section 1681c(a)(6) of this title*) pertaining to a

4

consumer in connection with any determination of the consumer's eligibility, or continued eligibility, for credit.

15 U.S.C. § 1681b(g)(2) (emphasis added).

As it stands, FCRA authorizes CRAs to include information about a consumer's medical debts in consumer reports when properly coded to conceal the name of the provider and the nature of the services provided. It also permits creditors to use that information to determine a consumer's credit eligibility. 15 U.S.C. § 1681b(g)(1)–(2).

Another provision, found in paragraph (g)(5), permits the Bureau to create additional exceptions to paragraph (g)(2), allowing creditors to make more uses of medical information than the statute explicitly authorizes. The Bureau may "*permit transactions* under paragraph (2) that are determined to be necessary and appropriate to protect legitimate operational, transactional, risk, consumer, and other needs . . . consistent with the intent of paragraph (2) to restrict the use of medical information for inappropriate purposes." 15 U.S.C. § 1681b(g)(5)(A) (emphasis added). In other words, the Bureau may permit creditors to obtain or use medical information to determine creditworthiness in more circumstances than the statute otherwise allows, but it may not prohibit uses of coded medical information that the statute authorizes.

## B. The Medical Debt Rule

Following the FACT Act's amendments to FCRA, and consistent with their rulemaking authority, federal regulators published a "financial information" exception in 2005. Although FCRA, as amended by the FACT Act, allows creditors to use coded medical-debt information for credit determinations, the 2005 rule went

5

further, allowing creditors to use both coded and non-coded medical-debt information if (1) it was "the type of information routinely used in making credit eligibility determinations," (2) it was used "in a manner and to an extent . . . no less favorable than [the creditor] would use comparable information," and (3) the creditor did not "take the consumer's physical, mental, or behavioral health, condition or history, type of treatment, or prognosis into account." 70 Fed. Reg. at 70667–68. After Congress transferred rulemaking authority under Section 1681b(g)(5)(A) to the Bureau in 2011, it retained and reissued the financial-information exception without change. *See* 12 C.F.R. § 1022.30(d). Over the next two decades, CRAs and creditors have relied on this statutory and regulatory framework to report and consider coded medical-debt information in connection with credit decisions.

The Medical Debt Rule contemplates overhauling the existing structure that authorizes CRAs to report, and creditors to consider, consumers' medical-debt information. The Rule would prohibit creditors from obtaining or using medical-financial information—"including information about medical debt"—in connection with credit determinations. 90 Fed. Reg. at 3282 (to be codified at 12 C.F.R. § 1022.30), *see also id.* at 3373–74. The Rule would allow creditors to use medical information in certain limited ways—such as to confirm income or benefits—but in general, the Rule concludes that it is "not 'necessary and appropriate['] . . . for creditors to consider sensitive financial information concerning a consumer's medical debt for underwriting purposes." 90 Fed. Reg. at 3300, *see also id.* at 3373–74. Such

a prohibition contradicts Section 1681b(g)(2), which permits creditors to obtain and use properly coded medical information.

The Medical Debt Rule also prohibits CRAs from reporting medical-debt information unless (1) they have "reason to believe the creditor intends to use the medical debt information in a manner not prohibited by § 1022.30"—in other words, not for a credit determination; and (2) they " [h]a[ve] reason to believe the creditor is not otherwise legally prohibited from obtaining or using the medical debt information, including by a State law that prohibits a creditor from obtaining or using medical debt information." 90 Fed. Reg. at 3277–78 (to be codified at 12 C.F.R. § 1022.38(b)(1)–(2)), 3374. This contradicts 15 U.S.C. § 1681b(g)(1), which permits CRAs to include a consumer's medical-debt information on their consumer report, as long as the information is coded to hide the consumer's health condition, procedure, and provider. It also misconstrues 15 U.S.C. § 1681b(a). Section 1681b(a) provides that CRAs may only furnish consumer reports for enumerated permissible purposes, including to a creditor "in connection with a credit transaction involving the consumer on whom the information is to be furnished." 15 U.S.C. § 1681b(a)(3)(A). Nothing in that section of FCRA states that CRAs may only furnish a consumer report if it includes properly coded medical-debt information and complies with all relevant state laws.

## C. The Trade Associations' Claims and the Proposed Consent Decree

The Trade Associations challenged the validity of the Medical Debt Rule, contending that the Rule exceeds the Bureau's authority in violation of FCRA and

the APA. The APA instructs courts to "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). "It is central to the real meaning of the rule of law . . . that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992) (citation modified). Further, "[n]othing . . . authorizes an agency to modify unambiguous requirements imposed by a federal statute." *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 327, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014). Invoking these APA provisions and corresponding principles of law, the Trade Associations challenged each aspect of the Medical Debt Rule as contrary to express provisions of FCRA and in excess of the Bureau's authority under the statute. In the Consenting Parties' proposed consent decree, they agree that the Medical Debt Rule is unlawful and should be vacated.

**D. Standing**

Although Defendant-Intervenors don't challenge the Trade Associations' standing to sue,[6] the Court is obligated to independently consider this Article III

---

[6] In an answer attached as an exhibit to their motion to intervene, Defendant-Intervenors reference in cursory fashion affirmative defenses to the complaint, including defenses that the Trade Associations "lack standing to bring some, or all, of the claims contained in the complaint," that "[t]he court lacks jurisdiction over the claims in the complaint," and that "[v]enue is not proper in this judicial district." (Dkt. #26-11 at 10–11). But there is no further explanation of the substance of these "defenses" or any supporting authority. Likewise, in all of their later filings detailing their objections to the proposed consent decree, Defendant-Intervenors do not even mention, much less argue, that the Trade Associations lack standing. Nonetheless, the Court considers the Trade Associations' standing to sue as standing goes to the Court's jurisdiction over this case. Defendant-Intervenors' venue argument, however, is not jurisdictional and is rejected as unsupported, waived, or both.

requirement. *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) (Standing "goes to the constitutional power of a federal court to entertain an action, and th[e] court has the duty to determine whether standing exists even if not raised by the parties." (footnote omitted)). Article III standing requires a plaintiff to prove "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024). As the Supreme Court has explained, causation and redressability are often "flip sides of the same coin." *Id.* (quotation omitted). Thus, "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381.

Only the national trade association—Consumer Data Industry Association ("CDIA")—claims to have standing independent of its members. (Dkt. #1 ¶ 21). The CDIA claims it will be "financially injured" by the Medical Debt Rule because it "earns considerable revenue from training healthcare providers and other furnishers of medical debt how to use 'Metro 2,' a standardized electronic format used by companies that furnish data to CRAs." (Dkt. #1 ¶ 21). If medical debt cannot be reported to CRAs, then "the demand for [the] CDIA's training services will decrease," resulting in financial harm. (Dkt. #1 ¶ 21). And because the "CDIA's financial injury from decreased reliance on Metro 2 is directly traceable to the Final Rule and would be remedied by a judgment vacating the rule," the CDIA claims it has standing.

(Dkt. #1 ¶ 21). The Court agrees and finds that the CDIA has standing in its own capacity.

In addition, both the CDIA and Cornerstone Credit Union League ("Cornerstone") claim that they have associational standing to sue on behalf of their members. (Dkt. #1 ¶¶ 17–22). An association has standing to sue on behalf of its members when "(a) the association's members would otherwise have standing to sue in their own right; (b) the interests the association seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Texas v. DOL*, 756 F.Supp.3d 361, 380 (E.D. Tex. 2024) (citing *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021) (quotations omitted)).

The Trade Associations both assert that they will be injured by the Medical Debt Rule's "substantial compliance costs." (Dkt. #1 ¶¶ 13–14). Take the CDIA, which alleges that the Medical Debt Rule will cause economic harm to its members for three main reasons. (Dkt. #1 ¶ 18). First, its members will have to change their reporting methodologies and algorithms, imposing substantial one-time and ongoing compliance costs. (Dkt. #1 ¶ 18). Second, prohibiting its members from furnishing medical-debt information will make "consumer reports less valuable to creditors, who are less likely to buy or pay current rates for" those reports because they "exclude a major category of financial obligations." (Dkt. #1 ¶ 18). Third, because creditors cannot obtain or use medical information, it follows that "creditors are less likely to purchase or utilize CRAs' consumer reporters." (Dkt. #1 ¶ 18).

To begin with, the Medical Debt Rule explicitly acknowledges the costs associated with the CDIA's first two alleged harms. *See* Medical Debt Rule, 90 Fed. Reg. at 3340 (compliance costs), *id.* at 3341 (costs to underwriting from decreased predictive value of consumer reports). And as to at least the alleged compliance costs, such direct "economic harm" constitutes "a quintessential Article III injury." *Book People, Inc. v. Wong*, 91 F.4th 318, 331 (5th Cir. 2024) (citation modified). More to the point, the CDIA's members—including Experian, Equifax, and Transunion—furnish consumer credit reports across the country with coded medical information for creditors to use for lending decisions, which makes its members direct "object[s] of the [r]egulation" challenged. *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264–65 (5th Cir. 2015). When, as here, "a plaintiff is an object of a regulation," there is "ordinarily little question" that the plaintiff has standing. *Id.* at 264 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The Court therefore concludes that the CDIA's members would otherwise have standing to sue in their own right.

As to the interests CDIA seeks to protect, its members have an "interest in reporting accurate information about consumers' medical debt," which "is germane to CDIA's purpose": "to 'promote[] the responsible use of consumer data . . . and to help businesses, governments and volunteer organizations avoid fraud and manage risk.'" (Dkt. #1 ¶ 19) (citation omitted). Finally, "both the claims and requested relief can be proven with evidence from representative members and do not require the

participation of individual members." (Dkt. #1 ¶ 20). Thus, the CDIA has associational standing to sue on behalf of its members, in addition to its own standing.

The analysis is much the same for Cornerstone, which represents "nearly 600 credit unions in Arkansas, Kansas, Missouri, Oklahoma, and Texas." (Dkt. #1 ¶ 14). According to Cornerstone, its members will be financially harmed by the Medical Debt Rule "because they will have to change their underwriting procedures and policies to eliminate consideration of medical debt information and account for the loss of information elsewhere." (Dkt. #1 ¶ 22). Likewise, because Cornerstone's members currently use consumer reports with coded medical-debt information to make lending decisions, they are direct objects of the Medical Debt Rule. *Contender Farms, L.L.P.*, 779 F.3d at 264–65. Cornerstone also claims that the Medical Debt Rule will "increase the cost of providing credit" because the medical-debt prohibition will make underwriting models "less predictive" and lead to credit being "extended to consumers who cannot reasonably afford it," increasing "delinquencies and defaults." (Dkt. #1 ¶ 22). Turning to the interests Cornerstone seeks to protect, "[t]he interest of credit unions in making informed and financially sustainable lending decisions is germane to Cornerstone's purpose, which is to '[a]dvance the success of credit unions.'" (Dkt. #1 ¶ 22) (citation omitted). And "the claims and requested relief can be proven with representative members and do not require the participation of individual members." (Dkt. #1 ¶ 22). As a result, Cornerstone has associational standing to sue on behalf of its members.

The Court concludes that both Trade Associations have standing to proceed in this action.[7]

## II. LEGAL STANDARDS

### A. Consent Decrees

The American legal system encourages settlements. *Cotton v. Hinton*, 559 F.2d 1326, 1330–31 (5th Cir. 1977). So until judgment is entered, the parties have the "right to compromise their dispute on mutually agreeable terms[.]" *United States v. City of Miami*, 664 F.2d 435, 440 (5th Cir. 1981) (Rubin, J., concurring). One way that parties can resolve a lawsuit is through a consent decree. As the Supreme Court has recognized, "consent decrees bear some of the earmarks of judgments entered after litigation," but "[a]t the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts."

---

[7] Under the APA, the Trade Associations must also satisfy an additional test for standing: "The interest [t]he[y] assert[] must be 'arguably within the zone of interests to be protected or regulated by the statute' that [t]he[y] say[] was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224, 132 S.Ct. 2199, 183 L.Ed.2d 211 (2012) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). The zone-of-interests test "is not meant to be especially demanding." *Id.* at 225 (quotation omitted). The test "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' 'Congress authorized that plaintiff to sue.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014) (quotation omitted).

But unlike constitutional standing, a zone-of-interest challenge to standing can be waived. *See, e.g., Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 n.6 (9th Cir. 2003) ("[B]ecause the zone of interests test is merely prudential rather than constitutional it is waivable."). Neither the Bureau nor Defendant-Intervenors have raised any zone-of-interest challenge to the Trade Associations' standing, so it is therefore waived. In any event, the test is met. The interests of the Trade Associations' members fall squarely within the "zone of interests" regulated under the Medical Debt Rule, particularly the contemplated prohibition in furnishing, obtaining, and using coded medical-debt information.

*Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986).

The "judicial decree" aspects of a consent decree include several characteristics: (1) a consent decree "looks like and is entered as a judgment," *id.* at 518; (2) "the court retains the power to modify a consent decree in certain circumstances over the objection of a signatory," *id.*; and (3) "noncompliance with a consent decree is enforceable by citation for contempt of court," *id.* Given these characteristics, the entry of a consent decree has long been understood to be "a judicial act." *United States v. Swift & Co.*, 286 U.S. 106, 115, 52 S.Ct. 460, 76 L.Ed. 999 (1932); *see also Decree*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "decree" as, among other things, "[a] court's final judgment"). And, once entered, a consent decree has "the force of a legal judgment."[8] *United States v. City of New Orleans*, 731 F.3d 434, 439 (5th Cir. 2013).

When evaluating a proposed consent decree, "the court's duty is akin, but not identical to its responsibility in approving settlements of class actions, stockholders' derivative suits, and proposed compromises of claims in bankruptcy." *City of Miami*, 664 F.2d at 441 (internal footnotes omitted). As the Fifth Circuit has explained, a court should ratify the parties' proposed compromise only after finding that "the settlement is fair, adequate[,] and reasonable and not the product of collusion

---

[8] *See also* Note, *The Consent Judgment as an Instrument of Compromise and Settlement*, 72 HARV. L. REV. 1314, 1316 (1959) ("The courts seem to regard a consent judgment as a facility available to the parties as a matter of right by which they may imbue their contractual compromises with certain consequences of judgments.").

14

between the parties." *Cotton*, 559 F.2d at 1330 (citation modified); *see also City of Miami*, 664 F.2d at 441 ("The court must ascertain only that the settlement is fair, adequate[,] and reasonable." (quotations omitted)). This inquiry requires the court to examine whether "the proposal represents a reasonable factual and legal determination based on the facts of record[.]" *City of Miami*, 664 F.2d at 441. And because "consent animates the legal force of a consent decree," the court may only enter the decree when all parties consent. *City of Cleveland,* 478 U.S. at 525.[9] Finally, courts must be mindful that a consent decree can only resolve "a dispute within the court's subject-matter jurisdiction" and should further "the objectives of the law upon which the complaint was based." *Id.*

## B. Administrative Agencies

The proposed consent decree before the Court is premised on an agreement among the Consenting Parties that the Bureau's attempt to promulgate the Medical Debt Rule exceeded its authority under FCRA and violated the APA. The Court's evaluation of the decree must therefore be informed by core principles on the authority of administrative agencies like the Bureau.

"Administrative agencies are creatures of statute." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117, 142 S.Ct. 661, 211 L.Ed.2d 448 (2022). Accordingly, they "must point to explicit Congressional authority justifying their decisions." *Inhance Techs., L.L.C. v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024); *see also VanDerStok v.*

---

[9] *See also Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (noting that district courts must confirm that "there has been valid consent by the concerned parties" to enter a consent decree).

*Garland*, 86 F.4th 179, 187 (5th Cir. 2023) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.") (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)).

To determine whether a statute grants an agency the authority it claims, the Court looks to the statute's text. *VanDerStok*, 86 F.4th at 188; *see also BedRoc Ltd. v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (explaining that statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous"). And when there is an ambiguity "about the scope of an agency's own power . . . abdication in favor of the agency is *least* appropriate." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024) (emphasis in original).

Against this backdrop, the Court considers the proposed consent decree.

### III. DISCUSSION

The Court's discussion proceeds in two parts. First, the Court considers whether all relevant parties have consented to the consent decree. After finding that they have, the Court evaluates the terms of the consent decree to determine whether they are fair, adequate, and reasonable.

### A. Party Consent

To begin with, there is disagreement between the Consenting Parties and the Defendant-Intervenors concerning the legal relevance of Defendant-Intervenors' objections to the consent decree. In Defendant-Intervenors' view, their consent is

16

required before the proposed consent decree may be entered. The Consenting Parties contend that, while the Defendant-Intervenors' objections should be considered by the Court, their consent is not required.

According to Defendant-Intervenors, the Court may not enter a consent decree if "it adversely affects the legal rights of an objecting party[.]" (Dkt. #50 at 2) (quoting *United States v. City of Hialeah*, 140 F.3d 968, 978–79 (11th Cir. 1998)). Relevant here, Defendant-Intervenors assert that their "right to benefit from the [Medical Debt] Rule's provisions" would be adversely affected if the Rule is vacated. (Dkt. #50 at 3). The result, say Defendant-Intervenors, is that "the consent decree cannot be entered, and [Defendant-Intervenors'] defenses must be decided on the merits." (Dkt. #50 at 3) (first citing *City of Miami*, 664 F.2d at 447; then citing *City of Hialeah*, 140 F.3d at 981).

The Consenting Parties counter that Defendant-Intervenors "misapprehend the meaning of a legal right in this context." (Dkt. #51 at 2) (quoting *City of Hialeah*, 140 F.3d at 975 (citation modified)). In particular, the purported "legal right" asserted by Defendant-Intervenors is not among the legal rights at issue in their cited authorities. (Dkt. #51 at 2) (first citing *City of Miami*, 664 F.2d at 445–46 ("contractual rights"); then citing *City of Hialeah*, 140 F.3d at 983–94 ("rights under anti-discrimination laws")). With no precedent suggesting otherwise, the Consenting Parties conclude that Defendant-Intervenors' "interest in the maintenance of government action" is an insufficient right, so the Court should enter the decree over Defendant-Intervenors' objections. (Dkt. #51 at 3).

17

The Court agrees with the Consenting Parties and finds that Defendant-Intervenors' consent is not needed to enter the proposed consent decree. The Supreme Court's analysis in *City of Cleveland* is instructive. That case concerned alleged racial discrimination by the City of Cleveland Fire Department. *City of Cleveland*, 478 U.S. at 504. Although the district court had permitted a local union (the "Union") to intervene in the matter, the Union "did not allege any causes of action or assert any claims" against either party. *Id.* at 507. After conducting multiple hearings and reviewing several proposed decrees, the district court accepted a proposed consent decree over the Union's objections. *Id.* at 507–11. After that decision was affirmed by the Sixth Circuit, the Union sought review in the Supreme Court. *Id.* at 512–14.

Relevant here, the Supreme Court considered whether the consent decree was invalid because "it was entered without the consent of the Union." *Id.* at 528. The Union argued that because it "was permitted to intervene as of right, its consent was required before the court could approve a consent decree." *Id.* The Court disagreed, noting that such an argument "misconceives the Union's rights in the litigation": "[W]hile an intervenor is entitled to present evidence and have its objections heard at [a hearing] on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent." *Id.* at 528–29 (citation modified). Because the Union had taken "advantage of its opportunity to participate in the District Court's hearings on the consent decree," and because it had been "permitted to air its objections to the reasonableness of the decree and to introduce relevant

evidence," the district court had provided the Union with "all the process that it was due[.]" *Id.* at 529 (citation modified).

The same is true here. Defendant-Intervenors were able to "take advantage of [their] opportunity to participate in the District court's hearing[] on the consent decree" and to "air [their] objections to the reasonableness of the decree." *Id.* They were permitted to file a response in opposition to the Consenting Parties' proposed consent decree before the fairness hearing. And they were permitted to file supplemental briefing on this exact issue—the legal relevance of their refusal to consent to the proposed decree. (Dkt. #49). In short, this Court has given Defendant-Intervenors "all the process that [they] w[ere] due[.]" *City of Cleveland*, 478 U.S. at 529. Courts have consistently applied the *City of Cleveland* framework in the APA context to reach the same conclusion. *See, e.g.*, *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1163, 1169–70 (9th Cir. 2012) (affirming the approval of a consent decree that was entered "[o]ver the [Intervenor's] objection[] and after supplemental briefing"); *Home Builders Assocs. of N. Cal. v. Norton*, 293 F.Supp.2d 1, 3 (D.D.C. 2002) (entering consent decree over objections of nonconsenting intervenor that was able to "air its objections . . . through both written briefs and oral argument before the Court" (quotations omitted)).

To be sure, the *City of Cleveland* Court described two circumstances in which a trial court may not enter a consent decree over a nonconsenting intervenor. First, a court may not do so when the decree "imposes obligations on a party that did not consent to the decree." *City of Cleveland*, 478 U.S. at 529. Second, the decree "cannot

19

dispose of the valid claims of nonconsenting intervenors[.]" *Id.* But as with the consent decree in *City of Cleveland*, the consent decree here "imposes no legal duties or obligations on [Defendant-Intervenors] at all." *Id.* at 530. Nor does it "purport to resolve any claims" that Defendant-Intervenors might have. *Id.* And Defendant-Intervenors' suggestion that they enjoy a legal right to benefit from a proposed rule now declared unlawful by the promulgating agency finds no support in *City of Cleveland* or Defendant-Intervenors' other cited authorities. *See, e.g.*, *Texas v. New Mexico*, 602 U.S. 943, 959, 144 S.Ct. 1756, 219 L.Ed.2d 539 (2024) (intervenor United States' consent was necessary because of its affected federal interests in an interstate compact and a treaty with Mexico); *City of Miami*, 664 F.2d at 445–46 (consent necessary because of intervenor's affected contractual rights); *City of Hialeah*, 140 F.3d at 983–94 (same but contractual rights and rights under Title VII).

In short, Defendant-Intervenors received all the process they were due. The consent decree imposes no duties on them. Nor does it adversely affect a relevant legal right. The Court therefore finds that Defendant-Intervenors' consent is not required to enter the consent decree and that all relevant parties have consented.

## B. Terms of the Consent Decree

The consent decree contains five proposed conclusions for the Court's adoption: one for each of the four counts in the complaint and one for the proposed remedy. Because it must decide whether each conclusion is fair, adequate, and reasonable, the Court takes each in turn.

### i. Count I

The Consenting Parties agree that, as alleged in count I of the complaint, the Medical Debt Rule exceeds the Bureau's authority and is contrary to law because it violates Section 1681b(g)(1). Recall that Section 1681b(g)(1) permits CRAs to include a consumer's medical-debt information in their consumer report, provided that the information is coded to hide the consumer's underlying health condition, procedure, and provider. Because the Medical Debt Rule contradicts the statute by "prohibiting CRAs from furnishing medical debt information to creditors—even coded information," the parties request that the Court find the Medical Debt Rule is contrary to law. (Dkt. #31 ¶ 6).

Defendant-Intervenors counter that Section 1681b(g)(1)(C) "is not an affirmative authorization—it simply requires that, when disclosure is otherwise authorized, the information be masked." (Dkt. #38 at 26). In Defendant-Intervenors' view, the words "otherwise authorized" means authorized first by Bureau regulation. Thus, they maintain that Section 1681b(g)(1)(C) "requires that—when an exception to the prohibition on consideration of medical information in § 1681b(g)(2) has been created pursuant to the [Bureau's] authority in § 1681b(g)(5)(A)—that information may be provided only in an anonymized manner." (Dkt. #38 at 27). In sum, Defendant-Intervenors believe that, absent an authorization from the Bureau under Section 1681b(g)(5)(A), CRAs are prohibited from reporting any medical-debt information.

The Court agrees with the Consenting Parties that the Medical Debt Rule is irreconcilable with Section 1681b(g)(1). Under FCRA, Congress has authorized CRAs to furnish credit reports with medical information to creditors if "the information to be furnished pertains solely to transactions, accounts, or balances relating to debts," and if any identifying information is coded as required by Section 1681c(a)(6). 15 U.S.C. § 1681b(g)(1)(C). The permissible purposes for furnishing this information are for use in "credit or insurance transaction[s]." Congress imposed only one relevant statutory limit on such furnishing: a CRA must have "reasonable grounds for believing that the consumer report" will be used for "a purpose listed in section 1681b of this title." 15 U.S.C. § 1681e(a).

Defendant-Intervenors' suggestion that Section 1681b(g)(2) requires the Bureau to first create an exception under its regulatory authority in Section 1681b(g)(5)(a) is atextual and unpersuasive. True enough, this Section allows the Bureau to create additional exceptions that broaden the permissible uses for medical-debt information. But nothing in the text—grammatically or otherwise—suggests that CRAs are prohibited from reporting any medical-debt information absent an authorization from the Bureau under Section 1681b(g)(5)(A).

Defendant-Intervenors also suggest that reading Section 1681b(g)(1) according to its plain text would "permit CRAs to furnish masked medical debt information in violation of other provisions of the FCRA, such as the permissible purpose restrictions." (Dkt. #38 at 19). Not so. FCRA's permissible-purpose provisions authorize CRAs to provide consumer reports when the CRA "has reason to believe

[the requestor] intends to use the information in connection with a credit transaction[.]" 15 U.S.C. § 1681b(a)(3). Because FCRA's creditor provision allows creditors to obtain and use properly coded medical information in connection with a credit transaction under Section 1681b(g)(2), CRAs have reason to believe creditors intend to use that information in connection with a credit transaction under Section 1681b(a)(3). *See infra* Part III.B.ii. Accordingly, Congress's language in the CRA provision of Section 1681b(g)(1) tracks with the permissible-purpose requirements of Section 1681b(a)(3) by allowing CRAs to furnish properly coded medical information for creditors to obtain and use for the permissible purpose of conducting a credit transaction.

Defendant-Intervenors' interpretation of Section 1681b(g)(1) also cannot be reconciled with the broader statutory context. When Congress sought to bar CRAs from including medical information in consumer reports, it did so unambiguously: Congress explicitly prohibited CRAs from furnishing certain medical information for veterans in consumer reports under Section 1681c. For example, Sections 1681c(a)(7) and (8) prohibit national CRAs from creating consumer reports with "any information related to a veteran's medical debt" older than one year, or "any information related to a fully paid or settled veteran's medical debt" that had been in a negative status. 15 U.S.C. § 1681c(a)(7)–(8). These provisions demonstrate that, while it created categorical bans on some medical information for veterans, Congress allowed CRAs to report certain coded medical information for non-veteran consumers.

Because the Court finds that the Medical Debt Rule contradicts the plain text of 15 U.S.C. § 1681b(g)(1), the proposed conclusion that the Medical Debt Rule exceeds the Bureau's statutory authority is fair, adequate, and reasonable.

### ii. Count II

The Consenting Parties agree that, as alleged in count II, the Medical Debt Rule exceeds the Bureau's authority and is contrary to law because it violates Section 1681b(g)(2). The Consenting Parties are correct. The Medical Debt Rule's conflict with Section 1681b(g)(2) mirrors its conflict with (g)(1). Just as FCRA generally prohibits CRAs from reporting medical information "unless" the information is properly coded to mask identifying health information, 15 U.S.C. § 1681b(g)(1)(C), FCRA prohibits creditors from obtaining or using medical information "other than medical information treated in the manner required under section 1681c(a)(6) of this title," *id*. § 1681b(g)(2). The "manner required under section 1681c(a)(6)" is "using codes that do not identify, or provide information sufficient to infer, the specific provider or the nature of such services, products, or devices to a person other than the consumer[.]" *Id*. § 1681c(a)(6)(A). In sum, FCRA expressly allows creditors to obtain and use properly coded medical-debt information in credit decisions, but the Medical Debt Rule would prohibit them from doing so. As it now recognizes, the Bureau was powerless to promulgate such a rule that flouts a federal statute by functionally rewriting it.

For their part, Defendant-Intervenors make four arguments to support that the Medical Debt Rule is consistent with Section 1681b(g)(2). None is persuasive.

They first assert that the Medical Debt Rule merely repealed a 2005 regulatory exception and that an agency may always rescind its prior regulations. This argument fails at the outset because it mischaracterizes the scope and effect of the Medical Debt Rule, which is designed not only to repeal a predecessor rule, but also to rewrite FCRA to prohibit the reporting and use of medical information.

As described above, *see supra* Part I.B, the original regulations implementing Section 1681b(g)(2) were passed by the Bureau's predecessor agencies in 2005, and, like the statute itself, contained two components. First, the regulations generally barred creditors from "obtain[ing] or us[ing] medical information pertaining to a consumer" during a credit transaction. 12 C.F.R. § 1022.30(b). But second, the regulations included a "[f]inancial information exception" that allowed creditors to use "medical information . . . relating to debts" if, among other things, "[t]he creditor does not take the consumer's physical, mental, or behavioral health, condition or history . . . into account." *Id*. § 1022.30(d)(i), (iii). These two rules tracked the statutory language: Creditors could not use most medical information in underwriting, but they could use medical-debt information. Indeed, the 2005 financial-information exception was likely broader than the statute—by its terms it was not limited to coded medical debt. The Medical Debt Rule repeals that financial-information exception, leaving in place only Section 1022.30(b)'s blanket prohibition on the use of medical information—a regulation which has never existed alone and is more restrictive than the text of Section 1681b(g)(2). *See* 90 Fed. Reg. at 3277–78, 3372–73. While the Bureau has the general authority to repeal existing regulations,

25

the Medical Debt Rule unlawfully exceeds that authority by fashioning a new regulatory scheme that conflicts with the plain text of Section 1681b(g)(2).

Second, Defendant-Intervenors note that the parenthetical in Section 1681b(g)(2) was added as a "technical and conforming amendment" during the drafting process. So what? Recall that the parenthetical appears in the portion of the statute providing that "a creditor shall not obtain or use medical information (other than medical information treated in the manner required under section 1681c(a)(6) of this title)" pertaining to a consumer in connection with determining their eligibility for credit. 15 U.S.C. § 1681b(g)(2). Defendant-Intervenors are correct: the language in Section 1681b(g)(1) and (g)(2) was added in the FACT Act's 2003 amendments to FCRA. They are also correct that almost all the language originated in Section 411 of that Act, while the parenthetical in (g)(2) was added in Section 412. That said, technical amendments are no less part of the statutory text. To the extent Defendant-Intervenors invite the Court to ignore the language of Section 1681b(g)(2), such an invitation is rejected.

Third, Defendant-Intervenors reprise their assertions concerning Section 1681b(g)(1), maintaining that the parenthetical in (g)(2) applies only if the Bureau allows creditors to consider medical-debt information. This argument is also untethered to the statutory text. A creditor's ability to consider coded medical-debt information does not require prior authorization from the Bureau. Congress could have written a statute that allowed creditors to conditionally use coded medical debt. It didn't. Instead, Congress wrote a statute that categorically bars creditors from

using medical information, "other than" properly coded medical debt information. As a result, the Bureau can "permit" creditors to use additional categories of information, 15 U.S.C. § 1681b(g)(5)(A), but it cannot restrict the universe of permissible information allowed by statute.

Fourth, Defendant-Intervenors argue that if the Consenting Parties' interpretation of the statute is accurate, creditors may lawfully consider all of a consumer's medical information, including evidence of a medical condition like cancer. Wrong. This argument fails to acknowledge FCRA's coding requirements, which demand that medical information be reported "using codes that do not identify, or provide information sufficient to infer, the specific provider or the nature of such [medical] services, products, or devices to a person other than the consumer[.]" 15 U.S.C. § 1681c(a)(6)(A). It also ignores (g)(1), which expressly limits CRAs to reporting information that "pertains solely to transactions, accounts, or balances relating to debts arising from the receipt of medical services, products, or devi[c]es." *Id*. § 1681b(g)(1)(C). CRAs cannot report a consumer's specific health condition, and coding the nature of medical services and devices further obscures any identifying health condition.

Because the Court finds that the Medical Debt Rule contradicts the plain text of Section 15 U.S.C. § 1681b(g)(2), the proposed conclusion that the Medical Debt Rule exceeds the Bureau's statutory authority under this Section is also fair, adequate, and reasonable.

### iii. Count III

The Consenting Parties agree that, as alleged in count III, the Medical Debt Rule unlawfully prohibits CRAs from reporting medical debt information if they have "reason to believe the creditor" is "otherwise legally prohibited from obtaining or using the medical debt information, including by State law." 90 Fed. Reg. at 3278, 3374. As the Bureau now recognizes, however, it has no authority to limit the contents of consumer reports based on state and other law.

This portion of the Medical Debt Rule appears to be premised on an erroneous interpretation of 15 U.S.C. § 1681b(a). Section 1681b(a) permits CRAs to furnish consumer reports for a set of defined purposes, including for creditors to consider "in connection with a credit transaction involving the consumer on whom the information is to be furnished." 15 U.S.C. § 1681b(a)(3)(A). Because nothing in this section prohibits CRA from furnishing consumer reports when medical-debt information is not properly coded or when relevant state law applies, the Medical Debt Rule contradicts Section 1681b(a) and exceeds the Bureau's authority.

Defendant-Intervenors propose two possible sources of authority for this aspect of the Medical Debt Rule: neither withstands scrutiny. First, Defendant-Intervenors point to the Bureau's general authority to prescribe "necessary" regulations to carry out FCRA's purposes. *See* 15 U.S.C. § 1681s(e)(1). But neither FCRA's text nor its statement of purposes seek to limit CRAs' reporting based on the information that a creditor may consider. *See id.* § 1681(b).

Second, invoking FCRA's requirement that CRAs may provide consumer reports only for "permissible purpose[s]," *id.* § 1681b(a), Defendant-Intervenors suggest that the Bureau—by regulation—may limit such "permissible purposes" beyond what is specified in FCRA's text. This is a misreading of the statute. The Bureau has no such power to define what in a consumer report is "permissible." Congress has defined the permissible purposes of a consumer report, and a creditor has a permissible purpose if it intends to use the report for a credit transaction. *Id.* § 1681b(a)(3)(A). And even if state law prohibited that creditor from considering medical-debt information on the report, creditors would still have a permissible purpose for the report as a whole, as they could fairly use the other information to assess creditworthiness. Put simply, FCRA's permissible-purposes provision is not a source of rulemaking authority for the Bureau to decide that state law applicable to creditors makes furnishing a report impermissible. Finally, just as an agency cannot prohibit what a federal statute explicitly permits, neither can a state law. Accordingly, any state law purporting to prohibit a CRA from furnishing a credit report with coded medical information would be inconsistent with FCRA and therefore preempted.

The Court agrees that, as alleged in count III, the Medical Debt Rule purports to provide the Bureau with authority to limit the contents of consumer reports based on state and other law. Because the Bureau has no such power under FCRA, the Consenting Parties' proposed conclusion that this section of the Medical Debt Rule exceeds the Bureau's statutory authority is fair, adequate, and reasonable.

### iv. Count IV

As to count IV, the Consenting Parties request that the Court dismiss the remaining claims, contained in count IV, with prejudice. The Consenting Parties agree that such dismissal would not in any way foreclose challenges to other Bureau regulations and that the Bureau will not argue issue or claim preclusion forecloses such a future challenge. (Dkt. #31 ¶ 11). Defendant-Intervenors do not appear to contest this request, and the Court finds that dismissing these claims with the Consenting Parties' agreed-upon conditions is fair, adequate, and reasonable.

### v. Remedies

The Consenting Parties correctly identify that vacatur is the default rule in this Circuit "when an agency action is contrary to law."[10] (Dkt. #31 ¶ 9); *see also Texas v. DOL*, 756 F.Supp.3d 361, 398 (E.D. Tex. 2024) ("In the Fifth Circuit, vacatur under § 706 is the default remedy for unlawful agency action.") (citation modified) (quoting *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024)). The Consenting Parties also agree that "the default rule applies in this case because the Bureau could not rectify the defect in the Medical Debt Rule on a remand to the agency." (Dkt. #31 ¶ 9). They therefore believe that vacatur is the appropriate remedy. (Dkt. #31 ¶ 9). In support, they note that the Northern District of Texas

---

[10] The Supreme Court recently concluded that universal injunctions "likely exceed the equitable authority that Congress has granted to federal courts." *See Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at *4 (June 27, 2025). The Court also made clear, however, that this ruling did not address vacatur of federal agency action under the APA. *Id.* at *8 n.10 ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."). Absent a change in controlling precedent, the Court adheres to the Fifth Circuit's existing guidance on this issue.

recently entered a consent judgment and vacated a Bureau rule after finding that it was contrary to law. *Chamber of Com. v. CFPB*, 2025 WL 1110761, at *1 (N.D. Tex. Apr. 15, 2025).

Defendant-Intervenors suggest that the Medical Debt Rule "could not be vacated as a whole" because the Court must instead apply a severability analysis. (Dkt. #50 at 4). That is so, Defendant-Intervenors contend, because "several" provisions of the Medical Debt Rule are not challenged as unlawful. (Dkt. #50 at 5). Those provisions include a new definition of medical debt, an unrelated exception to prohibiting the consideration of certain medical information, and new examples of permissible considerations of medical information. (Dkt. #50 at 5).

The Court agrees with the Consenting Parties that vacatur is the appropriate remedy. To begin, the Court need not engage in severability analysis when it has concluded that each of the Medical Debt Rule's substantive provisions is unlawful. When a rule's central provisions violate the governing statute, the appropriate remedy is to vacate the rule. *See, e.g.*, *DOL*, 756 F.Supp.3d at 398–99. And here, each of the substantive provisions of the Medical Debt Rule is unlawful. *See supra* Part III.B.i–iii.

Further, a court will only save portions of an unlawful rule where there is evidence the agency intended those portions to remain operative and "the remainder of the regulation could function sensibly without the stricken provisions." *Texas v. United States*, 126 F.4th 392, 419 (5th Cir. 2025) (citation modified). When the agency has codified its intentions in a severability clause, that clause informs the first

portion of the analysis. *See id*. The severability clause here gives specific instructions: "if . . . *any* provisions" of Section 1022.30 (governing creditors) are "determined to be invalid," then Section 1022.38(b)(1) (governing CRAs) "would not take . . . effect, because it relies on the amendments to § 1022.30." 90 Fed. Reg. at 3351 (emphasis added). Because the amendments to Section 1022.30 unlawfully prohibit creditors from considering coded medical-debt information, both it and Section 1022.38(b)(1) must be vacated. *See supra* Part III.B.i–ii. And Section 1022.38(b)(2) is separately unlawful for the reasons explained above. *See supra* Part III.B.iii.[11]

Finally, "remand without vacatur"—the remedy sought by Defendant-Intervenors—is the exception, not the rule, and "is appropriate only in 'rare cases.'" *DOL*, 756 F.Supp.3d at 398 (quoting *Rest. L. Ctr. v. DOL*, 120 F.4th 163, 177 (5th Cir. 2024)). Whether a case is rare turns on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Id.* at 399 (citation omitted). Starting with the first factor, the Court has found every major substantive provision of the Medical Debt Rule to "plainly exceed[] [the Bureau's] authority." *Id.* Thus, "[t]here is no likelihood that the [Bureau] can justify its decision on remand[.]" *Id.* And because the Medical Debt Rule has not gone into effect,

---

[11] Defendant-Intervenors suggest that, even if these sections of the Rule are vacated, the remaining subsections of the Rule are valid. But it strains credulity to assume that the Bureau intended the Rule's vestigial clauses to operate in the absence of the Rule's body. The only section of the Rule that was not challenged is Section 1022.3(j), which defines "medical debt information." 90 Fed. Reg. at 3277, 3372. That term is used only in the Rule's new Section 1022.38, so Section 1022.3(j) would have no independent effect absent Section 1022.38, which is unlawful.

Defendant-Intervenors have not identified, nor could they identify, "any 'disruptive consequences' that would call for remand without vacatur." *Id.*

Because the Court agrees that the Medical Debt Rule exceeded the Bureau's authority for the reasons described in counts I–III of the complaint, full vacatur of the Medical Debt Rule—the default remedy in this Circuit—is fair, adequate, and reasonable.[12]

\*    \*    \*

The Court finds that all terms of the consent decree are fair, adequate, and reasonable. The Court therefore adopts the proposed holdings of the consent decree as the holdings of this Court. As to counts I–III, the Court holds that the Medical Debt Rule exceeds the Bureau's statutory authority by violating the plain text of 15 U.S.C. § 1681b(a), (g)(1)–(2). And because vacatur is the default remedy when the Court finds that an agency action is contrary to law, the Court vacates the Medical Debt Rule in full. Finally, count IV is dismissed with prejudice.

---

[12] Defendant-Intervenors contend that, because the Bureau passed the Medical Debt Rule—a final rule—through notice-and-comment rulemaking, the Bureau may only repeal it through subsequent regulation. (Dkt. #38 at 16). As a result, Defendant-Intervenors reason that the entry of a consent decree vacating the Medical Debt Rule would violate the APA. *See* (Dkt. #38 at 16–18). This argument rests on a false premise. "[A] consent decree is not only a contract between the parties to the decree, but is also a 'judicial act.'" *Home Builders*, 293 F.Supp.2d at 5 (quoting *Citizens for a Better Env't*, 718 F.2d at 1125); *see also supra* Part II.A. Because the APA applies to judicial review of agency action—not judicial action—"the notice and comment requirements of 5 U.S.C. § 553" do not "apply before the Court's adoption of a consent decree." *Id.*

## IV. CONCLUSION

The proposed consent judgment is fair, adequate, and reasonable. It is therefore **ORDERED** that the Consenting Parties' Joint Motion for Consent Judgment, (Dkt. #31), is **GRANTED**.

It is further **ORDERED** that the Medical Debt Rule—Prohibition on Creditors and Consumer Reporting Agencies Concerning Medical Information (Regulation V), 90 Fed. Reg. 3276 (Jan. 14, 2025)—is hereby **SET ASIDE** and **VACATED**.

A final judgment will follow.

**So ORDERED and SIGNED this 11th day of July, 2025.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE